**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROLITEC INC., | |
| Plaintiff, | C.A. No. 20-984-RGA-MPT |
| v. | |
| SCENTAIR TECHNOLOGIES, LLC., | |
| Defendant. | |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR JUDGMENT ON THE PLEADINGS (RULE 12(C))**

Dated: November 28, 2022

OF COUNSEL:

Marc C. Levy
Jeffrey E. Danley
SEED IP LAW GROUP LLP
701 Fifth Avenue, Suite 5400
Seattle, WA 98104
Tel: (206) 622-4900
MarcL@seedip.com
JeffD@seedip.com

Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Tel: (302) 984-6300
blemon@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*

ME1 43468042v.1

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...............................................................1

II.   SUMMARY OF ARGUMENT ...................................................................................2

III.  STATEMENT OF FACTS ..........................................................................................2

    A.    The '162 Patent .............................................................................................2

    B.    The '388 Patent .............................................................................................3

    C.    The '404 Patent .............................................................................................4

    D.    The '789 Patent .............................................................................................4

IV.   LEGAL STANDARDS ...............................................................................................4

    A.    Patent Eligibility May Be Appropriately Determined on a Rule 12(c) Motion ............................................................................................................4

    B.    Patent-Eligible Subject Matter Under 35 U.S.C. § 101 ...............................5

V.    ARGUMENT ...............................................................................................................5

    A.    The Claims of the ScentAir Patents Are Directed to Patent Ineligible Subject Matter Under *Alice* Step One ...........................................................5

        1.    The Claims of the ScentAir Patents Are Directed to Manipulating and Collecting Data for Controlling Networked Scent Delivery Devices..............................................................................6

        2.    The Claims in the ScentAir Patents Are Similar to Claims in Other Cases that Have Been Held Unpatentable Under *Alice* .................8

        3.    The Claims in the ScentAir Patents Specify Generalized Steps to Be Performed on Conventional Computers .......................................12

        4.    The Claimed Technology Can Be Implemented Using Pencil and Paper, Confirming That They Are Directed Towards Abstract Ideas...................................................................................14

    B.    The Claims of the ScentAir Patents Lack an Inventive Concept and Fail *Alice* Step Two Because They Disclose Using Generic Computer Equipment to Implement the Abstract Ideas of Manipulating and Collecting Data ...............................................................................................16

    C.    The Claims Effect Broad Preemption of Technical Fields .................................18

VI.   CONCLUSION............................................................................................................20

## <u>TABLE OF CITATIONS</u>

**CASES**

*Affinity Labs of Tex. v. DIRECTV, LLC*,
   838 F.3d 1253 (Fed. Cir. 2016) ................................................................ 19

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ........................................ 1, 5, 6, 8, 9, 11, 16, 18, 19

*Apple Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed Cir 2016) ............................................................... 8

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
   788 F.3d 1371 (Fed. Cir. 2015) ............................................................ 19

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ............................................................................... 5

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ...................................................... 13, 19

*buySAFE, Inc. v. Google, Inc.*,
   765 F.3d 1350 (Fed. Cir. 2014) ............................................................ 18

*CareDx, Inc. v. Natera, Inc.*,
   40 F.4th 1371 (Fed. Cir. 2022) ............................................................... 5

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ....................................... 6, 11, 17, 18, 19

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ............................................................ 14

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ......................................................... 8, 12

*Enpat, Inc. v. Tenrox Inc.*,
   No. 6:13-cv-948-Orl-31KRS, 2015 U.S. Dist. LEXIS 15931 (M.D. Fla. Feb.
   10, 2015) ............................................................................................ 8, 9

*Ficep Corp. v. Peddinghaus Corp.*,
   No. 19-1994-RGA, 2022 U.S. Dist. LEXIS 34407 (D. Del. Feb. 28, 2022) ..................... 9, 10

*Fitbit Inc. v. AliphCom*,
   No. 16-cv-00118-BLF, 2017 U.S. Dist. LEXIS 30721 (N.D. Cal. Mar. 2, 2017) ................... 9

*IBM v. Zillow Grp., Inc.*,
   2022 U.S. App. LEXIS 28655 (Fed. Cir. Oct. 17, 2022) .............................. 7, 8, 15

*In re Ameranth Patent Litig. Cases*, No.
   11cv1810 DMS, 2022 U.S. Dist. LEXIS 45191 (S.D. Cal. Mar. 14, 2022) ....................... 19

*Inst. For Scientific Info. v. Gordon & Breach, Sci. Publrs., Inc.*,
   931 F.2d 1002 (3d Cir. 1991) ................................................................. 5

*Intellectual Ventures I LLC v. AT&T Mobility II LLC*,
235 F. Supp. 3d 577 (D. Del. 2016).................................................................4

