**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROLITEC INC., | |
| Plaintiff, | C.A. No. 20-984-WCB |
| v. | |
| SCENTAIR TECHNOLOGIES, LLC, | |
| Defendant. | |

**[JOINT PROPOSED] FINAL JURY INSTRUCTIONS**[1]

---

[1] The parties' disputes are noted and juxtaposed herein.

1. **Introduction**[2]

You have heard all the evidence in this case. I will now instruct you on the law that you are to apply. Following my instructions, the lawyers for each side will make their final arguments to you. After that, you will retire to the jury room to begin your deliberations.

These instructions will be a little lengthy, and they may be somewhat difficult to follow at times. To help you, I have made copies of the instructions for each of you that you can use during your deliberations. I mention this so you won't feel that you have to take notes right now or try to memorize anything as I speak. In fact, I would suggest that you just listen to these instructions, without trying to write anything down. If you miss something, you will be able to check the written copy of these instructions once you return to the jury room.

Many of the things I say, you will have heard before, either from me at the beginning of the case or from the lawyers during the trial. I will be repeating those things to remind you of them and so that you will have all the instructions you need in a single package.

When you return to the jury room, your job will be to consider the evidence you have heard and to decide the case in light of the legal principles that I will explain now. You will indicate your decisions on the various issues in the case by answering the questions on the verdict form that will be waiting for you in the jury room.

The decision you make is yours and yours alone. Please remember that nothing I say now or may have said, or any questions I may have asked during the trial are intended to suggest, or should be taken by you as suggesting, what I think your verdict should be.

---

[2] Court's Final Jury Instructions, ECF No. 497, at 2, *Ingenico Inc. v. IOENGINE, LLC*, Civil Action No. 18-826-WCB (D. Del. July 15, 2022) [hereinafter *Ingenico* Jury Instructions] (instruction 1).

### 1.1.    Preponderance of the Evidence / Clear and Convincing Evidence

I am going to start by returning to the subject of the burden of proof, which we discussed briefly at the beginning of the case.  There are two different burdens of proof that are used in a patent case such as this.

On the issue of whether ScentAir infringes Prolitec's patents, the burden of proof is the preponderance of the evidence. The preponderance of the evidence means that Prolitec has the burden of persuading you that its claim of infringement is more likely to be true than untrue. In other words, Prolitec has to produce evidence that, when considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not. To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting the claims of the party asserting infringement—here, Prolitec—must make the scales tip somewhat toward its side. Prolitec also has the burden to establish the amount of any money damages by a preponderance of the evidence.  If the evidence does not persuade you that Prolitec's claim is more likely to be true than untrue, that means Prolitec has failed to satisfy its burden. If that happens, you should find in favor of ScentAir on these issues.

As I said at the beginning of the trial, the issue of whether Prolitec's patents are invalid has a different burden of proof. On that issue, the burden of proof is clear and convincing evidence. Clear and convincing evidence means that ScentAir has the burden of leaving you with a clear conviction or belief that the evidence supports its defense of invalidity. Put another way, clear and convincing evidence means that it is highly probable that a fact is true. This is a higher standard of proof than preponderance of the evidence, meaning it is harder to prove something by clear and convincing evidence than by a preponderance of the evidence. If the evidence does not persuade you that ScentAir's claim of invalidity is supported by clear and convincing evidence, that means

ScentAir has failed to satisfy its burden. If that happens, you should find in favor of Prolitec on the issue of validity.

Finally, some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof is a higher burden of proof than those at issue in this case, applies only in criminal cases and has nothing to do with a civil case like this one. You should therefore not consider it in this case.[3]

---

[3] *Ingenico* Jury Instructions at 3 (instruction 1.1); with additions from *e.g.*, *Natera, Inc. v. ArcherDx, Inc.*, D.Del. C.A. No. 20-125, D.I. 605 at 12.

### 1.2.    Evidence in the Case; Credibility of Witnesses[4]

As the finders of the facts, you are responsible for weighing the evidence in this case, including the testimony of the witnesses you have heard and the exhibits that have been introduced as evidence. As a reminder, the lawyers' statements and characterizations of the evidence are not evidence. While the opening statements and closing arguments may have been helpful to you, your decision should ultimately depend on your evaluation of the evidence.

As part of your job as jurors, you are entitled to weigh the testimony of the witnesses. That's a job well suited for jurors like yourselves who have heard and seen the witnesses. For example, if two witnesses offer testimony that is in conflict, you should use your common sense in deciding whether the testimony can be reconciled and, if not, which witness you think is more believable. You can consider, for example, each witness's motive, state of mind, knowledge, and manner while on the witness stand. If there is a question as to the relative expertise of two witnesses, again you should use your common sense to decide which witness you find more knowledgeable and more believable. You are entitled to give the testimony of each witness whatever weight you feel is appropriate. You may choose to believe or disbelieve any witness's testimony, either entirely or in part.

Evidence can be direct or circumstantial. Direct evidence is evidence that directly proves a fact. If a witness testified that she saw it raining outside, that would be direct evidence that it was raining. Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was

---

[4] *Ingenico* Jury Instructions at 4 (instruction 1.2).

raining. The law makes no distinction between the weight you should give to direct evidence as opposed to circumstantial evidence.

### 1.3.    Number of Witnesses[5]

Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

---

[5] *See, e.g.*, *Natera*, *supra*, D.I. 605 at 9.

### 1.4.    Expert Witnesses[6]

Some of the witnesses have testified as expert witnesses because of their special knowledge in their relevant fields. The fact that a witness has testified as an expert does not mean you must accept that witness's opinions as true. As with all other witnesses, it is up to you to decide whether you find the witness's testimony convincing.

---

[6] *Ingenico* Jury Instructions at 5 (instruction 1.3).

### 1.5.    Depositions – Use as Evidence[7]

During the trial, some of the testimony was presented not through a live witness, but through a deposition. The deposition testimony that you heard at trial is entitled to the same consideration as any other evidence in the case, and you should judge its credibility and weight just the same as if the witness had been present and testified in person here in the courtroom.

---

[7] *Ingenico* Jury Instructions at 6 (instruction 1.4).

### 1.6.    Demonstrative Exhibits[8]

In the course of the trial, the lawyers have presented a number of slides, charts, and animations that were not formally admitted into evidence. Those items are commonly referred to as "demonstrative exhibits." They are not evidence and were intended only to aid in your understanding of the evidence in the case. It is the underlying testimony of the witnesses and the admitted trial exhibits that are the evidence in this case on which you should base your decisions.

