## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PROLITEC INC.,

                Plaintiff,

v.

SCENTAIR TECHNOLOGIES, LLC.,

                Defendant.

C.A. No. 20-984-WCB

### PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
### MOTION FOR JUDGMENT ON THE PLEADINGS (RULE 12(c))

Dated: May 15, 2024

OF COUNSEL:

Marc C. Levy
Syed M. Abedi
Jessica S. Gritton
Emily M. Ross
SEED IP LAW GROUP LLP
701 Fifth Avenue, Suite 5400
Seattle, WA 98104
Tel: (206) 622-4900
MarcL@seedip.com
SyedA@seedip.com
Jessica.Gritton@seedip.com
Emily.Ross@seedip.com

Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Tel: (302) 984-6300
blemon@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*

# <u>TABLE OF CONTENTS</u>

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ................................................................1

II.   SUMMARY OF ARGUMENT ...................................................................................2

III.  STATEMENT OF FACTS ........................................................................................2

IV.  LEGAL STANDARDS .............................................................................................5

     A.    Patent Eligibility May Be Appropriately Determined on a Rule 12(c) Motion.......................................................................................................5

     B.    Patent-Eligible Subject Matter Under 35 U.S.C. § 101 .........................5

V.   ARGUMENT ............................................................................................................7

     A.    *Alice* Step One: The Claims Are Directed to an Abstract Idea............7

          1.    The Claims Recite Broad, Result-Oriented Language that Does Not Provide Specific, Concrete Steps for *How* the Results Are Achieved .............................................................8

          2.    The Claims Themselves Do Not Include Any Alleged Technical Improvements to a Computer or a Physical Device..............11

          3.    The Claims Are Directed to a Mental Process Which Can Effectively Be Performed by a Human with Pen and Paper.................15

     B.    *Alice* Step Two: The Claims Lack an Inventive Concept Because They Disclose Using Generic Computer Equipment to Implement the Abstract Idea ......................................................................................17

     C.    The Claims Effect Broad Preemption of Technical Fields .................19

VI.  CONCLUSION........................................................................................................20

i

## TABLE OF CITATIONS

**CASES**

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
    94 F.4th 1371 (Fed. Cir. 2024) ................................................................ 11, 13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ................................................................ 5, 6, 17, 19

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
    788 F.3d 1371 (Fed. Cir. 2015) ................................................................ 19

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ................................................................ 5

*Brit. Telecomms. PLC v. IAC/InterActiveCorp*,
    381 F. Supp. 3d 293 (D. Del. 2019) ................................................................ 20

*BSG Tech LLC v. BuySeasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) ................................................................ 8, 10, 19

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ................................................................ 18

*ChargePoint Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) ................................................ 11, 13, 14, 15, 17, 18, 19

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................ 6

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ................................................................ 16

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ................................................................ 6, 7, 13, 14, 16

*Election Sys. & Software, LLC v. Smartmatic USA Corp.*,
    2023 WL 3013176 (D. Del. Apr. 25, 2023) ................................................................ 5

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ................................................................ 6

*Ficep Corp. v. Peddinghaus Corp.*,
    2023 WL 5346043 (Fed. Cir. Aug, 21, 2023) ................................................................ 15, 16

*GeoComply Sols. Inc. v. Xpoint Servs. LLC*,
    2023 WL 1927393 (D. Del. Feb. 10, 2023) ................................................................ 20

ii

*In re Killian*,
  45 F.4th 1373 (Fed. Cir. 2022) ....................................................... 16

*In re TLI Commc'ns LLC Pat. Lit.*,
  823 F.3d 607 (Fed. Cir. 2016) ....................................................... 18

*Inst. For Scientific Info. v. Gordon & Breach, Sci. Publrs., Inc.*,
  931 F.2d 1002 (3d Cir. 1991) ........................................................ 5

*Intellectual Ventures I LLC v. AT&T Mobility II LLC*,
  235 F. Supp. 3d 577 (D. Del. 2016) ............................................... 5

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir 2015) ...................................................... 17

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
  850 F.3d 1315 (Fed. Cir. 2017) ..................................................... 19

*Intellectual Ventures I LLC v. Symantec Corp*,
  838 F.3d 1307 (Fed. Cir. 2016) ..................................................... 19

*Joao Control & Monitoring Sys., LLC v. Telular Corp.*,
  173 F. Supp. 3d 717 (N.D. Ill. 2016) .................................7, 9, 10, 11, 15, 16

*KOM Software Inc. v. NetApp, Inc.*,
  2023 WL 6460025 (D. Del. Oct. 4, 2023) .................................5, 6, 8, 11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  566 U.S. 66 (2012) ..................................................................17, 18

*Parker v. Flook*,
  437 U.S. 584 (1978) .................................................................... 18

*Realtime Data LLC v. Array Networks Inc.*,
  2023 WL 4924814 (Fed. Cir. 2023) ................................................ 8

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) ..................................................... 17

