**IN THE UNITED STATES DISTRICT COURT FOR THE**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROLITEC INC., | |
| Plaintiff, Counter-Defendant | C.A. No. 20-984-WCB |
| v. | |
| SCENTAIR TECHNOLOGIES, LLC, | |
| Defendant, Counter-Plaintiff | |

**SCENTAIR TECHNOLOGIES, LLC'S RESPONSE TO PROLITEC INC.'S OPENING**
**BRIEF IN SUPPORT OF SUPPLEMENTAL CLAIM CONSTRUCTION**

Of Counsel:
Vincent J. Galluzzo
K&L GATES LLP
300 South Tryon Street, Suite 1000
Charlotte, NC  28202
Phone:  (704) 331-7400
vincent.galluzzo@klgates.com

Jared R. Lund
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL  60602
Phone:  (312) 372-1121
jared.lund@klgates.com

June 17, 2024

Steven L. Caponi (No. 3484)
Megan E. O'Connor (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE  19801
Phone:  (302) 416-7000
steven.caponi@klgates.com
megan.oconnor@klgates.com

*Attorneys for Counterclaim-Plaintiff*
*ScentAir Technologies, LLC*

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ..............................................1

II.    STATEMENT OF FACTS ....................................................................................2

     A.    The Claims of the '388 Patent ...................................................................2

     B.    The Reexamination of the '388 Patent.........................................................3

          1.    Hamada ................................................................................3

          2.    The Reexamination Proceedings...........................................3

III.    LEGAL STANDARDS ........................................................................................5

IV.    ARGUMENT..........................................................................................................6

     A.    Prolitec Fails to Address the Open-Ended Nature of the Claims..........................6

     B.    ScentAir Never Disclaimed the Claim Scope Argued by Prolitec but Only Pointed Out the Flaws in the Examiners' Analysis of Hamada..................6

     C.    Prolitec's Characterization of the Reexamination Record Is Not Accurate ....................................................................................................9

          1.    ScentAir's Reply to First Office Action (Mot. Ex. D) at 14, 28-31 (Cited by Mot. at 6-8, 10-12)..............................................9

          2.    ScentAir's Reply to Second Office Action (Mot. Ex. G) at 18-19 and 21-23 (Cited by Mot. at 7-8, 10-12)......................................11

          3.    Second Interview Agenda (Mot. Ex. F) at 5 (Cited by Mot. at 7) ...............................................................................................12

          4.    First Interview Agenda (Mot. Ex. J) at 5 (Cited by Mot. at 10) ...............................................................................................13

     D.    Prolitec's "Including by Activating the Scent Delivery Device" Is Ambiguous....................................................................................................13

     E.    Any Construction Should Match the Reexamination Record............................15

V.    CONCLUSION....................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)..................................................................................6

*Grober v. Mako Prods., Inc.*,
   686 F.3d 1335 (Fed. Cir. 2012)................................................................................5

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   327 F.3d 1364 (Fed. Cir. 2003)................................................................................6

*Lochner Techs. LLC v. Vizio, Inc.*,
   567 F. App'x 931 (Fed. Cir. 2014) .........................................................................11

*Lucent Techs., Inc. v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008)................................................................................6

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
   215 F.3d 1281 (Fed. Cir. 2000)................................................................................5

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................5

*Regents of Univ. of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997)................................................................................6

*TC Tech. LLC v. Sprint Corp.*,
   2021 WL 1616080 (D. Del. Apr. 26, 2021).............................................................9

*Uship Intellectual Props. LLC v. U.S.*,
   714 F.3d 1311 (Fed. Cir. 2013)................................................................................9

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Prolitec's Motion fails to meet its high burden to prove *clear* and *unmistakable* disavowal under either of the two arguments it makes.

Prolitec's first argument is flawed because the '388 Patent claims are open-ended in nature. Prolitec does not address the presumption afforded to "comprising" and "including" claims, but even if it had, Prolitec could not overcome that presumption because ScentAir did not make the exclusionary statements that Prolitec says it did.  Prolitec's entire motion is premised on ScentAir having allegedly argued that "*only* the central controller generates command data." *E.g.*, Mot. at 1, 7, 9, 10, 11 (emphasis added).  "Only" is the critical word upon which Prolitec builds its entire argument.  But "only" exists only in Prolitec's characterization, not in what ScentAir actually told the Patent Office.  ScentAir told the Patent Office that the claims require the central controller to generate command data, but it never told the Patent Office that *only* the central controller generates command data.  That is a critical distinction.  Careful comparison of Prolitec's characterization of the record with the actual record bears this out every single time and proves that Prolitec's proposed construction is unfounded.