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir 2015) ........................................................6, 14, 17

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017) .....................................................................18

*Intellectual Ventures I LLC v. Symantec Corp*,
838 F.3d 1307 (Fed. Cir. 2016) .....................................................................19

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012).............................................................................5, 6, 17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012).........................................................................................18

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ......................................................................5

*Parker v. Flook*,
437 U.S. 584 (1978).......................................................................................18

*See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) ......................................................................5

*SmileDirectClub, LLC v. Candid Care Co.*,
505 F. Supp. 3d 340 (D. Del. 2020).................................................................9

*SynKloud Techs., LLC v. HP Inc.*,
490 F. Supp. 3d 806 (D. Del. 2020)...........................................................18, 19

*TLI Communs. LLC v. AV Auto., LLC (In re TLI Communs. LLC Patent Litig.)*,
823 F.3d 607 (Fed. Cir. 2016) ..............................................................6, 12, 18

*Zyrcuits IP LLC v. Acuity Brands, Inc.*,
No. 20-1306-CFC, 2021 U.S. Dist. LEXIS 143688 (D. Del. Aug. 2, 2021) ...................10, 11

## STATUTES

35 U.S.C. § 101 ...............................................................................................5

## RULES

Fed. R. Civ. P. 12(c) ......................................................................................4, 5, 20

ME1 43468042V.1

The claims of the four patents that ScentAir has asserted against Prolitec (the "ScentAir Patents")[1] suffer from the same fatal defect: they claim unpatentable subject matter directed towards the abstract idea of collecting and/or manipulating scheduling and command data used to control networked scent delivery devices. Courts have long held that such patent claims directed toward collecting, analyzing, and manipulating data impermissibly cover abstract ideas and fail the two-part *Alice* test. Courts have further rejected attempts to salvage such claims by adding the generic capabilities of conventional computer systems or communications networks.

The core idea of the ScentAir Patents is nothing more than the quintessential human activity of managing the timing of events that have been scheduled on one or more calendars. The generic computer technology and network communication devices discussed in the ScentAir Patents do no more than what humans have long been able to do to coordinate the operation of scent delivery devices by, for example, identifying scent delivery devices in the same area and turning those devices on-and-off manually to control scenting problems. Importantly, the ScentAir Patents offer no advancements in the functionality of the scent delivery devices themselves but instead lean heavily on the use of conventional computer and networking components to coordinate the activity of those devices remotely. This confirms that the ScentAir Patents cover unpatentable subject matter such that ScentAir's counterclaims should be dismissed.

## I.      NATURE AND STAGE OF PROCEEDINGS

On July 24, 2020, Prolitec sued ScentAir alleging infringement of its patents. (*See* D.I. 1.) ScentAir subsequently filed an answer and asserted counterclaims alleging infringement of the ScentAir Patents. (*See* D.I. 33.) Prolitec denied those counterclaims. (*See* D.I. 36.)

---

[1] U.S. Patent Nos. 9,446,162 ("'162 Patent"), 9,460,404 ("'404 Patent"), 9,927,789 ("'789 Patent"), and 10,838,388 ("'388 Patent"). Prolitec identifies claim 1 in each of the ScentAir Patents as a respective representative claim.

ScentAir initiated *inter partes* review (IPR) challenging the patentability of the three patents asserted by Prolitec. The Parties stipulated to, and on September 17, 2021, the Court granted, a stay of the present action pending the outcome of the IPRs. (*See* D.I. 55, 56.) After the IPRs concluded, the Parties requested lifting the stay. (*See* D.I. 69.) The Court granted the Parties' request on July 25, 2022. (*See* D.I. 70.) After the Court lifted the stay, Prolitec carefully reviewed the ScentAir Patents  to evaluate their validity under Section 101. Having determined that the ScentAir Patents failed to meet the Section 101 standard, Prolitec prepared this motion.

The Parties are currently engaged in claim construction and fact discovery. Trial is set to begin on January 22, 2024. (D.I. 72.)

## II.      SUMMARY OF ARGUMENT

1.      All claims of the ScentAir Patents are directed to the same abstract idea of collecting and/or manipulating data related to commands for networked scent delivery devices.

2.      The claims of the ScentAir Patents do not recite an inventive concept, but instead implement the above-referenced abstract idea using generic computer and network components.

## III.     STATEMENT OF FACTS

The Asserted ScentAir Patents are directed towards the same technical area, namely, as ScentAir confirms, using a central controller to configure networked scent delivery devices to release a scent in a controlled manner. (*See* D.I. 33.) Within this technical area, the ScentAir Patents all involve the abstract idea of collecting and/or manipulating command data used to control those devices. Further, as described below, the ScentAir Patents describe nothing more than generic components operating in their usual manner to implement this abstract idea.