---

[8] *Ingenico* Jury Instructions at 7 (instruction 1.5).

### 1.7.     The Parties' Contentions and Questions to Decide[9]

In this case, Prolitec alleges that ScentAir's Breeze product infringes certain patent claims of the two Prolitec patents at issue in this case, the '004 patent and the '976 patent, under a legal doctrine known as the doctrine of equivalents. ScentAir denies that it has infringed any claims of Prolitec's patents.

ScentAir also argues that the asserted claims of those two patents are invalid under a legal doctrine known as anticipation. Prolitec denies that any of the asserted claims are invalid.

I will now summarize the issues that you must decide according to instructions that I will give you. You must decide the following issues separately:

- First, for each asserted patent claim of the Prolitec patents, whether Prolitec has proved, by a preponderance of the evidence, that ScentAir has infringed that patent claim under the doctrine of equivalents.

- Second, for each asserted patent claim of the Prolitec patents, you must decide whether ScentAir has proved, by clear and convincing evidence, that claim is invalid as anticipated.

- Third, if you find that any asserted claim or claims of the Prolitec patents are both infringed and valid, you must decide what amount of monetary damages Prolitec has proved, by a preponderance of the evidence, that it should be awarded as compensation for ScentAir's infringement.

---

[9] *See Ingenico* Jury Instructions at 8 (instruction 1.6).

## 2.  Patent Claims[10]

To decide what is covered by a patent, we look at the patent's claims. As you have heard, the claims are the numbered paragraphs at the end of the patent. The figures and text in the rest of the patent provide a description of the invention or context for the claims, but it is the claims that define what the patent covers. You will be called upon to decide whether ScentAir infringed claims 17 and 23 of the '004 patent; and claims 15, 16, 17, and 22 of the '976 patent. You don't have to remember those numbers. Those claims are all set out at the back of these instructions, and they will be listed for you on the verdict form.

When an accused device or system satisfies all the requirements of a claim, the claim is said to "cover" that thing, or that the thing "falls within the scope" of the claim. In other words, for example, a claim covers a device if all the claim requirements are present in that device. To find infringement, you must find that each of the requirements of a particular claim are satisfied. In patent law, the requirements of a claim are sometimes referred to as elements or limitations. Those terms all mean the same thing.

You must determine, separately for each asserted claim, whether or not there is infringement and whether or not the claim is invalid.[11]  In this case, the claims at issue—claims 17 and 23 of the '004 patent and claims 15, 16, 17 and 22 of the '976 patent—are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own additional requirements. To determine what a dependent claim covers, it is

---

[10] *See Ingenico* Jury Instructions at 9-10 (instruction 2).

[11]  FCBA Model Instruction B.3/3/1a DIRECT INFRINGEMENT BY LITERAL INFRINGEMENT ¶ 2.

necessary to look at both the dependent claim and any other claim(s) to which it refers. A product that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.[12]

Many of the terms used in the claims will be familiar to you, but others may not be. One term that is used a lot in patents, and is used in all of the patents in this case, is the term "comprising" or "comprises." In the patent context, "comprising" means "including" or "containing." So if a claim states that an invention "comprises" a particular feature, that means that a product can infringe that claim if it contains that feature, even if it also contains other features beyond those claimed in the patent.

Additionally, I have defined several of the terms that are used in the claims. You are to apply the following definitions when considering what the claims cover. The term "**cartridge**" in the preamble is limiting and means "assembly designed to be removeable and replaceable with a like assembly."[13] The term "**tortuous passage**" means "physical channel having repeated twists, bends or turns." The term "**convoluted flow path**" means "flow path having many twists and/or curves." The term "**toward an external environment**" means "in the direction of an airspace of a room or other enclosed space such as a concert hall, casino, lobby, or other large enclosed space." Any terms that I have not defined should be given their ordinary meaning.[14]

---

[12] FCBA Model Instruction B.2/2.1(a) INDEPENDENT AND DEPENDENT CLAIMS (deleting preceding portion defining "independent claim").

[13] SJ Order, D.I. 240.

[14] Markman Order, D.I. 124.

### 3. Infringement[15]

I will now instruct you on how to decide whether or not ScentAir has infringed the asserted claims of Prolitec's patents. Prolitec contends that ScentAir has infringed its rights under the '004 and '976 patents by directly infringing under the doctrine of equivalents, by inducing others to infringe, by contributing to the infringement of both patents, and by supplying or causing to be supplied all or a substantial portion of the components of a patented invention from the United States to another country.

United States patent law gives the owner of a U.S. patent the right to exclude others from making, using, selling, offering to sell, or importing something that is covered by one of the patent claims during the term of the patent. **[PROLITEC:** In determining whether ScentAir has made a sale or an offer for sale, you should consider whether the contract ScentAir entered into or offered to enter into is a commercial transaction that allows the other party to contract to control and use the accused device.]**[16] [SCENTAIR:** In determining whether ScentAir has made a sale or an offer

---

[15] *Ingenico* Jury Instructions at 11 (instruction 3.1).

[16] **PROLITEC'S POSITION:** Prolitec's proposed instruction is pulled directly from as-read jury instructions in *L.C. Eldridge Sales Co. v. Jurong Shipyard PTE*, Civil Action No. 6:11-cv-599-MHS (E.D. Tex. Nov. 22, 2013) (ECF No. 306 at 12-13); *see also* Jury Instructions, ECF No. 368 at 26, *M-I LLC v. FPUSA, LLC*, No. 5:15-cv-004-6-DAE (W.D. Tex. Oct. 18, 2021) (explicitly including "leases and offers to lease" as sales and offers to sell for the purposes of infringement liability). This instruction is crucial to Prolitec's infringement case because without it, the jury could find no infringement for a legally incorrect reason.

ScentAir insists that that it does not "sell" the Breeze, but instead has "service agreements" or "service contracts" where it leases the Breeze Device and then provides Breeze Cartridges to customers. *See, e.g.*, Andres Dep. at 75:6-16, 101:9-12. The law is clear that transactions that do not transfer title, such as leases and service contracts, constitute "sales" for the purpose of § 271(a) when "the transaction contemplates delivery and possession of a completed invention." *Transocean Offshore Deepwater Drilling, Inc. v. Stena Drilling Ltd*., 659 F. Supp. 2d 790, 799 (S.D. Tex. 2009); *Transocean Offshore Deepwater Drilling, Inc. v. Maesk Drilling U.S., Inc*., 699 F.3d 1340, 1356-57 (Fed. Cir. 2012); *Minton v. Nat'l Ass'n of Sec. Dealers*, 226 F. Supp. 2d, 845, 872-73 (E.D. Tex. 2002 (holding that lease of a patented telecommunications network and software program constituted a sale), *aff'd by*, *Minton v. NASD, Inc*., 336 F.3d 1373 (Fed. Cir.

for sale, you should consider whether a contract ScentAir entered into or offered to enter into is a commercial transaction that transfers title or property to the other party for a price.]¹⁷ If the contract or offer does, then you should treat that contract as a sale of or an offer to sell the device.