*Surgetech, LLC v. Uber Techs. Inc.*,
  2023 WL 7182200 (D. Del. Nov. 1, 2023) ........................................ 5

*SynKloud Techs., LLC v. HP Inc.*,
  490 F. Supp. 3d 806 (D. Del. 2020) ............................................... 19

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017) ................................................7, 8, 14

ME1 48472733V.1

*Valmont Indus., Inc. v. Lindsay Corp.*,
   2018 WL 5962469 (D. Del. Nov. 14, 2018) ............................................................................7

*Vehicle Intel. & Safety LLC v. Mercedes-Benz USA, LLC*,
   635 F. App'x 914 (Fed. Cir. 2015) ....................................................................................7, 11

**STATUTES**

35 U.S.C. § 101 ...........................................................................................................................5

**RULES**

Fed. R. Civ. P. 12(c) .............................................................................................................5, 20

iv

The sole remaining patent in ScentAir's counterclaim case, U.S. Patent No. 10,838,388 (the "'388 Patent"), is invalid under 35 U.S.C. § 101. The broad claims of the '388 Patent are directed to the abstract idea of monitoring and controlling networked scent delivery devices. The core idea of the '388 Patent is nothing more than using generic computer technology to generate and send a command from a list of instructions to a scent delivery device and receive a status update from that device. These are broadly recited generic functions, not a specific solution to a technological problem. The '388 Patent provides no technical details as to the generic computer and networking components recited in the asserted claims. Importantly, the '388 Patent offers no advancements in the functionality of either the generic computer components or the scent delivery devices themselves. Instead, the claims merely describe monitoring and controlling these devices using conventional computer and networking components. Thus, the '388 Patent is invalid because it is directed to unpatentable subject matter, and ScentAir's counterclaim should be dismissed.

## I.    NATURE AND STAGE OF PROCEEDINGS

On July 24, 2020, Prolitec sued ScentAir alleging infringement of its patents. D.I. 1. ScentAir filed an answer and asserted counterclaims alleging infringement of four of its own patents: U.S. Patent Nos. 9,446,162 (the "'162 Patent"); 9,460,404 (the "'404 Patent"); 9,927,789 (the "'789 Patent"); and the '388 Patent. D.I. 33. Prolitec denied those counterclaims. D.I. 36. The entire case was stayed from September 17, 2021 to July 25, 2022 while some of Prolitec's patents underwent *inter partes* review proceedings. D.I. 56, 70.

Prolitec first raised its Section 101 arguments, which addressed all four of ScentAir's patents, in its motion for judgment on the pleadings on November 28, 2022. D.I. 104, 105. The issue was fully briefed. D.I. 125, 130. On June 29, 2023, ScentAir filed its Third Amended Counterclaims, which withdrew the '162, '404, and '789 Patents. D.I. 179. This mooted most of Prolitec's original motion, and in response, the parties stipulated on July 10, 2023 that the Court

could rely upon certain portions of the existing briefing to decide Prolitec's motion as to the '388 Patent. D.I. 181, 188. On August 8, 2023, ScentAir's remaining infringement counterclaim was stayed pending reexamination of the '388 Patent. D.I. 212. Following the issuance of a reexamination certificate, the Court lifted the stay of ScentAir's counterclaim on May 8, 2024, and granted Prolitec's request for revised briefing on its November 28, 2022 motion. D.I. 330.

## II.  SUMMARY OF ARGUMENT

1.  The claims of the '388 Patent are directed to the abstract idea of monitoring and controlling networked scent delivery devices.

2.  The claims of the '388 Patent do not recite an inventive concept, but instead implement the above-referenced abstract idea using generic computer and network components.

## III.  STATEMENT OF FACTS

The '388 Patent is entitled "Scent Schedule Based on Relatedness of Scent Delivery Devices in a Scent Delivery System" and broadly relates to using a central controller to configure networked scent delivery devices to release a scent in a controlled manner. *See* D.I. 33. The '388 Patent claims priority to and shares a specification with the previously asserted '162 Patent. The bulk of this shared specification describes a system for managing scheduling conflicts within a group of networked scent delivery devices through a central controller that resolves scheduling conflicts. *See, e.g.*, '388 Pat., Figs. 2-5C, 7, Abstract, 1:38-2:24, 2:55-3:4, 6:4-15:32. This has the alleged benefit of preventing overscenting and concurrent emission of conflicting or incompatible scents within particular areas. *Id.*, 2:65-3:4. However, these schedule conflict management features are claimed by the no-longer-asserted '162 Patent,[1] not the '388 Patent. Instead, the claims of the

---

[1] For example, the '162 Patent claims determine whether two scent delivery devices are related, prioritizes them, and uses that priority to adjust a master scenting schedule when confronted with scheduling conflicts in the form of overlapping activation times. *See, e.g.*, '162 Pat., claim 1.

ME1 48472733v.1

'388 Patent focus on use of a central controller having an "out table" to store instructions to be sent to the scent delivery devices and an "in table" to store data concerning the status of such devices. *Id.*, 16:5-23. The claims of the '388 Patent do not cover any method or system to coordinate the operation of a group of networked scent delivery devices.