Prolitec's second argument is flawed because it only injects ambiguity into the claims. "Command data" must, as the claims require, "control the operation" of the scent delivery device, which means that it must in one way or another lead to the device being *operated* (i.e., turned on or off).  That is the entire purpose of the *delivery* device, after all.  ScentAir's arguments to the Patent Office accord that understanding and the breadth of the '388 Patent specification's disclosures.  Thus, it is unclear what Prolitec's optional and open-ended "including by activating

the scent delivery device" language does to resolve a dispute or clarify claim language.[1]  Claim construction is about addressing disputes and narrowing ambiguities.  Prolitec's construction, however, appears to be in search of a dispute and designed to create more ambiguity.

Finally, while no further construction of the '388 Patent is necessary, should the Court believe otherwise, the only construction that is supported by the record is one that makes explicit what the claims already make implicit:  "generating command data <u>by the central controller</u>."

II.      STATEMENT OF FACTS

A.       The Claims of the '388 Patent

The claims of the '388 Patent are open-ended "comprising" claims (claims 1-14) or "including" claims (claims 15-20).  Prolitec's Motion does not mention that fact, but it is critical to this dispute.  For example, claim 1 recites a "computer-implemented method for delivering scents, comprising" a list of method steps.  As relevant here, claim 1 requires that (1) the central controller is configured to control an operation of scent delivery devices based on one or more master schedules; (2) the central controller stores an out table in which instructions for the scent delivery devices are stored; (3) command data is generated based on those instructions; and (4) the command data be transmitted to a scent delivery device.  While the claim does not explicitly say so, the claim implies that the central controller carries out those third and fourth requirements.  But because the claim is a "comprising" claim, it does not exclude or prohibit additional steps or elements performing similar steps so long as at least what is claimed is met.

---

[1] For example, one consequence of Prolitec's construction could be that it supports ScentAir's position on the currently pending motion for judgment on the pleadings under Section 101. Prolitec's motion argued that "[t]he claim simply includes the result of generating command data to control the device."  D.I. 331 at 4.  Prolitec's construction seems to be adding an additional result:  activation of the scent delivery device.

### B.     The Reexamination of the '388 Patent

#### 1.     Hamada

Hamada does not disclose a method for controlling scenting devices from a central controller.  Instead, it discloses a system to "generate a scent using a scent generating device installed in a retail store etc. on the basis of information distributed to a mobile terminal."  D.I. 342-1 Ex. C ("Hamada") at Abstract.  Hamada calls this "fragrant digital signage."  *Id.* at ¶ [0003]. In Hamada's system, "the user first registers with the scent service management device 1 from a mobile terminal 3 indicating when and where the scent service will be received (scheduled time of provision)."  *Id.* at ¶ [0021].  At a later point, "the user of the mobile terminal 3 visits the retail store where the scent generating device 2 is installed, and sends a content reproduction request (including the service ID) from the mobile terminal 3 to the scent generating device 2."  *Id.* at ¶ [0023].  "Based on the received scent content reproduction request, the scent generating device 2 reads the scent instruction information stored in step 3 from the storage means, and generates the scent corresponding to the scent instruction information."  *Id.*  Thus, Hamada's scent generating device starts generating a scent in response to a command issued from the user's mobile terminal when they arrive at the store.  *E.g.*, *id.*

#### 2.     The Reexamination Proceedings[2]

Prolitec's Request for *Ex Parte* Reexamination identified the "scent service management device 1" of Hamada as meeting the "central controller" element of the '388 Patent claims.  Ex. 1

---

[2] Several of Prolitec's exhibits from the reexamination proceeding are incomplete (*e.g.*, Exhibit D is missing the Declaration of Robert Dezmelyk; Exhibit F is missing the Examiner's comments to the interview summary, etc.), and other relevant records from the proceeding were omitted.  For completeness, ScentAir includes the entire record (minus references) as Exhibit 1 hereto, citing to the page numbers superimposed at the bottom of each page.

at 49 (element 1[i]).  The Request also identified "instructions stored in the data storage unit 16"

of Hamada as meeting the "out table" element of the claims.  *Id.* at 51-52 (element 1[v]).