### A.      The '162 Patent

The '162 Patent, entitled "Scent Schedule Based on Relatedness of Scent Delivery Devices in a Scent Delivery System," uses "relatedness" between the scent delivery devices to coordinate

2

their scent-delivery activity. *See* '162 Pat., Abstract. The claims are directed toward systems, methods, and software that are used to "determine a relatedness group" between two scent delivery devices, "determine an order of priority" between those devices, and "generate" command data to "coordinate" the devices' respective activity levels so that only one device activates when they have overlapping scent delivery periods. *See* '162 Patent, Claims 1, 9, 18. The disclosed methods can be implemented using generic components, such as a "central controller" running on a rack mountable server, a conventional database, and a conventional communication network. *See* '162 Pat., col. 3:1-26, 4:37-40. [2]

### B.   The '388 Patent

The '388 Patent claims priority to the '162 Patent and has the same title. The '388 Patent is directed towards a "system architecture" that includes an "out table" data structure to store outbound data to be sent to the scent delivery devices. *See* '388 Pat., col. 16:5-23. The '388 Patent does not specify any particular structure for the out table (or for the in table that holds status data), nor does the patent specify any particular way in which the tables should operate. Instead, the specification describes the type of data that the two tables may hold – the in table to hold data received from the scent delivery devices, the out table to hold a list of scheduling instructions. '388 Pat., cols. 16:5-8; 18:62-19:3. Like the '162 Patent, the '388 Patent discloses that the tables can be implemented using ordinary network communications and computer technology. *See*, *e.g.*, Fig. 1 (showing a generic network connecting a central controller to the scent delivery devices); Fig. 7 (showing tables as part of the central controller); *see also* col. 4:41-44 (noting that the central controller can be implemented on a rack mountable server).

---

[2] Prolitec submits that claim construction is not necessary for deciding this motion.

### C.      The '404 Patent

The '404 Patent is entitled "Scent Delivery System Scheduling" and is directed towards technology that gives priority to scheduled "anti-events" to effectively override typical control of the scent delivery devices. *See* '404 Pat., Abstract. The claims in the '404 Patent are directed towards maintaining calendars with both events and anti-events, determining conflicting periods of events and anti-events, and manipulating the schedules of the devices to give priority to the anti-events. *See, e.g.,* '404 Patent, claim 1.

### D.      The '789 Patent

The '789 Patent claims priority to the '404 Patent and has the same title. *See* '789 Patent, Cover Page. The '789 Patent is directed towards technology that skews the activation or deactivation timing of multiple scent delivery devices, *e.g.*, to slightly delay activation of each respective device or ensure simultaneous activation of the devices. *See* '789 Pat., col. 23:14-24. Claim 1 of the '789 Patent broadly recites a process for receiving an "instruction," generating a skewing or an adjustment command based on the instruction, and transmitting the command to the scent delivery devices. *See* '789 Patent, Claim 1. Independent claims 7 and 13 recite corresponding system and machine instruction claims, respectively. *Id.*

## IV.      LEGAL STANDARDS

### A.      Patent Eligibility May Be Appropriately Determined on a Rule 12(c) Motion

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party." *Intellectual Ventures I LLC v. AT&T Mobility II LLC*, 235 F. Supp. 3d 577, 584 (D. Del. 2016). A Rule 12(c) motion should be granted when "the plaintiff can prove no set of facts in support of his claim." *Inst. For Scientific Info. v. Gordon*

4

*& Breach, Sci. Publrs., Inc.*, 931 F.2d 1002, 1005 (3d Cir. 1991).

Determining patent eligibility under Section 101 is a "threshold test," *Bilski v. Kappos*, 561 U.S. 593, 602 (2010), and "ultimately a question of law." *CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1376 (Fed. Cir. 2022). Thus, patent eligibility may appropriately be considered in a motion for judgment on the pleadings under Rule 12(c). *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015).