Infringement is determined on a claim-by-claim basis. Therefore, it is possible for there to be infringement as to one claim but not as to another.

In order to prove infringement, Prolitec must prove that the requirements of infringement are met by a preponderance of the evidence, which is to say that it is more likely than not that all the requirements of infringement have been proved.

---

2003); *In re Kollar*, 286 F.3d 1326, 1330, n. 3 (Fed. Cir. 2002) ("[A] commercial transaction arranged as a 'license' or a 'lease' of a product . . . may be tantamount to a sale . . . because the product is just as immediately transferred to the buyer as if it were sold."). Absent Prolitec's proposed instruction on this issue, the jury could find no infringement even though ScentAir's service contracts legally may be "sales" for the purposes of infringement.

¹⁷ **SCENTAIR's POSITION:**  The 2013 *LC Eldridge* instruction references a "contract to *control or use*" the accused device, which is incorrect. A "sale" is not contingent on the broad concept of "use"—which is a separate category of infringement under 271(a). The inclusion of "control or use" therefore invites error, as "use" can be present without any transfer of rights or property sufficient to trigger infringement liability. Also, "control" is a concept that is not discussed in the relevant caselaw.  When analyzing the issue of a "sale" for purposes of the on-sale bar, the Federal Circuit consulted both dictionaries and the UCC, and concluded that "the ordinary meaning of a sale includes the concept of a *transfer of title or property.*" *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (emphasis added) (citing Black's Law Dictionary 1337 (7th ed. 1999)); *accord In re Kollar*, 286 F.3d 1326, 1330-31 n.3 (Fed. Cir. 2002) (cited above by Prolitec) (discussing that a license to a product "immediately transferred to the 'buyer'" may be "tantamount to a sale"); Black's Law Dictionary (11th ed. 2019) (defining "sale" as "a transfer of the absolute title to property for a certain agreed price"). All of these authorities consistently define a sale in terms of the transfer of title or property, not "control or use."

### 3.1.    Direct Infringement[18]

In this case, Prolitec asserts that ScentAir has directly infringed the patents. ScentAir is liable for directly infringing Prolitec's patents if you find that Prolitec has proven that it is more likely than not that ScentAir (or any of its agents, e.g., anyone acting under ScentAir's direction or control, including pursuant to a contractual agreement with ScentAir), made, used, imported, offered to sell, or sold the invention defined in at least one claim of Prolitec's patents.[19]

There are two ways that direct infringement can be found. The first is when each limitation of a claim is identically found in the accused product—this is called literal infringement. Prolitec does not contend that the Breeze product literally infringes the asserted claims of the '004 and '976 patents.

The second way that direct infringement can be found is called infringement under the doctrine of equivalents. The parties dispute whether the Breeze product directly infringes the asserted claims under the doctrine of equivalents, and you must decide this issue according to the instructions I will give you in a moment.

A patent may be infringed directly or indirectly. Direct infringement results if the accused product is directly covered by at least one claim of the patent.[20]

A party can directly infringe a patent without knowing of the patent or without knowing that what the party is doing is patent infringement.[21] An alleged infringer may still directly infringe

---

[18]    AIPLA, AIPLA's Model Patent Jury Instructions 11-12 (2019), *available at* https://www.aipla.org/home/news-publications/model-patent-jury-instructions    [hereinafter AIPLA Model Jury Instructions] (instruction 3.1).

[19] AIPLA 2019 (3.1).

[20] *See* C.A. No. 07-190-SLR, D.I. 192 at 21.

[21] AIPLA 2019 (3.1).

even though it believes in good faith that what it is doing is not an infringement of the patent. [22] Indirect infringement results if the defendant induces another to infringe a patent, or contributes to the infringement of a patent by another.  In this case, Prolitec contends that ScentAir is an indirect infringer through both means.[23]  Finally, Prolitec also contends that ScentAir has infringed by supplying or causing to be supplied all or a substantial portion of the components of a patented invention from the United States to another country.

---

[22] *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 761 n.2 (2011) ("Direct infringement has long been understood to require no more than the unauthorized use of a patented invention. . . . Thus, a direct infringer's knowledge or intent is irrelevant.")

[23] *See* C.A. No. 07-190-SLR, D.I. 192 at 21-22.

### 3.2.    Direct Infringement Under the Doctrine of Equivalents[24]

If ScentAir makes, uses, sells, offers to sell within, or imports into the United States a product that does not literally meet all of the elements of an asserted claim and thus does not literally infringe that claim, there can still be direct infringement if that product satisfies those claim elements "under the doctrine of equivalents."

Under the doctrine of equivalents, a product infringes a claim if the accused product contains elements that literally meet or are equivalent to each and every element of the claim. You may find that an element or step is equivalent to an element of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the element of the claim. In order to prove infringement by "equivalents," Prolitec must prove the equivalency of the structure to the claim element by a preponderance of the evidence. Thus, each element of a claim must be met by the accused product either literally or under the doctrine of equivalents for you to find infringement.

In deciding whether a claim element and component are equivalents, you may consider whether, at the time of the alleged infringement, persons of ordinary skill in the field would have known of the interchangeability of the component with the claimed element. However, known interchangeability between the claim element and the component of the product is not necessary to find infringement under the doctrine of equivalents.[25]

---

[24] FCBA model instruction 3.1(c) (first two paragraphs).

[25] AIPLA 3.7.

Further, the same component of the accused product may satisfy more than one element of a claim. Similarly, two components of the accused product may satisfy a single claim element.[26]

**[SCENTAIR (subject to pretrial ruling):** In this case, I have determined, as a matter of law, that the doctrine of equivalents cannot be applied to certain elements of the asserted claims; specifically, I am instructing you that the doctrine of equivalents cannot be applied to the following elements of the asserted claims:

- "Cartridge housing" (as in claim 9 of the '004 Patent and claim 9 of the '976 Patent)

- "The tortuous passage being partially capped by the cartridge housing to enclose a portion of the tortuous passage and to define an aerosol outlet at a remaining uncovered portion" (as in claim 9 of the '976 Patent)

Consequently, each of the elements above must be literally present within the ScentAir Breeze for there to be infringement of the claim. Unless you find that each of the elements of the claims is literally present in the Breeze, you must find that there is no infringement.