The '388 Patent includes three independent claims that recite essentially identical elements and differ only in their form: claim 1 recites a computer-implemented method for delivering scents, claim 8 recites a system for delivering scents with a non-transitory computer-readable storage medium; and claim 15 recites a computer-program product for delivering scents embodied in a non-transitory machine-readable storage medium. Each independent claim includes essentially the same set of dependent claims. Accordingly, independent claim 1, the method claim, is representative of independent claims 8 and 15, and dependent claims 2-7 are representative of dependent claims 9-14 and 16-20. *See* Ex. A (comparing claims).

Representative independent claim 1 recites five general steps:

*establishing* a communication network including a central controller and one or more networked scent delivery devices . . . ;
*generating* command data that is configured to control the operation of a networked scent delivery device . . . ;
*transmitting* the command data to the networked scent delivery device using the communication network;
*receiving* a signal from the networked scent delivery device using the communication network, wherein the signal includes status data . . . ; and
*storing* the status associated with the networked scent delivery device in the in table of the central controller . . . .

'388 Pat., claim 1 (emphasis added). The claim further specifies that "the central controller is configured to control an operation of each of the one or more networked scent delivery devices, wherein controlling the operation is based on one or more master schedules . . . ." The central controller includes an "in table" for status data and an "out table" for instructions from which the central controller generates command data. The additional limitations primarily use nominally

3

different types of data that are manipulated in unspecified ways, e.g., "the command data is generated based on the instructions stored in the out table," and "the signal includes status data representing a status of the networked scent delivery device."

The dependent claims add minor features to the independent claims. Several elaborate on what "status data" includes, such as operation status (claim 2), which itself indicates whether or not the device is operating to deliver scent (claim 3, dependent on claim 2), and current connection to the communication network (claim 4). The others specify that the device is controlled in accordance with the command data when received (claim 5), which includes activating (claim 6, dependent on claim 5) and deactivating (claim 7, dependent on claim 5) the scent delivery device.

Although the '388 Patent recites an in table and an out table, the specification does not recite any structure for the tables, nor does it specify any particular way in which the tables should operate. The specification describes the tables only by their generic function of holding types of data—the in table to hold verification or status data received from the scent delivery devices, and the out table to hold a list of scheduling instructions. *Id.*, 16:5-8; 18:62-19:3. The '388 Patent discloses that the tables are implemented using ordinary network communications and computer technology. *See*, *e.g.*, *id.*, Fig. 1 (showing a generic network connecting a central controller to the scent delivery devices); Fig. 7 (showing tables as part of the central controller); *see also id.*, 4:41-44 (noting that the central controller can be implemented on a rack mountable server).

Similarly, while the '388 Patent includes the step of "generating command data that is configured to control the operation of a networked scent delivery device of the one or more networked scent delivery devices," the claims do not specify how this is accomplished. The claim simply includes the result of generating command data to control the device.

## IV.    LEGAL STANDARDS

### A.    Patent Eligibility May Be Appropriately Determined on a Rule 12(c) Motion

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party." *Intellectual Ventures I LLC v. AT&T Mobility II LLC*, 235 F. Supp. 3d 577, 584 (D. Del. 2016). A Rule 12(c) motion should be granted when "the plaintiff can prove no set of facts in support of his claim." *Inst. for Sci. Info. v. Gordon & Breach, Sci. Publrs., Inc.*, 931 F.2d 1002, 1005 (3d Cir. 1991).

Determining patent eligibility under Section 101 is a "threshold test," *Bilski v. Kappos*, 561 U.S. 593, 602 (2010), and ultimately a question of law. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). Thus, patent eligibility may appropriately be considered in a motion for judgment on the pleadings under Rule 12(c), *id.*, as this Court frequently does. *See, e.g.*, *Surgetech, LLC v. Uber Techs. Inc.*, 2023 WL 7182200 (D. Del. Nov. 1, 2023); *KOM Software Inc. v. NetApp, Inc.*, 2023 WL 6460025 (D. Del. Oct. 4, 2023); *Election Sys. & Software, LLC v. Smartmatic USA Corp.*, 2023 WL 3013176 (D. Del. Apr. 25, 2023).

### B.    Patent-Eligible Subject Matter Under 35 U.S.C. § 101

Under Section 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." However, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The Supreme Court established the two-step *Alice* test to determine patent eligibility.