After ordering the reexamination (*id.* at 193-94), the Examiners also matched up Hamada's

scent service management device 1 to the "central controller" of the claims (*e.g.*, *id.* at 211).  But

the Examiners *sua sponte* identified Figure 7 of Hamada as depicting the "out table" of the claims

and on Paragraph [0046] of Hamada as describing it.  *Id.* at 213-14.  The problem was that Figure

7 of Hamada could not be the "out table" of the'388 Patent claims because Hamada's Figure 7 was

part of Hamada's scent generating device 2 (what the Examiners matched to the recited "scent

delivery devices") not part of Hamada's scent service management device 1 (what the Examiners

said was the "central controller" of the claims).  The '388 Patent claims, of course, require that

"the central controller stores … an out table."

On a second office action, the Examiners agreed that their first rejection was faulty and

changed tack to identify Figure 3 of Hamada (the "scent service information table") as the "out

table."  *Id.* at 359-60.  But the Examiners' reliance on Figure 3 of Hamada as the "out table" was

fraught with its own issues.  Figure 3 of Hamada is just an inventory; it lists scents available during

periods provided at the retail stores listed.  Hamada at Fig. 3, ¶¶ [0034]-[0035].  This table is

displayed to users before they make their desired selection of location, scent, and time for delivery.

*Id.* at ¶ [0051]; *see also id.* at Fig. 9 (Step S12 occurring before "registration request").  Nowhere

in Figure 3 of Hamada is there stored an "instruction[] for each networked scent delivery device"

as required by the '388 Patent claims.

In the end, the Examiners conceded that Hamada did not invalidate the '388 Patent claims.

In particular, the Examiners found that Hamada lacked the recited "'out table in which instructions

for each networked scent delivery device are stored; generating command data that is configured

to control the operation of a networked scent delivery device of the one or more networked scent delivery devices, wherein the command data is generated based on the instructions stored in the out table of the central controller.'" Ex. 1 at 458-59. That is because the "scent content information" of Figure 3 of Hamada "does not fall within the scope of the 'instructions' as claimed because the 'scent content information' of figure 3 is merely data, and not an 'instruction,' because it is merely a value (i.e., the selected scent) that is input, stored, and processed by the instruction labeled as SCENT CONTENT INFORMATION of Hamada's figure 4." *Id.* at 459-60. ScentAir made clear at the end of the proceedings that it "does not acquiesce in the stated reasons or interpretations of the claims and reserves the right to assert other reasons for patentability and claim constructions in the co-pending or future litigation." *Id.* at 478.

## III.   LEGAL STANDARDS

Claim language is generally given its "ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation omitted). But when a patentee makes a "clear and unmistakable disavowal of [claim] scope during prosecution," that ordinary and customary meaning can be set aside. *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) (citation omitted). The same can apply to statements made during reexamination. *Id.* (citation omitted). Review of the prosecution history can be tricky, though, because "it often produces ambiguities created by ongoing negotiations between the inventor and the PTO." *Id.* (citation omitted). That is why prosecution disclaimer "only applies to *unambiguous* disavowals." *Id.* (emphasis added); *see also N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (holding that prosecution disclaimer did not apply when statements were amenable to multiple interpretations).

## IV.    ARGUMENT

### A.    Prolitec Fails to Address the Open-Ended Nature of the Claims

One of the first things every law student taking a Patent Law class learns is that the transition phrases of patent claims have particular, and significant, meanings.  The broadest is the "comprising" transition phrase, which "means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."  *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997).  The transition phrase "including" has "the same meaning."  *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008).  The claims of the '388 Patent take these broadest forms and do not exclude "other moieties" or "additional steps" not recited.  *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1572 (Fed. Cir. 1997); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003).

Prolitec does not address that the '388 Patent claims are "comprising" or "including" claims at all.  This is a critical omission, because Prolitec's proposal to include the language "only by the central controller" does more than just narrow the scope of the "generating command data" claim phrase, it effectively rewrites the "comprising" or "including" transition phrase into a closed phrase, like "consisting of."  Prolitec has not cited a single prosecution disclaimer case that would support such a fundamental departure from basic black-letter patent law.  But even if such a case does exist, the facts here cannot support the required *clear* and *unmistakable* disclaimer because the reexamination record is different from how Prolitec characterizes it in its Motion.