### B.    Patent-Eligible Subject Matter Under 35 U.S.C. § 101

Under Section 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." However, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The Supreme Court established a now-familiar two-part test to determine patent eligibility. Under the first step, a court determines whether the claims are directed to a "patent-ineligible concept[]." *Id.* at 217-18. Assuming they are, the court must determine in the second step whether the claims include an "inventive concept"—that is, whether the claims contain additional elements that "'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72 (2012)). Claim elements that are merely "well-understood, routine, and conventional" do not satisfy the second step. *See Alice*, 573 U.S. at 225. Finally, similar claims directed to the same abstract idea can be considered together for subject matter eligibility. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

## V.    ARGUMENT

### A.    The Claims of the ScentAir Patents Are Directed to Patent Ineligible Subject Matter Under *Alice* Step One

      1.        **The Claims of the ScentAir Patents Are Directed to Manipulating and Collecting Data for Controlling Networked Scent Delivery Devices**

In step one, the Court determines whether the challenged claims are directed to an abstract idea. *See Alice*, 573 U.S. at 218. As part of this step, "it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a 'fundamental . . . practice long prevalent in our system . . . .'" *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir 2015) (quoting *Alice*, 134 S. Ct. at 2356). Care must be taken "to avoid oversimplifying the claims because at some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *See TLI Communs. LLC v. AV Auto., LLC (In re TLI Communs. LLC Patent Litig.)*, 823 F.3d 607, 611 (Fed. Cir. 2016) (citing *Alice*, 134 S. Ct. at 2354, *and Mayo*, 132 S. Ct. at 1293) (ellipses in original; internal quotations removed). However, claims directed towards an abstract idea are not saved just because they recite "concrete, tangible components," such as general-purpose computers, conventional scanners, or generic networks. *See id.* The specification may be considered, particularly to "understand 'the problem facing the inventor' and ultimately, what the patent describes as the invention." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (quoting *In re TLI Communs. LLC Patent Litig.*, 823 F.3d 607, 612 (Fed Cir. 2016)).

The claims in the ScentAir Patents recite abstract ideas of manipulating and/or collecting command data used to control one or more networked scent delivery devices, as follows:

- '162 Patent: identify overlapping activation time periods for related devices, and manipulate those periods to prioritize one of the devices (*see* representative claim 1);

- '404 Patent: identify overlapping time periods for scheduled events and anti-events, and manipulate command data to prioritize the anti-events (*see* representative claim 1);

- '388 Patent: convert out-table instructions into command data for scent delivery devices,

6

and receive status updates from those devices (*see* representative claim 1); and

- '789 Patent: manipulate initiation times for scent delivery devices by applying a skew parameter or an adjustment duration to the command data (*see* representative claim 1).

On their respective faces, the representative claims for the '162 Patent and the '404 Patent are directed towards the basic mental process of identifying overlapping and conflicting time periods for scent delivery devices ('162 Patent) or events/anti-events ('404 Patent), and manipulating the time periods to assign priority to one of them. *See* '162 Patent, claim 1 (assigning an "order of priority" and "generating command data to activate only one of the first and the second delivery devices"); *see* '404 Patent, claim 1 (assigning priority to the anti-event). The claims in these two patents only recite manipulating data by updating the master scent schedule and/or command data upon detecting a conflict; they do not require that the modified data be transmitted to the scent delivery devices, or anything else be done with that data, and thus cover systems that have no impact on the delivery of scent from real-world devices. *See* '162 Patent, claim 1; '404 Patent, claim 1. At their broadest, these claims could cover a person's mental process for coordinating the operation of multiple scent delivery devices.

The claims of the '789 Patent and the '388 Patent are likewise directed toward the abstract idea of manipulating scheduling data for networked scent delivery devices. The '789 Patent claims recite adding skew parameters or adjustment periods to the command data based on unspecified "instructions" and transmitting the manipulated command data to the scent delivery devices. *See* '789 Patent, claim 1. The claims, though, do not provide any specific method or process for determining or introducing the skew or adjustment parameters. *See IBM v. Zillow Grp., Inc.*, 2022 U.S. App. LEXIS 28655, *9 (Fed. Cir. Oct. 17, 2022) (finding claims directed towards synchronization abstract because they "merely describe[] an 'effect or result dissociated from any

method by which [they are] accomplished" (citing and quoting *Apple Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1244 (Fed Cir. 2016)). The '388 Patent recites the abstract idea of converting instructions from the out-table into generic "command data" for one or more scent delivery devices and receiving status updates from the devices to be held in an in table. *See* '388 Patent, claim 1. Like the claims for the '789 Patent, the claims in the '388 Patent do not recite any method or process for manipulating the command data or receiving the status data and are therefore directed towards an abstract idea. *See IBM*, 2022 U.S. App. LEXIS 28655 at *9.

> **2.      The Claims in the ScentAir Patents Are Similar to Claims in Other Cases that Have Been Held Unpatentable Under *Alice***

To determine if the claims of the ScentAir Patents are directed to an abstract idea, it is useful to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1334 (Fed. Cir. 2016). Such a comparison here confirms that the ScentAir Patent claims are directed toward abstract ideas.