As for the remaining elements of the asserted claims not listed above, you are permitted to find these elements with the doctrine of equivalents analysis that I instructed you on earlier.][27]

---

[26] Paragraph inserted from AIPLA § 3.7.1.

[27] AIPLA § 3.7.1.

### 3.3.    Induced Infringement[28]

The first form of indirect infringement is referred to as induced infringement. Proof of induced infringement requires a showing by a preponderance of the evidence of each of the following:

(1) the accused infringer intentionally induced, encouraged, or caused another party to directly infringe a patent;

(2) the accused infringer knew of the patent and knew or should have known that the other party's actions would, if taken, constitute actual infringement of the patent by another party; and

(3) the accused infringer's conduct led the other party to directly infringe the claim.

Prolitec has alleged that ScentAir induced others to infringe all the asserted claims of the '004 and '976 patents. You are to make a separate determination of induced infringement for each of the asserted claims of Prolitec's patents.

To show induced infringement, Prolitec need not identify any specific third party that directly infringed one of Prolitec's patent claims and may instead prove that a class of individuals (such as certain of ScentAir's customers) directly infringed Prolitec's patents as a result of ScentAir's inducement, even if you cannot identify which specific individual actually committed direct infringement.[29]

---

[28] *Ingenico* Jury Instructions at 13.

[29] *Power Integrations*, 843 F.3d at 1335.

### 3.4.    Contributory Infringement[30]

Prolitec asserts that ScentAir has contributed to infringement of the asserted claims of the '004 and '976 patents by another person.

To find contributory infringement, you must find that someone other than ScentAir has directly infringed a claimed invention of the patent under the doctrine of equivalents.

To establish contributory infringement, Prolitec must prove that it is more likely than not that ScentAir had knowledge of both the patent and direct infringement of that patent. Prolitec must prove that each of the following is more likely than not:

(1) someone other than ScentAir has directly infringed a claim of the patent;

(2) ScentAir sold, offered for sale, or imported within the United States a component of the infringing product;

(3) the component is not a staple article or commodity of commerce capable of substantial non-infringing use;

(4) the component constitutes a material part of the claimed invention; and

(5) ScentAir knew that the component was especially made or adapted for use in an infringing product.

A "staple article or commodity of commerce capable of substantial non-infringing use" is something that has uses other than as a part or component of the patented product, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

---

[30] *See* AIPLA Model Jury Instructions at 19-20 (instruction 3.10).

### 3.5.    Infringement by Supply of All or a Substantial Portion of the Components of a Patented Invention to Another Country (§ 271(f)(1))[31]

Prolitec asserts that ScentAir infringed claims 17 and 23 of the '004 patent and claims 15, 16, 17 and 22 of the '976 patent by supplying or causing to be supplied all or a substantial portion of the components of the patented product from the United States to another country and actively inducing the assembly of those components into a product that would infringe the asserted claims of the '004 and '976 patents  if they had been assembled within the United States.

To show infringement under Section 271(f)(1), Prolitec must prove each of the following by a preponderance of the evidence:

(1) The product, as it was intended to be combined outside the United States, included all elements of at least one of the asserted claims;

(2) ScentAir actually supplied or caused to be supplied components from the United States that made up all or a substantial portion of any one of the asserted claims; and

(3) ScentAir specifically intended to induce the combination of the components into a product that would infringe the asserted patents if the components had been combined in the United States.

 A substantial portion of components requires a quantitative, not a qualitative, assessment. The export of a single component of a multicomponent invention cannot create liability under Section 271(f)(1).[32]

---

[31] AIPLA Model Jury Instructions at 19 (instruction 3.9).

[32] *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 142, 146-151 (2017).

### 3.6. Infringement by Supply of Components Especially Made or Adapted for Use in the Patented Invention to Another Country (§ 271(f)(2))[33]

Prolitec asserts that ScentAir infringes claims 17 and 23 of the '004 patent and claims 15, 16, 17 and 22 of the '976 patent by  supplying or causing to be supplied a component or components of a claimed invention of the '004 and '976 patents from the United States into a foreign country, where the exported component(s) were especially made or especially adapted for use in an invention covered by the '004 and '976 patents and have no substantial non-infringing uses, and where ScentAir knew the component(s) were especially made or adapted for use in the claimed invention and intended for the component(s) to be combined in a way that would have infringed the asserted claims of the '004 and '976 patents if the combination had occurred in the United States.

To show infringement of an asserted claim under Section 271(f)(2), the Prolitec must prove each of the following by a preponderance of evidence:

(1) ScentAir actually supplied the components from the United States into a foreign country or caused them to be supplied from the United States to a foreign country;

(2) ScentAir knew or should have known that the component(s) were especially made or adapted for use in a product that infringed an asserted claim of the '004 or '976 patents;

(3) the component(s) have no substantial non-infringing use; and

(4) ScentAir intended for the component(s) to be combined into that product. It is not necessary for you to find that the component(s) actually were combined into an infringing product, as long as you find that ScentAir intended the component(s) to be

---

[33] AIPLA Model Jury Instructions at 20-21 (instruction 3.11).

combined into a product that would have infringed an asserted claim of the '004 or '976 patents if they had been combined in the United States.

#### 4.  Invalidity

I will now instruct you on the rules you must follow in deciding whether or not ScentAir has proved that any asserted claims of the Prolitec patents are invalid. ScentAir has the burden of proving invalidity by clear and convincing evidence, which as I've said before means the evidence must leave you with a clear conviction or belief that the claims in question are invalid.

In order for someone to be entitled to a patent, the invention must be new, useful, and non-obvious. ScentAir contends that each of the asserted claims of Prolitec's patents are invalid because the inventions set forth in those claims were not new, but were anticipated by a number of prior inventions.[34]

As I have mentioned, in this case, Prolitec is asserting dependent claims 17 and 23 of the '004 patent.  These claims depend from claim 9 of the'004 patent, and include all of the requirements of claim 9, and in addition, the requirements of the dependent claim.  Similarly, claims 15, 16, 17 and 22 of the '976 patent depend from claim 9 of the '976 patent, and include all of the requirements of claim 9, and in addition, the requirements of the dependent claims.