Under *Alice* step one, the court determines whether the claims are directed to a "patent-

ineligible concept[].” *Id.* at 217-18. This first step of the patent-eligibility inquiry has been "described . . . as looking at the 'focus' of the claims," or "their 'character as a whole.'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). While no single test has emerged to definitively evaluate whether a claim is directed to an abstract idea, courts have identified a group of related principles that can be applied in gauging whether a patent claim is directed to an abstract idea. *See, e.g.*, *KOM*, 2023 WL 6460025 at *3 ("whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform 'economic or other tasks for which a computer is used in its ordinary capacity,'" "whether the claim is purely functional in nature or is sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result," and "whether according patent protection to the claimed subject matter would have a broad preemptive effect on future innovation in the same field"). Furthermore, it is useful to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

If the claims are directed to a patent-ineligible concept, the court must determine in the second step whether the claims include an "inventive concept"—that is, whether the claims contain "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217-18 (internal quotation marks omitted) (alterations in original). Claim elements that are merely "well-understood, routine, and conventional" do not satisfy the second step. *See id.* at 225. Finally, similar claims directed to the same abstract idea can be considered together for subject matter eligibility. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

## V.    ARGUMENT

### A.    *Alice* Step One: The Claims Are Directed to an Abstract Idea

At their core, the claims of the '388 Patent are directed to the abstract idea of monitoring and controlling networked scent delivery devices. The claims focus on the general idea of storing status update data received from scent delivery devices in a database table (the "in table") and sending commands to these devices based on instructions stored in a separate database table (the "out table") by a central controller. But the claims lack any concrete or specific steps to render them patent eligible. Representative claim 1 is purely functional in nature; it does not describe a specific means or method of solving a technological problem.

Courts have consistently found monitoring and/or controlling devices to be an abstract idea. *See, e.g.*, *Valmont Indus., Inc. v. Lindsay Corp.*, 2018 WL 5962469, at *5 (D. Del. Nov. 14, 2018) (finding "monitoring and controlling the status of irrigation equipment" directed to an abstract idea); *Joao Control & Monitoring Sys., LLC v. Telular Corp.*, 173 F. Supp. 3d 717, 725 (N.D. Ill. 2016) (finding "monitoring and controlling property" directed to an abstract idea), *amended by* 2017 WL 1151052 (N.D. Ill. Mar. 28, 2017) (limiting invalidity ruling to only the claims that were still asserted when the motion was decided); *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338, 1340 (Fed. Cir. 2017) (finding "monitoring the delivery of real-time information to a user or users" directed to an abstract idea; finding another claim directed to an abstract idea where it "requires the functional results of . . . 'controlling,' [and] 'monitoring,' . . . but does not sufficiently describe how to achieve these results in a non-abstract way."); *Vehicle Intel. & Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 917 (Fed. Cir. 2015) (finding claims for monitoring equipment operators and controlling the equipment if the operator is impaired directed to an abstract idea); *Elec. Power*, 830 F.3d at 1353-54 (Fed. Cir. 2016) (finding claims for real-time monitoring of an electric power grid directed to an abstract idea). Applying

the abstract idea to the realm of networked scent delivery devices does not make the idea any less abstract. *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018) ("[A] claim is not patent eligible merely because it applies an abstract idea in a narrow way.")

The claims of the '388 Patent are directed to an abstract idea because they broadly claim functional steps that lack any technical improvement to either a computer or a physical device. To the extent that the claims recite technical limitations, they are merely generic, routine components defined by their function rather than any concrete structure, which only emphasizes how abstract the underlying thrust of the claims is. *See supra* Section III. The claims can be replicated by a human armed with pen and paper. This assessment is further supported by the numerous analogous cases in which courts have found patent-ineligible subject matter under these principles.

### 1.    The Claims Recite Broad, Result-Oriented Language that Does Not Provide Specific, Concrete Steps for *How* the Results Are Achieved

"[I]n determining whether a method claim is directed to an abstract idea, the Federal Circuit has focused on whether the claim is purely functional in nature or is sufficiently concrete or specific to be directed to a patent-eligible process rather than a patent-ineligible result." *KOM*, 2023 WL 6460025, at *4 (collecting cases); *Realtime Data LLC v. Array Networks Inc.*, 2023 WL 4924814, *7-12 (Fed. Cir. 2023) (same). To do this, courts "look to whether the claims in the patent focus on a specific means or method or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery." *Two-Way Media*, 874 F.3d at 1337.

The claims of the '388 Patent are functional in nature because of their broad focus on the generic results of a command being generated and transmitted to a scent delivery device, and a status update being received from that device and stored. The claims lack any meaningful recitation of *how* the commands are generated or *how* the status update is used beyond just being stored.

Regarding the commands, the claims merely require that the command data be generated based on an out table containing instructions. But the operative relationship—"based on"—provides no actual information about how that generation would take place. *See Joao Control*, 173 F. Supp. 3d at 725 (finding the claims directed to an abstract idea because the claims did not explain how they achieved their desired result of monitoring and controlling property). Similarly, regarding the status update, the claims require only that the status update be stored in the in table. The claims fail to specify how that data is supposed to be used. Indeed, neither the claims nor the specification provides any meaningful technical details regarding how these commands are generated based on the out table instructions, nor how the status is determined.