### B.    ScentAir Never Disclaimed the Claim Scope Argued by Prolitec but Only Pointed Out the Flaws in the Examiners' Analysis of Hamada

Each argument made by ScentAir stemmed from the fact that both Prolitec and the Examiners identified the scent service management device 1 of Hamada as reading on the "central controller" of the '388 Patent claims.  Having done that, a proper invalidity rejection would need

to show how Hamada's scent service management device 1 meets the claimed requirements for a "central controller."  But neither of the Office Actions did that.  In each instance, the Examiners pointed to *devices other than the scent service management device 1* as having some of those characteristics or carrying out some of those tasks.

In the first Office Action, the Examiners identified Hamada's Figure 7, an "Example of Scent Service Setting Information Table," as meeting the recited "out table."  Ex. 1 at 214.  Figure 7, however, is part of data storage unit 29, which is part of the scent generating device 2—not the scent service management device 1.  *See* Hamada at ¶¶ [0042]-[0043], [0046].  As relevant here, ScentAir's Response to that Office Action is all about convincing the Examiners of their mistake.

ScentAir first established that Hamada's Figure 7 is "stored in the data storage unit 29, which is part of the scent generating device 2, not the scent service management device 1."  Ex. 1 at 291; *id.* at 291-94.  ScentAir next argued that Hamada does not disclose "generating command data" or its "related requirements of the independent claims" for the same reason:  "under the reasoning of the rejection that Fig. 7 is the out table, it would necessarily be the scent generating device 2 of Hamada, not the scent service management device 1, that generates the 'command data […].'  But a scent generating device sending command data to itself is not what is recited by the independent claims."  *Id.* at 294-95.  ScentAir then provided "more support for the difference between Hamada and the claims of the '388 patent," all in direct response to the Office Action, all characterizing what Hamada discloses, though without specifying exactly which claim requirements were missing.  *Id.* at 296-97.

In the second Office Action, the Examiners shifted their rejection and identified Hamada's Figure 3, an "Example of Scent Service Information Table," as meeting the recited "out table."  *Id.* at 359-60, 366-67.  The Examiners contended that this was the required "out table" because "it

stores scent content information (i.e., scent instruction information), which reads on the claimed 'instructions for each network scent delivery device.'" *Id.* at 367 (footnote omitted) (citing Hamada ¶ [0027]).  But the problem with the Examiners' new rejection was that Figure 3 of Hamada is just an inventory table.  It does not include "instructions," it only includes "information indicating the content of scent services that *can be provided*" to the user.  Hamada ¶ [0027]; *see also id.* ¶¶ [0034]-[0035], [0051], Fig. 9 (Step S12).  And this "screen information" is provided to the user *before* the user registers for a scenting service.  *Id.* ¶ [0027] (describing the process of "receiv[ing] a service presentation request" from the user, "send[ing] screen information indicting the content of scent services that can be provided" to the user, and then "receiv[ing] information … related to the scent service selected by the user from information on scent services displayed" to the user).  As relevant here, ScentAir's Response to the second Office Action is all about convincing the Examiners of their new mistake.

ScentAir responded by first arguing that "Hamada's table of Fig. 3 does not store 'instructions for each networked delivery device,' and therefore cannot be an 'out table.'"  Ex. 1 at 410.  Instead, it is an "inventory table identifying the provision periods when scents are available in the devices in the retail store."  *Id.* at 410-11 (quoting Hamada ¶¶ [0031], [0035]).  ScentAir then described Hamada's process with relation to Figures 3, 4, and 7 to establish that Figure 3 does not contain any such "instructions."  *Id.* at 411-12.  ScentAir next rebutted the Examiners' reasoning that Figure 3's "scent content information" is "scent instruction information" with reference to Hamada's disclosures.  *Id.* at 413-14.