> **a.      The Claims in the '162 Patent and the '404 Patent Are Directed Toward the Abstract Idea of Analyzing and Manipulating Data to Reconcile Conflicting Schedules**

It is useful to compare the claims of the '162 and '404 Patents to those claims at issue in *Enpat, Inc. v. Tenrox Inc.*, No. 6:13-cv-948-Orl-31KRS, 2015 U.S. Dist. LEXIS 15931 (M.D. Fla. Feb. 10, 2015). In *Enpat*, the asserted patent claims were directed toward methods for project management that detected competing requests for a system resource and then reconciled those conflicting requests. *See id.* at *6. In finding the asserted claims directed toward an abstract idea, the *Enpat* court noted that they merely described an automated system "with a computer filling the role of the project manager, shuffling a limited supply of resources among tasks with differing priorities and prerequisites." *Id at* *7. Other courts have similarly found that implementing scheduling decisions on a generic computer do not clear the patentability bar set by *Alice*. *See*

*Fitbit Inc. v. AliphCom*, No. 16-cv-00118-BLF, 2017 U.S. Dist. LEXIS 30721, *42, 53-54 (N.D. Cal. Mar. 2, 2017) (holding unpatentable claims directed toward scheduling a fitness notification); *SmileDirectClub, LLC v. Candid Care Co.*, 505 F. Supp. 3d 340 (D. Del. 2020) (holding unpatentable claims directed toward scheduling of remote dental procedures).

The same analysis applies to the claims in the '162 and '404 Patents. Like in *Enpat*, the claims in these patents are directed toward receiving competing requests for a resource (*e.g.*, the time-period during which the devices can release scents), detecting conflicts between those requests (*e.g.*, overlapping time periods), and then applying a prioritization scheme to reconcile the conflicting requests. Notably, the claims in neither ScentAir patent require that anything be done with the reconciled time periods once determined, nor do the claims require any specific algorithm or structure be used to implement the prioritization scheme. *See, e.g.,* '162 Patent, claim 1; '404 Patent, claim 1. Claims, such as these, that are directed towards "analyzing information by steps people go through in their minds . . . without more" are treated "as essentially mental processes within the abstract-idea category." *See Fitbit*, 2017 U.S. Dist. LEXIS 30721 at *16.

>   **b.     The Claims in the '789 Patent and '388 Patent Are Directed Toward Manipulating Instructions to Generate Command Data, and the '388 Patent Adds the Further Abstract Idea of Collecting Data From the Scent Delivery Devices**

The claims in the '789 Patent and the '388 Patent are directed toward the abstract idea of manipulating "instructions" to generate command data. *See, e.g.*, '789 Patent, claim 1; '388 Patent, claim 1. Numerous cases have held that such claims directed toward converting data from one format to another fail step one of *Alice*. The decision in *Ficep Corp. v. Peddinghaus Corp.*, No. 19-1994-RGA, 2022 U.S. Dist. LEXIS 34407 (D. Del. Feb. 28, 2022), is instructive here. In *Ficep*, the patent claims recited methods for converting data stored in a generic CAD file format to instructions to be used by a manufacturing machine. *See id.* at *11-12. The patent specified no

improvement to the manufacturing process itself, and the claims described "only in general terms how one may receive, store, extract, identify, and transmit the parameters to a manufacturing machine using generic computer technology." *See id.*

Similarly here, the claims of the '789 Patent and the '388 Patent recite that data stored as "instructions" are used to generate "command data" that controls the scent delivery devices. *See, e.g.,* '789 Patent, claim 1; '388 Patent, claim 1. But this process is nothing more than a conversion from data stored as "instructions" to data stored as command data, much like the data in *Ficep* was converted from a CAD file format to machine specific instructions. Importantly, the two ScentAir Patents describe no improvements to the operation of the scent delivery device itself, much like the patents in *Ficep* did not improve the manufacturing process. Instead, the "Technical Field" of the patents confirms that they are directed towards "the *scheduling* of the delivery of scents" ('789 Patent) or "*managing* conflicting scheduled scent events" ('388 Patent) (emphasis added).

The claims in the '388 Patent do not recite that the command data does anything further than just "control the operation of a networked scent delivery device." *See, e.g.,* '388 Patent, claim 1. The '388 Patent claims merely convert "instructions" to "command data" and thus are directed to an abstract idea of manipulating data. *See Zyrcuits IP LLC v. Acuity Brands, Inc.*, No. 20-1306-CFC, 2021 U.S. Dist. LEXIS 143688, *8 (D. Del. Aug. 2, 2021) (noting that " claims directed to the manipulation of data are abstract absent additional features"). The storage of the networked scent delivery status in a table, as recited in the claims, does not save them from being directed to an abstract idea. *See id.* at *10-11 (holding that storing data is an abstract idea).