**[SCENTAIR:** Independent claim 9 of the '004 patent and claim 9 of the '976 patent are not asserted in this case, and they have been previously decided to be invalid and, as a result, have been cancelled.  As I instructed you earlier, a dependent claim recites all the requirements of its independent claim and adds additional requirements. This means the scope of the dependent claim should be narrower than the scope of the independent claim from which it depends.  The finding that the broader independent claim is invalid does not mean the narrower dependent claims are

---

[34] *Ingenico* Jury Instructions at 15 (instruction 4.1).

also invalid. Rather, you must consider the validity of each claim separately, on a claim-by-claim basis,[35] according to the instructions I am about to give you.]

[**PROLITEC:** Independent claim 9 of the '004 patent and claim 9 of the '976 patent are not asserted in this case. As I instructed you earlier, a dependent claim recites all the requirements of its independent claim and adds additional requirements. This means the scope of the dependent claim should be narrower than the scope of the independent claim from which it depends.]

---

[35] *See, e.g.*, *VB Assets, LLC v. Amazon.com Services* LLC, C.A. No. 19-1410, D.I. 288 at 10 (Nov. 8, 2023).

### 4.1.    Prior Art[36]

To determine whether a patent claim is anticipated in light of what came before, it is important to know how patent law defines what came before. What came before, as you've heard this week, is referred to as the "prior art." That term has a specific meaning in patent law.[37]

ScentAir contends that the ScentAir/Air Berger ScentBox, ScentAir ScentDirect, the ScentAir ScentStream, and the Prolitec AirQ products are prior art because each was publicly known or was used, on sale, or otherwise made available to the public before the claimed priority date of the asserted claims. Claims 17 and 23 of the '004 patent and claims 16 and 22 of the '976 patent claim a priority date of August 25, 2015. Claims 15 and 17 of the '976 patent claim a priority date of April 22, 2014. An invention is known when the information about it was reasonably accessible to the public on that date. An invention was publicly used when it was either accessible to the public or commercially exploited. An invention was sold or offered for sale when it was offered commercially and what was offered was ready to be patented, i.e., it was reduced to practice or it had been described such that a person having ordinary skill in the field of the technology could have made and used the claimed invention, even if it was not yet reduced to practice or publicly disclosed.

ScentAir contends that the ScentAir/Air Berger ScentBox, ScentAir ScentDirect, the ScentAir ScentStream, and the Prolitec AirQ products are prior art because they were made available to the public before the filing date of the patent. ScentAir must prove by clear and convincing evidence that each of the Air Berger ScentBox, ScentAir ScentDirect, the ScentAir ScentStream, and the Prolitec AirQ products is prior art.

---

[36] FCBA Model Instructions 4.3a-3 PRIOR ART (post-AIA).

[37] *Ingenico* Jury Instructions at 16 (first paragraph of instruction 4.2)

### 4.2.    Level of Ordinary Skill[38]

The term "person of ordinary skill in the art" is a term frequently used in patent law, and it has an important role in deciding whether an invention was described in the prior art. For the Asserted Patents, the parties have agreed that a person of ordinary skill in the art is a person having a bachelor's degree in mechanical engineering or chemical engineering as well as at least three years of experience working with, designing, or studying liquid diffusion devices or similar devices.[39]

---

[38] *See Ingenico* Jury Instructions at 22-23 (instruction 4.5).

[39] Opening Report of Dr. Timothy Morse Regarding Invalidity of the Prolitec Asserted Patents, ¶ 13 (June 1, 2023) [hereinafter Morse Op. Invalid. Rpt.]; Responsive Expert Report of Marcus Hultmark Ph.D., ¶ 34 (June 29, 2023).

### 4.3.    Anticipation[40]

In order for someone to be entitled to a patent, the invention must actually be "new." ScentAir contends that claims 17 and 23 of the '004 patent and claims 15, 16, 17 and 22 of the '976 patent are invalid because the claimed inventions are anticipated. ScentAir must convince you of this by clear and convincing evidence, i.e., that the evidence highly probably demonstrates that the claims are invalid.

Specifically, ScentAir contends that the following pieces of prior art anticipate the asserted claims of the '004 and '976 patents:  the ScentAir/Air Berger ScentBox, ScentAir ScentDirect, the ScentAir ScentStream, and the Prolitec AirQ products. Anticipation must be determined on a claim-by-claim basis. ScentAir must prove by clear and convincing evidence that all of the requirements of an asserted claim are present in a single piece of prior art. **[SCENTAIR (subject to ruling):** In this case, all agree that the ScentDirect and the ScentStream products contain all of the limitations of claim 9 of each asserted patents, therefore, for just these prior art products, you need only determine whether ScentAir has proven by clear and convincing evidence that ScentDirect or ScentStream contain the additional limitations present in the asserted, dependent claims.**]**

To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied—such that a person having ordinary skill in the art in the technology of the invention, looking at that one reference, could make and use the claimed invention.

---

[40] FCBA Model Instruction 4.3b-1 ANTICIPATION.

[**SCENTAIR:** Because ScentAir is relying on prior art that was not considered by the PTO during examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the PTO did consider. If you decide it is different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear-and-convincing burden of proving invalidity.[41]]

---

[41] FCBA Model Instruction 4.3b-1 ANTICIPATION.

**PROLITEC'S OBJECTION:** ScentAir's proposed instruction is based on FCBA Model Instruction 4.3b-1, but Prolitec was unable to find support for this proposition in the authorities provided by the Model, nor has ScentAir provided any of its own when this issue was brought up during the meet-and-confer process. The proposed instruction seems to be based on the principle that "the challenger's 'burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application.'" *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999). None of ScentAir's prior art was considered by the PTO. The jury has no reference point for what the prior art considered by the PTO during examination was, nor how to compare ScentAir's prior art to it. Accordingly, instructing the jury on this principle adds no value.

Additionally, the phrasing of this proposed instruction implies that there are *lower* obstacles to proving invalidity using prior art that *was not* considered by the PTO, rather than the reality that there are *higher* ones using prior art that *was* considered by the PTO. *See Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1375 (Fed. Cir. 2015). This proposed instruction is likely to confuse the jury into thinking that ScentAir has a lower burden to carry on invalidity because they can "weigh [ScentAir's] prior art more heavily." If ScentAir's proposed instruction is included, the jury could find invalidity by misapplying ScentAir's burden of clear and convincing evidence.