In addition, the claims here do no more than specify conventional computer technology to perform these general steps, and the specification further describes implementing the components with conventional technology. For example, according to the specification, the central controller is implemented by "a rack mountable server" that is "configured to maintain a database." '388 Pat., 4:41-44. The specification specifies no changes to these server and database components to take them outside the realm of the conventional. The specification further discloses that the network consists of various well-known network technology. *Id.*, 3:15-30. Finally, the scent delivery unit is disclosed at a high level as comprising "a scent reservoir and an atomizing device" implemented by nothing more than a bottle that contains a scented liquid and well-known venturi atomizer. *Id.*, 3:46-57.

The specification further discloses implementing the claimed in table and out table with the same rack mountable server used to implement the central controller. *See id.*, 15:33-37; 16:5-7, 16:34-35. The specification describes the tables as nothing more than generic data structures that hold status and scheduling data. *Id.*, 16:5-8; 18:62-19:3. The master scenting schedule also

9

comprises a collection of events that is stored in the rack mountable server. *See id.*, 4:51-61. The fact that the "specification says nothing about how to construct" an in table, out table, or master scenting schedule "suggests that this feature of the claimed system" is not the "focus" of the claims. *See BSG Tech*, 899 F.3d at 1289. Indeed, it is axiomatic that the threadbare details of the cryptic "in table" and "out table" are only depicted in Figure 6 (below) devoid of any technical details:



"[C]laims are not saved from abstraction merely because they recite components more specific than a generic computer." *Id.* at 1286 (collecting cases). Even reciting "a database structure slightly more detailed than a generic database" does not make the claims non-abstract. *Id.* at 1287.

    *Joao Control* is instructive. The *Joao Control* patents broadly claimed "apparatuses and methods for monitoring and controlling property remotely through a computer network and the Internet." *Joao Control*, 173 F. Supp. 3d at 720. One patent more specifically claimed sending signals to remotely "activat[e], de-activat[e], disable[e], re-enabl[e], [or] control[] an operation of" a device or other system, including in response to information received about the device. *See id.* at 721-23. The court held that the claims were directed to an abstract idea because:

> [t]he patent claims do not describe how the devices are programmed to activate, de-activate, disable, re-enable, or control property, or how the devices are programmed to send particular signals to one another. In other words, the patent claims contain

no description about how the apparatus works generally, other than through the use of generic computer "devices," which transmit and receive data.

*Id.* at 728; *see also Vehicle Intel.*, 635 F. App'x at 917 (finding an abstract idea because "[n]one of the claims at issue are limited to a particular kind of impairment, explain how to perform either screening or testing for any impairment, specify how to program the 'expert system' to perform any screening or testing, or explain the nature of control to be exercised on the vehicle in response to the test results.").

Like in *Joao Control*, the '388 Patent does not describe *how* the claimed method works, except that it uses generic, conventional computer components. While the claims further recite that the command data be generated based on an out table containing instructions, the operative relationship—"based on"—provides no actual information about how that generation would take place. The claims provide no meaningful specificity beyond sending commands to a scent delivery device based on a schedule and receiving a status from that device.  Such claims fall squarely within the realm of an abstract idea.

### 2.    The Claims Themselves Do Not Include Any Alleged Technical Improvements to a Computer or a Physical Device

"Where the claims at issue provide for an improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible." *KOM*, 2023 WL 6460025, at *4 (collecting cases). The claims of the '388 patent, however, do not fit this description because although the specification may disclose alleged technical improvements, they are not recited or implemented by the claims. *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 94 F.4th 1371, 1379 (Fed. Cir. 2024) (refusing "to import details from the specification if those details are themselves not claimed"); *see also ChargePoint v. SemaConnect, Inc.,* 920 F.3d 759, 769 (Fed. Cir. 2019).

ME1 48472733v.1

First, the claims of the '388 Patent do not recite any technical improvement to the coordinated control of groups of networked scent delivery devices. The specification largely focuses on resolving scheduling conflicts between scent delivery devices that scent the same area to avoid overscenting or "concurrent emission of conflicting or incompatible scents." *See, e.g.*, '388 Pat., Figs. 2-5C, 7, Abstract, 1:38-2:24, 2:55-3:4, 6:4-15:32. But the claims of the '388 Patent refer to "one or more networked scent delivery devices," meaning that they do not require multiple scent delivery devices. The claims cannot have a "group" with only a single networked scent delivery device, nor can they perform any sort of coordinated control without a group. The specification further predicates its ability to resolve scheduling conflicts on specific scent delivery devices being "related" to each other. *E.g.*, *id.*, Fig. 2, 7:23-40. This also cannot occur with only a single device. Moreover, to the extent that these constitute technical improvements, they are covered by the no-longer-asserted '162 Patent, which *does* recite multiple devices, coordinated control, and management of scheduling conflicts based on relatedness of devices. *See, e.g.*, '162 Pat., claim 1. Even considering the claims as they apply to a single scent delivery device, they do not describe an improved method or system; they merely recite a series of generic steps or results.