ScentAir's statements to the Patent Office were not "clear and unmistakable" disclaimers, especially not of the subject matter Prolitec's construction would disclaim.  ScentAir did not clearly and unmistakably say that *only* the central controller generates command data or that the

'388 Patent claims exclude, for example, a system where command data is generated by a central controller and another device. "[E]ven if individual statements" in the reexamination record "could be read to stand for such a proposition" (ScentAir disagrees any could), ScentAir's "statements do not rise to the level of a clear and unmistakable disclaimer of claim scope when examined in the context of the entire response." *TC Tech. LLC v. Sprint Corp.*, 2021 WL 1616080, at *4 (D. Del. Apr. 26, 2021). Thus, the presumption of open-endedness conferred to the '388 Patent claims by their use of "comprising" should stand.

### C.      Prolitec's Characterization of the Reexamination Record Is Not Accurate

The prosecution disclaimer analysis must "focus[] on what the applicant said," not just on what the counterparty wishes was said. *See Uship Intellectual Props. LLC v. U.S.*, 714 F.3d 1311, 1315-16 (Fed. Cir. 2013). Here, Prolitec's constructions lack support in *what ScentAir actually said*. Broadly speaking, it is not true that "ScentAir asserted that the claims do not cover systems where command data is generated in any device other than the central controller" or that ScentAir told the Patent Office that "command data" must "be brought into existence only and exclusively by the central controller." Mot. at 9, 10. Perhaps that is why Prolitec provides no supporting citation for either proposition. *See id.* But even going through the various portions of the reexamination record that Prolitec does cite only underscores the absence of disclaimer.

#### 1.      ScentAir's Reply to First Office Action (Mot. Ex. D) at 14, 28-31 (Cited by Mot. at 6-8, 10-12)

Page 14 comes in the midst of a background discussion of the '388 Patent and its disclosures. *See generally* Mot. Ex. D at 10-14. There, ScentAir explains that the '388 Patent "recites" (in its claims) "command data" and "describes" (in its specification) "that the central controller generates the command data which activates the scent delivery devices." Mot. Ex. D at 14. Prolitec's citation to this statement (Mot. at 12) is unremarkable. That ScentAir's reference

to "activates the scent delivery devices" was rooted in the specification is confirmed by ScentAir's citation to two portions of the specification that "describe" that as one aspect of command data. *See* Mot. Ex. D at 14 (quoting from '388 Patent at 7:34-36, 7:51-55, 5:36-41, 7:41-44, and 5:55-61); *see* '388 Patent at 7:34-36, 7:51-55. This general, background discussion of the various disclosed embodiments of "command data" in the '388 Patent is not an argument about Hamada or claim scope at all, it is just background. ScentAir's substantive analysis of the rejection, the '388 Patent, and Hamada is not until later, starting on page 16. *See generally id.* at 16-38.

In pages 28-31, ScentAir argued that the Examiners' citation of Figure 7 of Hamada as the "out table" could not meet the '388 Patent claims because, contrary to the claims, Figure 7 of Hamada was not stored in what the Examiners identified as the "central controller" of Hamada. This entire discourse begins by emphasizing the lack of an "out table of the central controller" in Hamada. *Id.* at 28 ("Patent Owner respectfully disagrees because the scent service management device 1 of Hamada does not generate command data from an 'out table of the central controller' as claimed by the '388 Patent."). The portion quoted by Prolitec (Mot. at 12) begins, "[U]nder the reasoning of the rejection that Fig. 7 is the out table, it would necessarily be the scent generating device 2 of Hamada, not the scent service management device 1, that generates the 'command data ….'" Mot. Ex. D at 28. What Prolitec quotes is along those lines and is not a "clear and unmistakable" disclaimer of claim scope.

The pages that follow simply step through the various reasons why Figure 7 is part of the scent generating device 2 of Hamada, not scent service management device 1. Prolitec makes hay of ScentAir's argument that "a scent generating device *sending* command data to itself is not what is recited by the independent claims," Mot. at 10-11 (emphasis added), but that is literally true: claim 1 of the '388 Patent recites, "*transmitting* the command data to the networked scent delivery

- 10 -

device using the communication network." A POSITA would not read this element to cover a networked scent delivery device using the communication network to transmit (or "send" as ScentAir argued during reexamination) the command data to itself. In any event, none of this comes anywhere close to disclaiming the ability of devices other than the central controller to generate command data so long as *at least* the central controller does.