The claims in the '789 Patent may appear better because they recite that the instructions introduce either a skew parameter or an adjustment duration. But this additional aspect adds nothing inventive because the claims fail to specify how this is accomplished. Because the claim

10

language lacks the "technical specifics" on introducing the skew or adjustment, these claims also fail the first *Alice* step. *Id.* at *12 (holding the representative claim was directed to an abstract idea because it provided no "guidance on how to accomplish this idea").

> ### c. Using a Generic Network Operating in a Normal Way Does Not Save the Claims from Being Directed to an Abstract Idea

ScentAir may contend that the claims in its patents are directed toward the concrete concept of improving the operation of scent delivery devices using network communications. Such a contention is dead on arrival under the Federal Circuit's *ChargePoint* decision. In *ChargePoint v. SemaConnect, Inc.*, the court considered whether patents directed toward communicating commands to electric charging stations over a network covered patentable subject matter. 920 F.3d 759 (Fed. Cir. 2019). The court acknowledged that the specification describes various benefits of a network-controlled system (*e.g.*, "drivers can determine whether a charging station is available, drivers can pay to charge their vehicles, and utility companies can supply information to charging stations"). *Id.* at 768. However, "the specification never suggests that the charging station *itself* is improved from a technical perspective, or that it would operate different than it otherwise could." *Id.* (emphasis added) The Court concluded that the claim "is indeed 'directed to' the abstract idea of communication over a network to interact with network-attached devices." *Id.* at 770.

The same logic applies here. The specification identifies certain benefits of a network controlled scent delivery system such as the ability to avoid overscenting situations or the "concurrent emission of conflicting or incompatible scents." '162 Pat., col. 2:65-3-4. But, as in *ChargePoint*, the specification never suggests that the scent delivery device *itself* is improved, or that it would operate differently than it otherwise could absent the network communication. The addition of network communications simply adds one more unpatentable abstract idea.

### 3. The Claims in the ScentAir Patents Specify Generalized Steps to Be Performed on Conventional Computers

According to the Federal Circuit, "a relevant inquiry at step one is 'to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *See TLI Communs.*, 823 F.3d at 612 (citing and quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)). Claims that "simply add[] conventional computer components to well-known business practices" or that specify "generalized steps to be performed on a computer using conventional computer activity" are more likely to be directed towards abstract ideas. *See Enfish*, 822 F.3d at 1338.

Here, the claims do no more than specify conventional computer technology to perform methods consisting of general steps. According to the common specification for the related '162 and '388 Patents, the following generic network system implements the process for manipulating the scheduling data and instructions disclosed in those patents:



*See* '162 Patent, Figure 1.

The specification describes implementing the components with conventional technology. For example, according to the specification, the central controller is implemented by "a rack mountable server" that is "configured to maintain a database." *See id.*, col. 4:37-40. The specification specifies no changes to these server and database components to take them outside the realm of the conventional. The specification further discloses that the network consists of various well-known network technology. *See id.*, col. 3:11-26. Finally, the scent delivery unit is disclosed at a high level as comprising "a scent reservoir and an atomizing device" implemented by nothing more than a bottle that contains a scented liquid and well-known venturi atomizer. *See id.*, col. 3:42-47. The common specification for the '404 and '789 Patents likewise discloses the use of conventional hardware and computer components to implement the abstract ideas. *See, e.g.,* '404 Patent, Fig. 1; *see also id.*, cols. 3:5-20 (conventional networking technology); 3:36-41 (conventional scent device); 4:31-34 (central controller implemented by rack mountable server).

The specification further discloses implementing the in-table and out-table claimed in the '388 Patent with the same rack mountable server used to implement the central controller. *See* '388 Patent, cols. 15:33-37; 16:5-7, 35-38. The specification describes the tables as nothing more than generic data structures that hold scheduling data. The master scenting schedule also comprises a collection of events that is stored in the rack mountable server. *See* '162 Patent, col. 4:47-49. The fact that the "specification says nothing about how to construct" an in table, out table, or master scenting schedule "suggests that this feature of the claimed system" is not the "focus" of the claims. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289 (Fed. Cir. 2018).

The conventional technology disclosed in the ScentAir Patents does no more than implement methods consisting of generalized steps. For example, representative claim 1 of the '162 Patent implements a method having general steps to (i) identify related scent devices; (ii)

13

detect overlapping activation periods in related devices; and (iii) provide priority to one of the devices. *See* '162 Patent, claim 1; *see also*, claims 9, 18. The '404 Patent likewise implements a method of general steps that identifies conflicts between events and anti-events and gives priority to the anti-events. *See*, *e.g.*, '404, claim 1.