**SCENTAIR'S RESPONSE:** The FCBA model instruction makes clear that the jury may compare the asserted prior art to prior art that was before the examiner, in order to determine whether previously-unconsidered prior art should be weighted "more heavily." This instruction is essentially the inverse of the well-accepted principle, reflected in *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1375 (Fed. Cir. 2015), that the PTO is "presumed to have done its job," consistent with *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999). (Indeed, if any of the asserted prior art in this case had been before the PTO, Plaintiff would have lobbied for the inclusion of similar language.) The instructions here are replete with the iteration of the "clear and convincing" standard of proof that must be applied. Accordingly, there is no risk of confusion, and many District Courts have utilized the FCBA model. *See, e.g.,*, *OptoLum, Inc. v. Cree, Inc.*, No. 1:17-CV-00687, D.I. 335 at 53-54 (M.D.N.C., Nov. 7, 2021); *CloudofChange, LLC v. NCR Corp.,* No. 6:19-cv-00513-ADA, D.I. 150 at 22 (W.D. Tex. May 19, 2021); *Bayer Healthcare Pharm., Inc. v. Biogen Idec, Inc.*, No. 2:10-cv-02734-CCC-JBC, D.I. 968 at 34 (D.N.J. Feb. 21, 2018); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings*, C.A. No. 15-634-JFB, D.I. 481 at 36 (D. Del. Nov. 7, 2018).

To prove anticipation by prior art products, ScentAir may rely on physical prior art products in addition to collections of documents describing the design and operation of those prior art products.[42]  The combination of the prior art device and collection of documents still constitutes a single prior art reference, as it is permissible to use several documents as evidence about how a single prior art system worked.[43]

---

[42] *IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464, 518-19 (D. Del. 2022); *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, No. 18-cv-366, 2020 WL 3047989, at *6 (D. Del. June 8, 2020).

[43] *Brit. Telecomms.*, 2020 WL 3047989, at *6; *see also IP Innovation LLC v. Red Hat, Inc.*, No. 2:07-CV-447, 2010 WL 9501469, at *4 (E.D. Tex. Oct. 13, 2010); *Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024, 2016 WL 861065, at *2 (N.D. Cal. Mar. 5, 2016).

5. **Damages**[44]

If you find that an asserted patent claim is infringed and not invalid, Prolitec is entitled to at least a reasonable royalty to compensate it for that infringement.[45] If you find that none of the Asserted Claims are infringed or if you find that all of the infringed claims are invalid, then you need not address damages in your deliberation. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, or which should prevail on any issue.

The damages you award must be adequate to compensate Prolitec for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put Prolitec in approximately the same financial position that it would have been in had the parties reached an agreement for ScentAir to license the patents before the alleged infringement began.[46]

Prolitec has the burden to establish the amount of damages to which it is entitled by a preponderance of the evidence.[47] In other words, you should award only those damages that Prolitec establishes that it more likely than not suffered. While Prolitec is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.

---

[44] Final Jury Instructions, ECF No. 217, at 22, *MHL Custom, Inc. v. Waydoo USA, Inc.*, C.A. No. 21-0091-RGA (D. Del. Mar. 31, 2023) [hereinafter *MHL* Jury Instructions] (instruction 6.1).

[45] FCBA Model Instruction 5.5.

[46] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), *cert. denied*, 560 U.S. 935 (2010); *Rite- Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc), *cert. denied*, 516 U.S. 867 (1995) ("[T]he Supreme Court has interpreted [Section 284] to mean that 'adequate' damages should approximate those damages that will *fully compensate* the patentee for infringement.") (emphasis in original).

[47] *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) ("[T]he amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence.").

You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork. [48]

In this case, Prolitec seeks a reasonable royalty. A reasonable royalty is defined as the money amount Prolitec and ScentAir would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. You must be careful to ensure that award is no more and no less than the value of the patented invention.

---

[48] *Lucent Techs.*, 580 F.3d at 1325 (citing *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)) ("Any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"); *Intellectual Ventures I LLC v. Symantex Corp.*, C.A. No. 10-1067-LPS, 2015 WL 307572, at *1-2 (D. Del. Jan. 23, 2015).

### 5.1.    Reasonable Royalty[49]

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time just prior to when the infringement first began.[50]

In considering this hypothetical negotiation, you should focus on what the expectations of Prolitec and ScentAir would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.[51]

A reasonable royalty can be calculated in several different ways, and in this case, the parties have agreed that a one-time lump sum payment is appropriate. A one-time lump sum payment is equal to an amount that the alleged infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product, both past and future. When a one-time lump sum payment is made, the alleged infringer pays a single price for a license covering both past and future infringing sales. The lump sum payment must reflect the value attributable to the infringing features of the product, and no more.[52]

---

[49] *See MHL* Jury Instructions at 23-24 (instruction 6.2).

[50] *Lucent Techs.*, 580 F.3d at 1324-25.

[51] *Id.*

[52] *Ericsson*, 773 F.3d at 1226 ("[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.").

Damages are not based on a hindsight evaluation of what happened, but on what Prolitec and ScentAir would have agreed upon at the time of the hypothetical negotiation on April 1, 2020.[53] Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may, under certain circumstances, include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.[54]

---

[53] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) ("[A reasonable royalty] must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time.").

[54] *Lucent Techs.*, 580 F.3d at 1333.

### 5.2.    Factors for Determining a Reasonable Royalty[55]

In determining the amount of a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the factors you may consider in making your determination are:

(1)    The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

(2)    The rates paid by the licensee for the use of other patents comparable to the patent in suit.

(3)    The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

(4)    The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5)    The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.

(6)    The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

(7)    The duration of the patent and the term of the license.

---

[55] *See MHL* Jury Instructions at 25 (instruction 6.3).

(8)  The established profitability of the product made under the patent; its commercial success; and its current popularity.

(9)  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

(10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

(11) The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14) The opinion testimony of qualified experts.

(15) The amount that a licensor (such as the patent holder) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and

which amount would have been acceptable by a prudent patent holder who was willing to grant a license.

No one factor is dispositive, and you can and should consider all the evidence that has been presented to you in this case that would have increased or decreased the royalty the infringer would have been willing to pay, and the patent holder would have been willing to accept, acting as normally prudent businesspeople.[56]

---

[56] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

## 5.3    Damages - Apportionment[57]

The amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or Prolitec's size or market position. A royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more. The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment. When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.[58]

[SCENTAIR: In this case, because all of the asserted claims are dependent claims, and because the independent claims from which they depend have been previously determined to be invalid, an award of damages must be based only on the value contributed by the novel features set forth in the asserted dependent claims, as opposed to features of the independent claims that have been cancelled.]