Second, the claims do not recite any technical improvements related to real-time control of networked scent delivery devices, as ScentAir previously contended. *See* D.I. 125 at 4-5, 9-10. The claims recite "a real-time status update,"[2] but they do not recite that the command data is sent in real time to the scent delivery devices. *See* '388 Pat., claim 1. Accordingly, the claims cannot be directed to the real-time control of scent delivery devices. Unsurprisingly, ScentAir could only

_____

[2] The "status" of the device is merely stored in the in table and is not recited in the claims as being used to control the device in any way. Accordingly, even if the central controller receives a real-time information in the form of a device status, the claims do not specify how the central controller controls the operation of the device based on that information.

ME1 48472733v.1

point to the specification to contend that the '388 Patent improves real-time remote control of the scent delivery devices. *See* D.I. 125 at 4-5, 10. However, the specification discloses a mix of embodiments where some deliver command data to scent delivery devices to control their operation in real-time, and some do not. For example, in one embodiment, "[t]he delivery of an instruction may occur in real-time (e.g., a 'turn on' instruction is sent in real-time, which results in the machine turning on in response to and upon receipt of the instruction)," while in another embodiment, "delivery of instructions from the scent delivery unit control section 610 may occur ahead of time (e.g., a 'turn on at 6 pm' instruction being sent at 5 pm)." '388 Pat., 16:64-17:1, 17:7-10; *see also id.*, 7:53-61. The claims of the '388 Patent are not narrowly directed to the specific embodiment where the command data is sent in real-time to the scent delivery device. *See ChargePoint*, 920 F.3d at 769 ("[A]ny reliance on the specification in the § 101 analysis must always yield to the claim language" and "cannot be used to import details from the specification if those details are not claimed."). As such, any purported technical improvement is immaterial.[3]

Third, the claims of the '388 Patent do not recite any technical improvement of the scent delivery devices themselves. Instead, ScentAir previously attempted to stretch the language of the claims to assert that the "out table" and the "in table" make the scent delivery devices "more technologically efficient (and cheaper to manufacture) by allowing for reduced computer processing and memory needs on-board a scent delivery device without the loss of functionality

---

[3] Notably, the specification provides no technical details of how the command data is used to control the operation in real-time, other than conclusory statements that the central controller can accomplish this in "real-time" by "ON" and "OFF" commands. *See, e.g.*, '388 Pat., 5:30-54. Even if the claims did recite real-time control of networked scent delivery devices, merely performing an abstract idea in real time using conventional, generic technology does not transform an otherwise abstract idea into patentable subject matter. *See Elec. Power*, 830 F.3d at 1356 (finding that performing functions "in real time" with "entirely conventional, generic technology" was not an inventive concept); *AI Visualize*, 97 F.4th at 1380 (finding "creation of virtual views 'on demand' or in 'real-time'" did not constitute an inventive concept).

or user control." D.I. 125 at 5. In particular, ScentAir pointed to an alternative embodiment in which "turn on" instructions may be sent in real time, which purportedly allows the scent delivery units to require minimal intelligence and functionality. *Id.* (citing '388 Pat., 16:15-23, 16:59-17:2). The specification, however, does not elaborate beyond this. *See* '388 Pat., 16:15-23, 16:59-17:2. Besides the specification's lack of support for this purported benefit, ScentAir cherry-picked this particular embodiment, even though another embodiment discloses:

> the central controller 102 can generate and transmit command data that contains all required information for each scent delivery unit 104 to perform as scheduled (e.g., transmits command data directly to the unit to activate from 1:30 pm to 3:30 pm on Wednesday, July 7th using a scent cycle time of 300 seconds and a 50% duty cycle). . . . Notably, in these implementations, **the scent delivery units 104 may have additional processing and memory capabilities** that enable them to process the more complex command data received from the controller 102.

*Id.*, 5:55-67 (emphasis added); *see also id.*, 17:62-65 ("such machine-specific instructions may be sent out in real-time to less intelligent scent delivery units or may be sent out ahead of time to more intelligent scent delivery units."). Fatal to ScentAir's argument is the fact that the claims of the '388 Patent are not narrowed to their chosen embodiment that purportedly provides such benefits. *See ChargePoint*, 920 F.3d at 769. Indeed, the claims do not recite any sort of "real-time" exchange of command data between the central controller and the scent delivery device, as would be required for the implied "technological efficien[cies]." D.I. 125 at 5. Even if they did, simply performing an abstract idea in real-time is itself an abstract idea. *See Two-Way Media*, 874 F.3d at 1338; *Elec. Power*, 830 F.3d at 1351.

Furthermore, using a generic network operating in a normal way does not save the claims from being directed to an abstract idea. ScentAir may contend that the claims in its patents are directed toward the concrete concept of improving the operation of scent delivery devices using network communications. Such a contention is dead on arrival under the Federal Circuit's precedent. In *ChargePoint*, the court considered whether patents directed toward communicating

14

commands to electric charging stations over a network covered patentable subject matter. 920 F.3d at 766-70. The court acknowledged that the specification describes various benefits of a network-controlled system (e.g., "drivers can determine whether a charging station is available, drivers can pay to charge their vehicles, and utility companies can supply information to charging stations"). *Id.* at 768. However, "the specification never suggests that the charging station *itself* is improved from a technical perspective, or that it would operate different than it otherwise could." *Id*. (emphasis added). The Court concluded that the claim "is indeed 'directed to' the abstract idea of communication over a network to interact with network-attached devices." *Id*. at 770.