**2.      ScentAir's Reply to Second Office Action (Mot. Ex. G) at 18-19 and 21-23 (Cited by Mot. at 7-8, 10-12)**

In pages 18-19, ScentAir described the "interrelated steps" of claim 1 "that are dependently linked in an ordered combination that require command data to be generated by and sent from the central controller to control the scent delivery device." Mot. Ex. G at 18. ScentAir characterizes what the claims require, not that they are closed-ended or prohibit further elements or steps beyond what is recited. And the claims require the central controller to generate and send command data because: (1) the linkage of "the operation" to "an operation" of the central controller, (2) the linkage of "the out table" to "an out table", (3) the communication network is recited as having a central controller and a scent delivery device, and (4) the claim requires that the command data be transmitted to the scent delivery device. Nowhere does ScentAir argue, or do the '388 Patent claims require, that the central controller *exclusively* generate or send command data.

In pages 20-21, ScentAir supports that analysis by a review of the specification, which confirms that the claims require the central controller to generate and send the command data. *Id.* at 20-21. ScentAir's statement that "the specification provides no embodiments where anything other than the central controller generates and sends the command data" is true, but still does not exclude the possibility of other devices generating or sending command data, so long as *at least* the central controller does. *See id.* at 21. Patent claims, especially "comprising" claims, do not exclude additional embodiments not recited in the specification. *See Lochner Techs. LLC v. Vizio,*

- 11 -

*Inc.*, 567 F. App'x 931, 939 (Fed. Cir. 2014) (referring to precedent that "an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention" and that a patent claim can be "broader than the specific examples disclosed") (citations omitted).

On pages 21-23, ScentAir continues along the same argument by rebutting the Office Action's pick-and-choose approach to rejection. While the Examiners had identified Hamada's scent service management device 1 as the "central controller" of the claims, the Examiners pointed to "command data" as being "generated from the scent reproduction request from the user at the mobile device (#3)." Mot. Ex. G at 21-22 (quoting Ex. 1 at 368). Because the Office Action had not identified the user's mobile device as the "central controller," it could not satisfy the '388 Patent by pointing to another component doing what the claims require the central controller to do. Or, as ScentAir said it then: "the mobile device of Hamada is not a central controller." *Id.* This was no disclaimer of mobile devices being "central controllers" or mobile devices also generating or sending command data, such as through a central controller. It was a response to an Office Action that identified one device as being a central controller and another device as generating and sending command data, when the claims require that a central controller do all of that. Prolitec and the Examiners could have identified the mobile device as the "central controller," but neither did. Therefore, a proper rejection could not rely on generation or sending of command data by the mobile device. That is why ScentAir focused on "the Scent Service Management Device of Hamada" failing to "generate and send the command to activate the scent generation unit." *Id.* at 23.

### 3. Second Interview Agenda (Mot. Ex. F) at 5 (Cited by Mot. at 7)

On page 5 of the interview agenda, ScentAir repeats the same arguments as for its Reply to Second Office Action discussed in the section immediately above: the way the claims are

written, they implicitly require the central controller to generate and send command data.  Mot. Ex. F at 5.  There is no disclaimer of additional elements also generating or sending control data, so long as at least the central controller is.  Likewise, ScentAir's arguments about "data to activate the delivery of the scents" merely reflects the plain language of the claims, which recite that "command data … is configured to control *the operation* of a networked scent delivery device." The entire purpose of scent delivery devices—their entire *operational* value—is in delivering scents.  In other words, ScentAir's arguments reflect the plain reality that "command data" must in one way or another lead to the device being operated (i.e. turned on or off).  Because it is unclear whether Prolitec is proposing something more or different with its construction, it is impossible for ScentAir to further respond to Prolitec's arguments at this point.

### 4.     First Interview Agenda (Mot. Ex. J) at 5 (Cited by Mot. at 10)

ScentAir's argument here is the same as the one set forth in its Response to the First Office Action discussed above, where ScentAir told the Examiners that Figure 7 is not the recited "out table" because it is not in the identified "central controller" of Hamada.  Mot. Ex. J at 5.  Because Figure 7 is not the "out table" recited in the claims, the Office Action also failed to satisfy the generation of "command data" as recited in the claims because the "command data" must be "generated based on the instructions stored in the out table of the central controller," per claim 1. That is exactly what ScentAir said, per the portion quoted by Prolitec.  *See* Mot. at 10 (quoting Mot. Ex. J at 5).