Both the '789 Patent and the '388 Patent also disclose implementing generalized steps. The '789 Patent claims recite receiving unspecified "instructions," converting the instructions to command data, and transmitting the command data to a plurality of scent delivery devices to synchronize those devices. *See* '789 Patent, claim 1. Finally, the '388 Patent has claims directed toward a method having the generalized steps of converting out-table instructions into command data and receiving status updates from scent delivery devices. *See* '388 Patent, claim 1.

The fact that the ScentAir Patents recite nothing more than implementing generalized steps on conventional computer technology confirms that the claims of the ScentAir Patents are directed toward abstract ideas.

        **4.**    **The Claimed Technology Can Be Implemented Using Pencil and Paper, Confirming That They Are Directed Towards Abstract Ideas**

In determining if claims are directed towards abstract ideas, courts have considered whether the claimed technology "could still be made using a pencil and paper." *See Intellectual Ventures*, 792 F.3d at 1368. According to the Federal Circuit, "methods which can be performed mentally, or which are the equivalent of human mental work, are unpatentable abstract ideas." *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011).

Here, the claimed methods of each of the ScentAir Patents can be performed in the human mind or with pencil and paper. The technology claimed in the '162 Patent and the '404 Patent can be performed entirely in the human mind, such as, for example, by an operator or owner of multiple scent delivery devices. The supposed problem solved by these patents – preventing over-scenting

and other "undesirable operations," *see* '162 Patent, col. 6:4-11; '404 Patent, cols. 5:59-6:20 – would be self-evident to the operator of these devices. Thus, the problem that the ScentAir Patents seek to solve "is not specific to a computing environment." *See IBM*, 2022 U.S. App. LEXIS 28655 at *17. The operator of the devices could address these "undesirable operations" when they arise by simply shutting off one or more of the devices. To prevent these situations from happening, an operator could draft a written schedule, much like the schedule shown in Figures 5A-5C of the '162 patent and Figure 5 of the '404 Patent, to coordinate the start times of the scent delivery devices:





Notably, the claims in the '162 and the '404 Patent do not require that anything be done with the manipulated start times or that the manipulated data be sent to the devices. Thus, the claims completely map onto this mental process.

The claims in the '789 Patent and the '388 Patent fare no better. The claims in the '789 Patent recite determining a skew parameter or an adjustment parameter based upon a received instruction and sending the adjustment period to a scent delivery device so that the initiation of multiple devices is "synchronized." This is nothing more than automating a manual process. An operator could determine an "adjustment period" using a watch or clock to determine the offset between the initiation of multiple devices, and apply the offset as an adjustment to one of the devices to synchronize their initiation. Finally, the '388 Patent discloses that scheduling instructions could be stored in one table and that status updates could be stored in a second table. An operator, though, could do the same by keeping the same tables in paper format for the scheduling and for the status updates. The status updates themselves could be based on something as simple as a status light on the device showing that it is operational.

In sum, the claims in the ScentAir Patents cover abstract ideas that could be implemented by an operator using a pencil and paper. These claims fail the first *Alice* step.

**B.** **The Claims of the ScentAir Patents Lack an Inventive Concept and Fail *Alice* Step Two Because They Disclose Using Generic Computer Equipment to Implement the Abstract Ideas of Manipulating and Collecting Data**

The claims in the Asserted ScentAir Patents also fail step two of *Alice* because they recite steps to be taken on conventional computer systems and networks, and thus, lack an inventive concept. Under step two of *Alice*, a court considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566

U.S. at 78-79). The additional feature may not merely be "well-understood, routine, conventional activities previously known in the industry." *ChargePoint*, 920 F.3d at 773. "[T]ransformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* (internal punctuation and citations omitted). "Put another way, there must be an 'inventive concept' to take the claim into the realm of patent-eligibility" such that "[a] simple instruction to apply an abstract idea on a computer is not enough." *See Intellectual Ventures*, 792 F.3d at 1367. Relying upon "the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept." *See id.* "Whether a claim supplies an inventive concept that renders a claim significantly more than an abstract idea to which it is directed is a question of law that may include underlying factual determinations." *See ChargePoint*, 920 F.3d at 773.