[PROLITEC: In this case, because all of the asserted claims are dependent claims, and because the independent claims from which they depend are not asserted, an award of damages must be based only on the value contributed by the features of the asserted dependent claims, as opposed to features of the independent claims.]

---

[57] FCBA Model Instruction 5.12.

[58] Memorandum Opinion, D.I. 240 at 30 & 36.

The lawyers will now present their closing arguments to you. Prolitec will go first; then ScentAir will present argument to you; and Prolitec will then return briefly for the last word. After that I will have a few final words for you, and you will then return to the jury room to begin your deliberations.[59]

---

[59] *Ingenico* Jury Instructions at 25.

## 6.  Jury Deliberations

### 6.1.    Election of a Foreperson[60]

The first thing you should do when you retire to the jury room is select a foreperson. They

will be responsible for communicating with the court as needed.

---

[60] *Ingenico* Jury Instructions at 26 (instruction 5.1).

### 6.2.    Verdict – Unanimous – Duty to Deliberate[61]

You should then begin your deliberations. Your verdict on each issue must be unanimous. There will be a verdict form in the jury room waiting for you when you retire for your deliberations. You will note that the verdict form has a series of questions to be answered during the course of your deliberations. The questions on the form correspond to the jury instructions that I have just given you. When you reach a unanimous verdict as to each question on the verdict form, the foreperson is to fill in the answers on the verdict form, and then sign and date the verdict form.

Please make sure to read the questions carefully, and note that some of the questions may not require answers, depending on how you answer other questions.

Do not reveal your answers to any of the questions to anyone outside of the jury until you finish your deliberations and return to the courtroom to deliver your verdict. If there is a divided vote on any of the issues at some point during your deliberations, you should not reveal how the vote is divided on any issue, even to me. It frequently happens that there is disagreement among jurors when they begin deliberating. But part of your responsibility as jurors is to continue to deliberate in order to attempt to reach a unanimous verdict on each of the questions you are being asked to answer. In the course of respectful discussion among the jurors, it almost always happens that the jurors can reach a unanimous verdict, even if they are divided at the outset.

When you return to the courtroom to announce your verdict, please bring the completed verdict form with you. You will give the completed and signed verdict form to the court security officer, who will give it to me. I will then examine the verdict form to be sure everything it filled out that needs to be filled out, and I will read the verdict aloud.

---

[61] *Ingenico* Jury Instructions at 27-28 (instruction 5.2).

At that point, I may do what is called "polling the jury," which means asking each of you if the verdict I just read is your verdict. That is not because there is a problem or because I am skeptical of what you have reported. It is just a standard procedure to ensure that each juror agrees to the verdict. I will then ask you to return to the jury room where you can gather your things. I will then come to the jury room to thank you for your service and to discharge you.

### 6.3.    Outside Communication[62]

During your deliberations you must not communicate with or obtain any information relating to this case from any source other than your fellow jurors. This means that you may not consult any outside sources, such as the Internet, during your deliberations. Of course, you can have contact with the court security officer or other court staff as necessary to deal with any needs you may have, but you should not discuss the case itself with anyone outside the jury.

---

[62] *Ingenico* Jury Instructions at 29 (instruction 5.3).

### 6.4.    Jury's Responsibility[63]

I expect that when you get to the jury room to begin your deliberations, you may feel a little overwhelmed. That is not uncommon. This has been a complicated case, and there will be a lot of evidence and argument to think about. But I think you will be pleasantly surprised that as you start working methodically through the case, things will begin to seem more manageable.

I hope and expect that you will listen to one another's views respectfully, even if initially you disagree on some issues. Discussing the issues from different perspectives can often help in formulating your own ideas about how particular issues should be decided.

---

[63] *Ingenico* Jury Instructions at 30 (instruction 5.4).

### 6.5.    Communications Between Court and Jury During Deliberations[64]

If you wish to see any of the exhibits, you are free to see them. All you need to do is have your foreperson sign a note asking for the exhibit and provide that note to the court security officer who is taking care of you during your deliberations. You can ask to see all the exhibits or you can just ask for some of them, if you like. Just let us know what you want, and we will get those exhibits for you.

If you have a question or otherwise want to communicate with me at any time, please follow the same procedure by providing a written message or question to the court security officer, who will then bring it to me. You probably will not get a reply right away, as I will usually need to summon all the lawyers and get their input before I can respond to the question. That just means I usually cannot get back to you right away, but we will do our best to get you an answer to your question as soon as we can.

If you do have a question that is hanging you up, you are entitled to ask. I have to tell you, however, that once the case is submitted to you, as it will be in a moment, we will not be able to take any additional evidence, and I may just have to tell you to rely on your collective recollection of what the evidence was and tell you that you have to decide the case based on the evidence you have heard. I think you will find in most instances, if you put your heads together, you will recall the evidence that you need to get over the problem. That's one of the reasons there are eight of you. Eight memories are better than one.

Finally, and most importantly, trust your common sense throughout. One of the strongest traditions of our justice system is the confidence we place in the sound common sense of an

---

[64] *Ingenico* Jury Instructions at 31 (instruction 5.5).

American jury. The parties in this case have confidence in you. And so do I. You may now retire for your deliberations.

## APPENDIX

## CLAIMS AT ISSUE[65]

**U.S. Patent No. 9,162,004 ("the '004 patent"), asserted claims 17 and 23**

Asserted claim 17 of the '004 patent encompasses the requirements of claim 9. Claim 17

reads as follows:

> **17.** The cartridge of claim **9** wherein the tortuous passage follows a non-linear path that assists in preventing liquid from leaking from the cartridge when the cartridge is upended.

Claim 9 reads as follows:

> **9.** A cartridge for use with a liquid diffusing device, the cartridge comprising:
>
> a cartridge housing defining an internal housing cavity partially filled with a liquid to be diffused;
>
> a diffusion head positioned within the internal housing cavity, the diffusion head including a venturi device for generating a diffused liquid from the liquid contained in the internal housing cavity; and
>
> an insert positioned downstream of the diffusion head, the insert including an inlet to receive the diffused liquid generated by the Venturi device, an outlet Zone through which to discharge the diffused liquid toward an external environment, and a tortuous passage extending between the inlet and the outlet zone.

Asserted claim 23 of the '004 patent also encompasses the requirements of claim 9. Claim

23 reads as follows:

> **23.** The cartridge of claim **9** wherein the tortuous passage of the insert is configured to provide a convoluted flow path that retards a flow of the liquid to be diffused through the insert when the cartridge is temporarily held upside-down.