The same logic applies here. The specification identifies certain benefits of a network-controlled scent delivery system, such as the ability to avoid overscenting situations or the "concurrent emission of conflicting or incompatible scents." '388 Pat., 3:1-4. But, as in *ChargePoint*, the specification never suggests that the scent delivery device *itself* is improved, or that it would operate differently than it otherwise could absent the network communication. The addition of network communications simply adds one more unpatentable abstract idea. *See also Joao Control*, 173 F. Supp. 3d at 727 (collecting cases finding that operating remotely "does not make the patents non-abstract").

### 3.    The Claims Are Directed to a Mental Process Which Can Effectively Be Performed by a Human with Pen and Paper

At their core, the claims cover a mental process that can be replicated by a human with the aid of a pen and paper, which make them directed to an abstract idea. *See Ficep Corp. v. Peddinghaus Corp.*, 2023 WL 5346043, at *3 (Fed. Cir. Aug, 21, 2023) ("Where the 'focus of the claimed advance over the prior art' shows that 'the claim's 'character as a whole' is directed to' steps that 'can be performed in the human mind, or by a human using a pen and paper' the claim is for a patent-ineligible abstract idea." (quoting *In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir.

2022))); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) ("methods which can be performed mentally, or which are the equivalent of human mental work, are unpatentable abstract ideas.").

A human could perform the steps of the claims of the '388 Patent. The '388 Patent discloses that scheduling instructions could be stored in one table and that status updates could be stored in another table. A human operator could do the same by keeping the same tables in paper format for the scheduling and for the status updates. The indication of the status to a human operator could take any number of forms, including something as simple as a status light on or audible tone emitted from the device indicating that it is operational. A human could also "generat[e] command data that is configured to control the operation of a networked scent delivery device . . . based on the instructions stored in the out table of the central controller" by, for example, reading the scheduling instructions in the out table and determining the appropriate command for the device (such as pressing a button to turn it on). "[W]e have treated analyzing information by steps people go through in their minds . . . , without more, as essentially mental processes within the abstract-idea category." *Elec. Power*, 830 F.3d at 1354 (collecting cases). Indeed, humans have operated machines based on schedules from time immemorial.

To the extent that the "establishing," "transmitting," and "receiving" claim elements are not a mental process, the claims are still directed to an abstract idea. These steps merely automate the known, manual process of interacting with a device (such as a scent delivery device), and thus still constitute an abstract idea. *See Ficep*, 2023 WL 5346043, at *4. "Turning equipment on and off, or otherwise controlling equipment, is a well-known concept. Indeed, the most basic electronic equipment, such as coffee makers, toasters, and electric lights, would be rendered useless if humans could not control them." *Joao Control*, 173 F. Supp. 3d at 727. A human operator can

easily walk over to a scent delivery device to turn it on and off according to the schedule they desire, as well as check on the status of the device. Even if these claim elements are directed to a different abstract idea, such as that of interacting with a device, "[a]dding one abstract idea . . . to another abstract idea . . . does not render the claim non-abstract." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

### B. *Alice* Step Two: The Claims Lack an Inventive Concept Because They Disclose Using Generic Computer Equipment to Implement the Abstract Idea

The claims also fail step two of *Alice* because they recite steps that are performed on conventional computer systems and networks, and thus, lack an inventive concept. Under step two of *Alice*, a court considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Alice*, 573 U.S. at 217 (quoting *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78-79 (2012)). The additional features may not merely be "well-understood, routine, conventional activities previously known in the industry." *ChargePoint*, 920 F.3d at 773. "[T]ransformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* (internal punctuation and citations omitted). "Put another way, there must be an 'inventive concept' to take the claim into the realm of patent-eligibility" since "[a] simple instruction to apply an abstract idea on a computer is not enough." *See Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir 2015). Relying upon "the improved speed or efficiency inherent with applying the abstract idea on a computer" does not "provide a sufficient inventive concept." *See id.* "Whether a claim supplies an inventive concept that renders a claim significantly more than an abstract idea to which it is directed is a question of law that may include underlying factual determinations." *See ChargePoint*, 920 F.3d at 773.