### D.     Prolitec's "Including by Activating the Scent Delivery Device" Is Ambiguous

While Prolitec's citations to the reexamination record discussed above do not support its constructions, Prolitec's proposed addition of "including by activating the scent delivery device" is also inappropriate because it is, at best, ambiguous and unnecessary.

Usually, parties would not get to claim construction briefing without meeting and

conferring on claim scope and proposed constructions.  Given the unique posture here, ScentAir requested a meet-and-confer with Prolitec's counsel to determine whether, and to what extent, there was a dispute.  During that call, ScentAir asked for Prolitec to explain what its language meant, such as whether it was narrower than the scope of the embodiments in the specification, or whether Prolitec was proposing a requirement for direct activation of the scent delivery device (as opposed to, for example, a schedule which may not immediately turn the device on or off but eventually does).  Prolitec's counsel refused to provide more clarity, claiming that Prolitec was not prepared to discuss such "hypotheticals."  Something is awry when a proponent of a construction cannot (or refuses to) provide clarity about a construction it is proposing. Accordingly, and out of an abundance of caution, ScentAir assumes there is a dispute to be had.

Regardless, Prolitec's "including" language creates more uncertainty in the claims, not less.  As Prolitec details on page 14 of its Motion, the specification discloses embodiments of "command data" that can be (1) a series of on/off commands, (2) individual on or off commands, or (3) a schedule that does not necessarily contain on or off commands but conveys to the scent delivery device information for the device to "perform as scheduled" (e.g., when to turn on or off, the characteristics of its operation, etc.).  *See* '388 Patent at 5:36-37, 5:47-50, 5:56-61.  Moreover, the '388 Patent discloses embodiments where a user device schedules scenting events by using the central controller as a middle-man.  *See id.* at 5:3-30, 9:24-28, 9:39-46, 13:49-57, Figs. 3, 4.  It is unclear whether Prolitec's construction encompasses all of these embodiments, but if it excludes any, that would be improper and not supported by the reexamination record.  It is also unclear whether Prolitec's construction is simply acknowledging that "command data" is a term whose scope "includ[es] … activating the scent delivery device," which would be a true statement (for example, as recited in claim 6), but an unnecessary claim construction.

Without more from Prolitec, the Court should not endorse a construction so ambiguous, which will only lead to revisiting this same dispute at summary judgment, pretrial, or even trial. Now is the time to resolve ambiguities in claim scope, to the extent there are any, not to create new ones like Prolitec proposes. Should Prolitec provide more clarity in its reply brief, ScentAir will seek leave to file a sur-reply to address what Prolitec actually wants.

### E.        Any Construction Should Match the Reexamination Record

While ScentAir disagrees that any further construction is necessary, the only construction supported by the reexamination record would be to make explicit that the *central controller* generates the recited command data. That aspect is inherent in the claims as discussed above, including because (1) the "central controller" and "command data" are both recited as "configured to control [an/the] operation" of one or more scent delivery devices and (2) the "command data is generated based on the instructions stored in the out table," which of course is stored in the "central controller". Even though this requirement "is apparent from the claim language" (Ex. 1 at 415) and does not affect claim scope, if the Court should find it necessary to make the requirement explicit, ScentAir proposes the following construction: "generating command data that is configured to control the operation of a networked scent delivery device" should be construed as "generating command data by the central controller that is configured to control the operation of a networked scent delivery device."

### V.        CONCLUSION

For the foregoing reasons, the Court should deny Prolitec's Motion.

Dated: June 17, 2024

**K&L GATES LLP**

OF COUNSEL:                                        /s/ *Steven L. Caponi*
                                                   Steven L. Caponi (No. 3484)
Vincent J. Galluzzo                                Megan E. O'Connor (No. 6569)
K&L GATES LLP                                      K&L GATES LLP
300 South Tryon Street, Suite 1000                 600 N. King Street, Suite 901
Charlotte, NC  28202                               Wilmington, DE  19801
Phone:  (704) 331-7400                             Phone:  (302) 416-7000
vincent.galluzzo@klgates.com                       steven.caponi@klgates.com
                                                   megan.oconnor@klgates.com

Jared R. Lund
K&L GATES LLP                                      *Attorneys for Counterclaim-Plaintiff*
70 West Madison Street, Suite 3300                 *ScentAir Technologies, LLC*
Chicago, IL  60602
Phone:  (312) 372-1121
jared.lund@klgates.com