As described above, the patent claims here are directed to the abstract idea of manipulating and/or collecting command data used to control one or more networked scent delivery devices. The specification and claims of the ScentAir Patents contain nothing more than conventional computer equipment to implement this abstract idea. The central controller is implemented by "a rack mountable server" "configured to maintain a database," *see* '162 Patent, col. 4:37-40, and the specification fails to disclose that those components operate in anything other than their normal and expected manner. The network used to provide communication between the components consists of various well-known network technologies, *see id.*, col. 3:11-26, and the scent delivery unit itself is a well-known component. *See id.*, col. 3:42-47. The '404 and '789 Patents likewise disclose conventional hardware and computer components to implement the abstract ideas. *See supra,* Section V.A.3. The sending and receiving of data, as recited in the claims of the '789 and '388 Patents, represent nothing more than conventional activity that can be performed by a generic

computer. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

The various tables and schedules disclosed in the specifications are disclosed as nothing more than generic data structures generated in generic computer devices. *See* supra, Section V.A.3. The Supreme Court has cautioned that determining patentable subject matter should not "depend simply on the draftsman's art." *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)). Much like the structure of the claims should not be dispositive of patentability, neither should the invocation of "concrete tangible components" allow claims to "escape[] the reach of the abstract-idea inquiry." *See ChargePoint*, 920 F.3d at 770 (citing and quoting *In re TLI Communs*, 823 F.3d at 611). The use of "out table," "in table," or "master [scenting] schedule" cannot save the claims from reciting abstract ideas when those features are implemented in a conventional manner using generic technology. The components recited in the claims of the ScentAir Patents do not convey the "something more" required under the second part of the *Alice* analysis.

Finally, limiting the claims to scent delivery devices does not "convert the otherwise ineligible concept into an inventive concept." *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328-1329 (Fed. Cir. 2017) (holding that "limiting an abstract idea to one field of use or adding token post solution components . . . do not convert the otherwise ineligible concept into an inventive concept"). The claims in the ScentAir Patents thus fail *Alice*, step two.

## C.     The Claims Effect Broad Preemption of Technical Fields

The concern regarding preemption "drives the judicial exceptions to patentability." *See SynKloud Techs., LLC v. HP Inc.*, 490 F. Supp. 3d 806, 811-12 (D. Del. 2020) (discussing preemption with respect to both steps in the *Alice* analysis) (internal quotation omitted) (citing *Alice*, 573 U.S. at 216). In this analysis, "reliance on the specification must always yield to the

claim language" because "the claim language defines the breadth of each claim." *See id.*

With respect to the first *Alice* step, "a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea." *See ChargePoint*, 920 F.3d at 769. Preemption concerns also arise in the *Alice*, part two, analysis because the focus on "specificity" "is linked with concerns about preemption." *See SynKloud*, 490 F. Supp. 3d at 811. "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Further, "[a] narrow claim directed to an abstract idea, however, is not necessarily patent-eligible." *See Intellectual Ventures I LLC v. Symantec Corp*, 838 F.3d 1307, 1321 (Fed. Cir. 2016); *see also BSG Tech*, 899 F.3d at 1291.

Here, the preemption concerns are significant. As seen in the discussion above with the '162 and '404 Patents, the claims in those patents are directed towards identifying conflicting time periods between two different scent delivery devices and applying priority to one of those devices. *See, e.g.*, '162 Patent, claim 1; '404 Patent, claim 1. Similarly, the claims of the '404 Patent are so broad as to capture almost any system that implements an "anti-event." *See, e.g.*, '404 Patent, claim 1. The fact that these claims are confined to scent delivery cannot save them because "limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract." *Affinity Labs of Tex. v. DIRECTV, LLC*, 838 F.3d 1253, 1259 (Fed. Cir. 2016); *see also In re Ameranth Patent Litig. Cases*, No. 11cv1810 DMS, 2022 U.S. Dist. LEXIS 45191, *15 (S.D. Cal. Mar. 14, 2022).

Preemption concerns also arise with the '789 and '388 Patents. The '789 Patent broadly recites claims that implement skew parameters and adjustment duration. *See, e.g.,* '789 Patent,

claim 1. Significantly, the claims recite that the parameters are generated according to an unspecified "instruction." *See id.* Thus, these claims may cover any method for generating skew parameters and adjustment durations. Finally, the '388 Patent recites the use of out tables to store instructions for scent delivery devices, and in tables to receive and store status updates about those devices. *See, e.g.,* '388 Patent, claim 1. These claims could possibly preempt any method used for sending commands to and receiving status updates from scent delivery devices.

These significant preemption concerns further weigh in favor of finding the claims of the ScentAir Patents to be directed towards unpatentable subject matter.

## VI.  CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests that the Court grant Plaintiff's Rule 12(c) motion for judgment on the pleadings.

Dated: November 28, 2022

OF COUNSEL:

Marc C. Levy
Jeffrey E. Danley
SEED IP LAW GROUP LLP
701 Fifth Avenue, Suite 5400
Seattle, WA 98104
Tel: (206) 622-4900
MarcL@seedip.com
JeffD@seedip.com

MCCARTER & ENGLISH, LLP

/s/ Brian R. Lemon
Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Tel: (302) 984-6300
blemon@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*