---

[65] *See Ingenico* Jury Instructions at 32-37 (Claims at Issue).

**U.S. Patent No. 9,745,976 ("the '976 patent"), asserted claims 15, 16, 17, and 22**

Asserted claim 15 of the '976 patent encompasses the requirements of claim 9. Claim 15

reads as follows:

> **15.** The cartridge of claim **9** wherein the tortuous passage is at least partially
> defined by a vertical sidewall of the insert.

Claim 9 reads as follows:

> **9.** A cartridge for use with a liquid diffusing device, the cartridge
> comprising:
> a cartridge housing defining an internal housing cavity partially filled with
> a liquid to be diffused;
> a venturi device for generating a diffused liquid from the liquid contained
> in the internal housing cavity; and
> an insert positioned downstream of the venturi device, the insert including
> an inlet to receive the diffused liquid generated by the venturi device, an outlet zone
> through which to discharge the diffused liquid toward an external environment, and
> a tortuous passage extending between the inlet and the outlet zone, the tortuous
> passage being partially capped by the cartridge housing to enclose a portion of the
> tortuous passage and to define an aerosol outlet at a remaining uncovered portion.

Asserted claim 16 of the '976 patent also encompasses the requirements of claim 9. Claim

16 reads as follows:

> **16.** The cartridge of claim **9** wherein the tortuous passage follows a non-
> linear path that assists in preventing liquid from leaking from the cartridge when
> the cartridge is upended.

Asserted claim 17 of the '976 patent also encompasses the requirements of claim 9. Claim

17 reads as follows:

> **17.** The cartridge of claim **9** wherein the insert is provided between the
> cartridge housing and the venturi device.

Asserted claim 22 of the '976 patent also encompasses the requirements of claim 9. Claim

22 reads as follows:

> **22.** The cartridge of claim **9** wherein the tortuous passage of the insert is
> configured to provide a convoluted flow path that retards a flow of the liquid to be
> diffused through the insert when the cartridge is temporarily held upside-down.

## GLOSSARY OF PATENT-RELATED TERMS[66]

Some of the terms in this glossary are defined in more detail in the legal instructions you are given.

**Abstract**: A brief summary of the technical disclosure in a patent to enable the U.S. Patent and Trademark Office and the public to determine quickly the nature and gist of the technical disclosure in the patent.

**Amendment**: A patent applicant's change to one or more claims or to the specification either in response to an office action taken by an Examiner or independently by the patent applicant during the patent application examination process.

**Claim**: Each claim of a patent is a concise, formal definition of an invention and appears at the end of the specification in a separately numbered paragraph. In concept, a patent claim marks the boundaries of the patent in the same way that a legal description in a deed specifies the boundaries of land, i.e., similar to a landowner who can prevent others from trespassing on the bounded property, the inventor can prevent others from using what is claimed. Claims may be independent or dependent. An independent claim stands alone. A dependent claim does not stand alone and refers to one or more other claims. A dependent claim incorporates whatever the other referenced claim or claims say.

**Drawings**: The drawings are visual representations of the claimed invention contained in a patent application and issued patent, and usually include several figures illustrating various aspects of the claimed invention.

**Elements**: The required parts of a patent claim, sometimes referred to as "limitations" or "requirements." A device infringes a patent if it contains each and every requirement of a patent claim.

**Embodiment**: A product that contains the claimed invention.

**Examination**: Procedure before the U.S. Patent and Trademark Office whereby an Examiner reviews the filed patent application to determine if the claimed invention is patentable.

**Filing Date**: Date that a patent application, with all the required sections, has been submitted to the U.S. Patent and Trademark Office.

**Infringement**: Violation of a patent occurring when someone makes, uses, or sells a patented invention, without permission of the patent holder, within the United States during the term of the patent. Infringement may be direct, by inducement, or contributory, as described to you in the final instructions.

**License**: Permission to make, use, or sell a patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other compensation.

---

[66] *Ingenico* Jury Instructions at 38-40 (Glossary of Patent-Related Terms).

**Limitation**: A required part of an invention set forth in a patent claim. A limitation is a requirement of the invention. The word "limitation" is often used interchangeably with the words "requirement" or "element." The phrase "claim limitation" is often used interchangeably with the phrase "claim element."

**Non-Obviousness**: One of the requirements for securing a patent. To be valid, the subject matter of the invention must not have been obvious to a person of ordinary skill in the art at the time of the earlier of the filing date of the patent application or the date of invention.

**Office Action**: A written communication from the Examiner to the patent applicant in the course of the application examination process.

**Patent**: A patent is an exclusive right granted by the U.S. Patent and Trademark Office to an inventor to prevent others from making, using, or selling an invention for a term of 20 years from the date the patent application was filed. The patent has three parts, which are a specification, drawings and claims. The patent is granted after examination by the U.S. Patent and Trademark Office of a patent application filed by the inventor which has these parts, and this examination is called the prosecution history.

**Patent Application**: The initial papers filed in the United States Patent and Trademark Office (Patent Office or PTO) by an applicant. These typically include a specification, drawings and the oath (Declaration) of applicant.

**Patent Examiners**: Persons employed by the Patent Office having expertise in various technical areas who review (examine) patent applications to determine whether the claims of a patent application are patentable and the disclosure adequately describes the Invention.

**United States Patent and Trademark Office (USPTO, or PTO, or Patent Office)**: An administrative branch of the U.S. Department of Commerce that is charged with overseeing and implementing the federal laws of patents and trademarks. It is responsible for examining all patent applications and issuing all patents in the United States.

**Prior Art**: Previously known subject matter in the field of a claimed invention for which a patent is being sought. It includes issued patents, publications, and knowledge deemed to be publicly available, such as trade skills, trade practices, and the like.

**Prosecution History**: The prosecution history is the complete written record of the proceedings in the PTO from the initial application to the issued patent. The prosecution history includes the office actions taken by the PTO and the amendments to the patent application filed by the applicant during the examination process.

**Reference (Prior Art Reference)**: Any item of prior art (publication or patent) used to determine patentability.

**Requirement**: A required part or step of an invention set forth in a patent claim. The word "requirement" is often used interchangeably with the word "limitation" or "element."

**Royalty**: A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention.

**Specification**: The specification is a required part of a patent application and an issued patent. It includes a written description of the invention and the process of making and using it, together with the claims of the patent.

**Written Description**: That part of the specification that comes before the claims and describes the invention and the process of making and using it.