17

As described above, the patent claims here are directed to the abstract idea of monitoring and controlling networked scent delivery devices. The specification and claims contain nothing more than conventional computer equipment to implement this abstract idea. *See supra* Section V.A.1. The central controller is implemented by "a rack mountable server . . . configured to maintain a database." '388 Pat., 4:41-44. The specification fails to disclose that those components operate in anything other than their normal and expected manner. *See id.* The network used to provide communication between the components consists of various well-known network technologies, and the scent delivery unit itself is a well-known component. *See id.*, 3:15-30, 3:46-57. The sending and receiving of data represent nothing more than conventional activity that can be performed by a generic computer. *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

The various tables and schedules disclosed in the specifications are disclosed as nothing more than generic data structures generated in generic computer devices. *See supra* Section V.A.1. The Supreme Court has cautioned that determining patentable subject matter should not "depend simply on the draftsman's art." *See Mayo*, 566 U.S. 66, 72 (2012) (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)). The invocation of "concrete tangible components" does not allow claims to "escape[] the reach of the abstract-idea inquiry." *See ChargePoint*, 920 F.3d at 770 (quoting *In re TLI Commc'ns LLC Pat. Lit.*, 823 F.3d 607, 611 (Fed. Cir. 2016)). The use of "out table," "in table," or "master [scenting] schedule" cannot save the claims from reciting abstract ideas when those features are implemented in a conventional manner using generic technology. The components recited in the claims of the ScentAir Patents do not convey the "something more" required under the second part of the *Alice* analysis.

Finally, limiting the claims to scent delivery devices does not "convert the otherwise

18

ineligible concept into an inventive concept." *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328-1329 (Fed. Cir. 2017) (holding that "limiting an abstract idea to one field of use or adding token post solution components . . . do not convert the otherwise ineligible concept into an inventive concept"). The claims in the ScentAir Patents thus fail *Alice* step two.

**C.     The Claims Effect Broad Preemption of Technical Fields**

The concern regarding preemption "drives the judicial exceptions to patentability." *See SynKloud Techs., LLC v. HP Inc.*, 490 F. Supp. 3d 806, 811-12 (D. Del. 2020) (discussing preemption with respect to both steps in the *Alice* analysis) (internal quotation omitted) (citing *Alice*, 573 U.S. at 216). In this analysis, "reliance on the specification must always yield to the claim language" because "the claim language defines the breadth of each claim." *See id.*

With respect to the first *Alice* step, "a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea." *See ChargePoint*, 920 F.3d at 769. Preemption concerns also arise in the *Alice*, part two, analysis because the focus on "specificity" "is linked with concerns about preemption." *See SynKloud*, 490 F. Supp. 3d at 811. "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Further, "[a] narrow claim directed to an abstract idea, however, is not necessarily patent-eligible." *See Intellectual Ventures I LLC v. Symantec Corp*, 838 F.3d 1307, 1321 (Fed. Cir. 2016); *see also BSG Tech*, 899 F.3d at 1291.

Here, the preemption concerns are significant. The claims of the '388 Patent do not actually recite any alleged technical improvements, like coordinating a group of scent delivery devices, managing scheduling conflicts between related scent delivery devices, or controlling scent delivery

devices in real time. The claims recite the use of conventional components, such as a central controller that generates command data for scent delivery devices, out tables to store instructions for scent delivery devices, in tables to store status updates about those devices, and a communication network that connects a central controller with scent delivery devices. *See, e.g.,* '388 Pat., claim 1. "Because the claims recite no algorithm or other mechanism for effecting the task, they read on any implementation of the abstract idea, thus preempting any method of achieving the same end." *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 320 (D. Del. 2019). The '388 Patent could preempt any method used for sending commands to and receiving status updates from scent delivery devices. "As such, it would result in the preemption of a wide range of activities relating to [the abstract idea], even outside the context of" any of the alleged technical improvements. *GeoComply Sols. Inc. v. Xpoint Servs. LLC*, 2023 WL 1927393, at *8 (D. Del. Feb. 10, 2023).

## VI.     CONCLUSION

Patents are reserved for concrete inventions, not abstract ideas. The '388 Patent fails this basic requirement because it does not recite specific steps to solve a technological problem. Rather, the claims of the '388 Patent are directed to purely functional generic elements of a computer to monitor and control networked scent delivery devices. Such a patent poses substantial preemption concerns because it could effectively foreclose any method of controlling and monitoring networked scent delivery devices. Commerce is replete with examples of using the Internet of Things to control and monitor devices. ScentAir is not entitled to a patent that would effectively give it a monopoly on using the Internet of Things for scent delivery devices.

For the reasons discussed above, Plaintiff respectfully requests that the Court grant Plaintiff's Rule 12(c) motion for judgment on the pleadings.

Dated: May 15, 2024

OF COUNSEL:

Marc C. Levy
Syed M. Abedi
Jessica S. Gritton
Emily M. Ross
SEED IP LAW GROUP LLP
701 Fifth Avenue, Suite 5400
Seattle, WA 98104
Tel: (206) 622-4900
MarcL@seedip.com
SyedA@seedip.com
Jessica.Gritton@seedip.com
Emily.Ross@seedip.com

MCCARTER & ENGLISH, LLP


/s/ Alexandra M. Joyce
Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Tel: (302) 984-6300
blemon@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff*
*Prolitec Inc.*

21