**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PROLITEC INC.,

           Plaintiff, Counter-Defendant

v.

SCENTAIR TECHNOLOGIES, LLC,

           Defendant, Counter-Plaintiff

C.A. No. 20-984-WCB

**SCENTAIR'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY**

Of Counsel:
Vincent J. Galluzzo
K&L GATES LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Phone: (704) 331-7400
vincent.galluzzo@klgates.com

Jared R. Lund
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602
Phone: (312) 372-1121
jared.lund@klgates.com

November 5, 2024

Steven L. Caponi, Esq. (No. 3484)
Megan E. Hunt (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
megan.hunt@klgates.com

*Attorneys for Counterclaim-Plaintiff
ScentAir Technologies, LLC*

## TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ......................................................1

II.   SUMMARY OF ARGUMENT ..............................................................................1

III.  STATEMENT OF FACTS ..................................................................................2

      A.    The '388 Patent ................................................................................2

      B.    Prolitec's Anticipation and Obviousness Defenses .............................4

      C.    Prolitec's On-Sale Bar Defense ...........................................................4

      D.    Prolitec's Inequitable Conduct Defense...............................................5

IV.   LEGAL STANDARDS ......................................................................................6

      A.    Summary Judgment ............................................................................6

      B.    FRE 702 and *Daubert* ......................................................................6

V.    ARGUMENT ..................................................................................................7

      A.    Prolitec's Invalidity Defenses Rest on a Legally Improper Claim
            Construction ........................................................................................7

            1.    This Claim Construction Dispute Is Ripe for Adjudication
                  Now ...........................................................................................7

            2.    The "In Table" and "Out Table" Cannot Be Met by a Single
                  Table .........................................................................................8

            3.    Under the Correct Construction, Summary Judgement Is
                  Warranted ..............................................................................12

      B.    Summary Judgment of No On-Sale Bar Is Warranted........................14

            1.    Prolitec Has Failed to Show a Sale
                  *of the Patented Invention* .....................................................14

            2.    Prolitec Has Failed to Show "Command Data" Required by
                  the Claims ..............................................................................18

      C.    Dr. Plock's Opinions on Obviousness and Anticipation Should Be
            Excluded, and Summary Judgment Should Be Granted to ScentAir.................19

            1.    Dr. Plock's Obviousness Opinions Are Legally Insufficient.................20

            2.    Dr. Plock's Opinions on Inherency, Relating to Obviousness
                  and Anticipation, Are Improper ............................................31

      D.    Summary Judgment of No Inequitable Conduct Is Appropriate
            Because Prolitec Has No Evidence of a Specific Intent to Deceive
            the USPTO ........................................................................................34

VI.   CONCLUSION................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1st Media, LLC v. Elec. Arts, Inc.*,
    694 F.3d 1367 (Fed. Cir. 2012)..................................................................35

*Acceleration Bay, LLC v. Amazon Web Servs., Inc.*,
    CV 22-904-RGA, 2024 WL 4164876 (D. Del. Sept. 12, 2024) ...................21, 27, 31

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012)..........................................................27, 30, 31

*Adasa Inc. v. Avery Dennison Corp.*,
    No. 6:17-cv-01685-MK, 2020 WL 5518184 (D. Or. Sept. 14, 2020) ....................25

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*,
    101 F. Supp. 2d 1257 (N.D. Cal. 1999) ........................................................24

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................6

*ART+COM Innovationpool GmbH v. Google Inc.*,
    155 F. Supp. 3d 489 (D. Del. 2016)...............................................................7

*Aspex Eyewear, Inc. v. Concepts In Optics, Inc.*,
    111 F. App'x 582 (Fed. Cir. 2004) ..........................................................18, 19

*ATD Corp. v. Lydall, Inc.*,
    159 F.3d 534 (Fed. Cir. 1998)...............................................................24, 30

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010)...........................................................8, 9, 10

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*,
    224 F.3d 1308 (Fed. Cir. 2000).................................................................9, 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................6

*Conoco, Inc. v. Energy & Enviro. Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006).....................................................................7

*Daubert v. Merrell Dow Pharms, Inc.*,
    509 U.S. 579 (1993)....................................................................................6

*Endo Pharms. Sols., Inc. v. Custopharm Inc.*,
  894 F.3d 1374 (Fed. Cir. 2018)..................................................................................32

*Extang Corp. v. Truck Accessories Grp., LLC*,
  No. CV 19-923 (KAJ), 2022 WL 610451 (D. Del. Feb. 18, 2022) ..........................20

*Gen. Elec. Co. v. Joiner*,
  118 S. Ct. 512 (1997)................................................................................................32

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
  919 F.2d 720 (Fed. Cir. 1990)..................................................................................31

*Greatbatch Ltd. v. AVX Corp.*,
  No. CV 13-723-LPS, 2015 WL 9171042 (D. Del. Dec. 11, 2015)...........................35

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
  343 F. Supp. 2d 272 (D. Del. 2004).........................................................................17

*Innogenetics, N.V. v. Abbott Laboratories*,
  512 F.3d 1363 (Fed. Cir. 2008)..........................................................................21, 29

*Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*,
  No. 15-819-LPS-CJB, 2018 WL 1785033 (D. Del. Apr. 4, 2018) .....................32, 34

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014)................................................................................30

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
  140 F. App'x 236 (Fed. Cir. 2005) ..........................................................................20

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
  315 F. Supp. 2d 589 (D. Del. 2004)...........................................................................6

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006)..................................................................................29

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)....................................................................................................6

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
  22 F.4th 1369 (Fed. Cir. 2022) ..................................................................................9

*Luv N' Care, Ltd. v. Laurain*,
  98 F.4th 1081 (Fed. Cir. 2024) ................................................................................35

*Metalcraft of Mayville, Inc. v. Toro Co.*,
  848 F.3d 1358 (Fed. Cir. 2017)................................................................................31

*Microsoft Corp. v. i4i Ltd.*,
    564 U.S. 91 (2011)..................................................................................................20

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)................................................................................33

*Northpeak Wireless, LLC v. 3COM Corp.*,
    674 F. App'x 982 (Fed. Cir. 2016) ...........................................................................12

*Noven Pharms., Inc. v. Amneal Pharms. LLC*,
    No. 18-699-LPS, 2020 WL 11191445 (D. Del. Sept. 4, 2020) ...............................18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)..................................................................................7

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d. Cir. 1994).........................................................................................6

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
    773 F.3d 1186 (Fed. Cir. 2014).........................................................................32, 34

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998)...........................................................................................14, 16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................12

*Plumtree Software, Inc. v. Datamize, LLC*,
    473 F.3d 1152 (Fed. Cir. 2006)..........................................................................14, 17

*Princeton Biochemicals v. Beckman Coulter, Inc.*,
    411 F.3d 1332 (Fed. Cir. 2005)................................................................................24

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    725 F.3d 1377 (Fed. Cir. 2013)................................................................................23

*In re Robertson*,
    169 F.3d 743 (Fed. Cir. 1999)..................................................................................32

*Schumer v. Lab. Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002)................................................................................21

*Securus Techs., Inc. v. Glob. Tel*Link Corp.*,
    701 F. App'x 971 (Fed. Cir. 2017) ..........................................................................30

*Shire Dev., LLC v. Watson Pharms., Inc.*,
    787 F.3d 1359 (Fed. Cir. 2015).............................................................................8, 9

*Sisvel Int'l S.A. v. Sierra Wireless, Inc.*,
     82 F.4th 1355 (Fed. Cir. 2023) ........................................................................27

*Solvay, S.A. v. Honeywell Int'l Inc.*,
     886 F. Supp. 2d 396 (D. Del. 2012) ....................................................................7

*Space Systems/Loral, Inc. v. Lockheed Martin Corp.*,
     271 F.3d 1076 (Fed. Cir. 2001) .........................................................................17

*Sparton Corp. v. United States*,
     399 F.3d 1321 (Fed. Cir. 2005) ....................................................................14, 17

*Sun Pharma. Indus. Ltd. v. Saptalis Pharms., LLC*,
     No. 18-649-WCB, 2019 WL 2549267 (D. Del. June 19, 2019) ..............................8

*Therasense, Inc. v. Becton, Dickinson & Co.*,
     649 F.3d 1276 (Fed. Cir. 2011) (en banc) ..........................................................35

*TQ Delta, LLC v. Cisco Sys. Inc.*,
     942 F.3d 1352 (Fed. Cir. 2019) .........................................................................24

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*,
     777 F. App'x 495 (Fed. Cir. 2019) ....................................................................10

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................................6

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | U.S. Patent No. 10,838,388 |
| 2 | Excerpts from Patent File History for U.S. Patent No. 10,838,388 |
| 3 | Excerpts from Patent Reexamination File History for U.S. Patent No. 10,838,388 |
| 4 | **(UNDER SEAL)** Opening Expert Report of Cory Plock, Ph.D. |
| 5 | Exhibit D to Opening Expert Report of Cory Plock, Ph.D. |
| 6 | **(UNDER SEAL)** Reply Expert Report on Invalidity and Supplement Expert Report on Non-Infringement by Cory Plock Ph.D. |
| 7 | **(UNDER SEAL)** Deposition of Cory Plock, held on October 10, 2024 |
| 8 | Japanese Patent Appl. No. JP 2009-217641 A to Hamada |
| 9 | U.S. Patent Appl. Pub. No. US 2013/0131883 to Yamada |
| 10 | U.S. Patent Appl. Pub. No. US 2011/0089260 to Van Roemburg |
| 11 | **(UNDER SEAL)** ScentAir Requirements Specification Document SA-1638 v3.5 (SCENTAIR_00082577) |
| 12 | **(UNDER SEAL)** ScentAir Requirements Specification Document SA-2001 v1.0 (SCENTAIR_00082355) |
| 13 | Environmental Scent Service Agreement (SCENTAIR_00081879) |
| 14 | Environmental Scent Service Agreement (SCENTAIR_00004706) |
| 15 | **(UNDER SEAL)** Deposition of John Thurston Chandler, held on May 15, 2023 |

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement case where both parties asserted their patents, but only ScentAir's patent remains to be adjudicated. Prolitec initiated this lawsuit in July 2020, asserting infringement by ScentAir of four Prolitec patents. D.I. 1. ScentAir counterclaimed for infringement of four of its own patents. D.I. 33. Prolitec asserted affirmative defenses in response, including inequitable conduct. D.I. 193. Both parties narrowed their asserted patents, leaving Prolitec with two asserted patents remaining and ScentAir with one (the '388 Patent). D.I. 19; D.I. 162; D.I. 179. ScentAir's part of the case was stayed pending *ex parte* reexamination proceedings initiated by Prolitec. *See* D.I. 212 at 1-2. Prolitec's part of the case proceeded to trial in January 2024, where a jury concluded that ScentAir did not infringe the asserted claims of the Prolitec patents and that those claims were not invalid. D.I. 304, 315. The Court lifted the stay on ScentAir's part of the case on May 8, 2024 (D.I. 330), after the USPTO confirmed the patentability of all 20 claims of the '388 Patent. *See* D.I. 327.

## II.    SUMMARY OF ARGUMENT

A.    Prolitec's invalidity defenses rely on a claim construction of the complementary, but mutually exclusive, claim terms "in table" and "out table" that would permit a single database table to meet both terms. A proper construction of "in table" and "out table" prohibits them from being met by the same database table. ScentAir thus moves for summary judgment of no anticipation and no obviousness under a correct claim construction.

B.    The on-sale bar requires a pre-critical date sale *of the patented invention*, but Prolitec's on-sale bar defense cannot prove one ever occurred, certainly not by clear and convincing evidence. ScentAir did not have a patented invention to sell at the time of its agreement with the Barclays Center in March 2012 because the inventors conceived of the invention after that date. And ScentAir and the inventors did not complete development of the Barclays Center

system until after the critical date, July 10, 2012. Regardless, Prolitec has failed to meet its burden to show that the complete invention was ready for patenting prior to the critical date because Dr. Plock fails to identify what meets the "command data" requirement of the recited claims. ScentAir thus moves for summary judgment of no on-sale bar for these two independent reasons.

C.    Dr. Plock's opinions on obviousness and inherency are legally improper for a host of reasons. In short, Dr. Plock's obviousness opinions propose a "pick and choose" approach that fails to provide anything more than generic, hindsight-based reasons for obviousness that are divorced from the references being combined. Dr. Plock's inherency opinions are also improper because they have no grounding in the references themselves and are just as hindsight-ridden as his obviousness opinions. ScentAir thus moves for Dr. Plock's opinions to be excluded under *Daubert* and, as a result, that ScentAir be granted summary judgment of no anticipation and no obviousness (to the extent not already granted for the reasons above).

D.    Prolitec advances an inequitable conduct defense but, like so many defendants who raise the defense, has no evidence to support the "specific intent to deceive the USPTO" pillar of inequitable conduct. ScentAir thus moves for summary judgment of no inequitable conduct.

## III.    STATEMENT OF FACTS

### A.    The '388 Patent

1.    The '388 Patent has two inventors, John Thurston Chandler and Chad Alan Morton. Ex. 1 at (72).[1] The attorney of record responsible for prosecution of the application that led to the '388 Patent was Sameer Vadera. *E.g.*, Ex. 2 at 10.

2.    The '388 Patent has 20 claims, three of which are independent claims: 1, 8, and 15.

---

[1] All exhibits referenced in this brief are to the Declaration of Vincent J. Galluzzo being filed contemporaneously herewith.

Ex. 1, cls. 1, 8, 15. Claim 1 and its dependent claims (2-7) each recite a "computer-implemented method for delivering scents," claim 8 and its dependent claims (9-14) each recite a "system for delivering scents," and claim 15 and its dependent claims (16-20) each recite a "computer-program product." *Id.*, cls. 1-20.

3.    Each claim of the '388 Patent requires, among other things, "an in table in which verification information relating to each networked scent delivery device is stored" and "an out table in which instructions for each networked scent delivery device are stored." *Id.*, cls. 1, 8, 15.

4.    Each claim of the '388 Patent also requires, among other things, "command data" and "transmitting the command data to the networked scent delivery device using the communication network." *Id.*, cls. 1, 8, 15.

5.    During the original prosecution of the '388 Patent, the Examiner stated in the "Reasons for Allowance" that "[n]one of the prior art of record, alone or in combination, expressly teach or fairly suggest the combination of the specifics" of the patent claims "comprising of a central controller configured to control networked scent delivery devices using an out table wherein instructions for each networked scent delivery device is stored and using an in table wherein verification information relating to each networked scent delivery device is stored to provide real-time status updates for each networked scent delivery device." Ex. 2 at 155-56.

6.    During the *ex parte* reexamination proceedings initiated by Prolitec, the Examiner stated in the "Reasons for Confirmation of Patentability" that "Claims 1-20 are confirmed as patentable because Hamada does not disclose or make obvious 'an in table in which verification information relating to each network[ed] scent delivery device is stored' and 'an out table in which instructions for each networked scent delivery device are stored'" as well as "'generating command data that is configured to control the operation of a networked scent delivery device of

the one or more networked scent delivery devices, wherein the command data is generated based on the instructions stored in the out table of the central controller'" in combination with the other limitations of the claims." Ex. 3 at 458-59.

      **B.**    **Prolitec's Anticipation and Obviousness Defenses**

    7.    Dr. Plock, Prolitec's technical expert, opines that the "in table" requirement of the '388 Patent claims are met by one of two references: Hamada or Yamada. Ex. 7, 232:6-233:1. For Hamada, Dr. Plock relies on the "Scent Service Registration Table" depicted in Figure 4 of Hamada. *Id.*, 200:8-17; Ex. 8 at Fig. 4. For Yamada, Dr. Plock relies on the table depicted in Yamada's Figure 28. *E.g.*, Ex. 4, ¶ 300; Ex. 9 at Fig. 28.

    8.    Dr. Plock opines that the "out table" requirement of the '388 Patent claims is met only by the Hamada reference. Ex. 7, 233:8-15. Dr. Plock relies on the same "Scent Service Registration Table" depicted in Figure 4 of Hamada as meeting both the "out table" and the "in table" requirements of the '388 Patent claims. *Id.*, 207:24-208:5; *see also id.*, 198:8-17, 200:8-17.

    9.    Prior-art Hamada discloses a system that utilizes a "communication network 4 such as the Internet," but is not limited to use of the internet as the means of communication. Ex. 8, ¶ [0019]; Ex. 7, 203:20-204:17, 205:15-206:1.

    10.    Prior-art Van Roemburg is silent as to the type, number, and usage of any internal data structures of its communication system. *See generally* Ex. 10, ¶¶ [0006]-[0017], [0033]-[0052].

      **C.**    **Prolitec's On-Sale Bar Defense**

    11.    Prolitec relies on at least two documents that it contends show the subject matter of the '388 Patent was ready for patenting prior to the critical date of July 10, 2012: Ex. 11 (dated July 6, 2012) and Ex. 12 (dated June 18, 2012). *See* Ex. 7, 142:19-23. Prolitec also relies on a March 21, 2012, Environmental Scent Service Agreement between ScentAir and Brooklyn Events

Center, LLC (the "Barclays Agreement").

12.     The Barclays Agreement is a services agreement whereby the service "is provided by means of an on-premise fragrance delivery system in the Serviced Premises (the 'Equipment') that uses replaceable scent cartridges or containers." Ex. 13, SCENTAIR_00081879. The Addendum to the Barclays Agreement includes proposed pricing for "Installation", "Mthly", and "Qrtly" for various areas in the Barclays Cener. *Id.*, SCENTAIR_00081882. The Addendum also includes a price for "Control Panel/Networking System." *Id.*, SCENTAIR_00081883.

13.     The Barclays Agreement does not state that it is for a computer-implemented method for delivering scents such as would meet claims 1-7 of the '388 Patent, a system for delivering scents such as would meet claims 8-14 of the '388 Patent, or a computer-program product such as would meet claims 15-20 of the '388 Patent.

14.     The inventions claimed in the '388 Patent were conceived as a result of development of the Barclays Center system, which occurred after March 21, 2012. Ex. 15, 79:2-81:9, 150:7-15, 157:8-158:12.

15.     ScentAir did not complete development of the Barclays Center system until after July 6, 2012. *Id.*, 92:17-95:4, 123:17-125:23, 129:25-130:16, 138:10-17, 158:14-18.

### D.    Prolitec's Inequitable Conduct Defense

16.     Prolitec's Seventh Affirmative Defense alleges that there was inequitable conduct by "the applicant and named inventors, John Thurston Chandler and Chad Alan Morton, and/or their representatives involved in the prosecution of the patents." D.I. 193, ¶ 7. Prolitec's affirmative defense pleads intent in a single paragraph "[o]n information and belief." *Id.*, ¶ 28.

17.     None of ScentAir, John Thurston Chandler, Chad Alan Morton, or any of their representatives acted with a specific intent to deceive the USPTO.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any evidence must be viewed in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The substantive law dictates which facts are material, and disputes over non-material facts will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant must identify the basis for summary judgment and the evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If, as here, the moving party does not have the ultimate burden of persuasion at trial, the moving party need not produce evidence negating the existence of a material fact but need only point out the absence of evidence supporting the non-movant's case. *Id.* at 325.

### B.    FRE 702 and *Daubert*

The Supreme Court has "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600-01 (D. Del. 2004). Under *Daubert* and Rule 702 judges are "gatekeeper[s]," allowing the jury to hear only relevant, reliable evidence. *Kumho Tire*, 526 U.S. at 145. Thus, "*any* step that renders [expert] analysis unreliable under *[Daubert] renders the expert's testimony inadmissible.*" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d. Cir. 1994) (emphasis in original).

## V.    ARGUMENT

### A.    Prolitec's Invalidity Defenses Rest on a Legally Improper Claim Construction

ScentAir moves for summary judgment of no invalidity under 35 U.S.C. § 102 and for summary judgment of no invalidity under 35 U.S.C. § 103 because Prolitec's defenses rest on a legally improper understanding of the recited "in table" and "out table." As detailed below, the "in table" and "out table" of the asserted claims cannot be met by a single table, but Prolitec's defenses rely only on one table. Because the "elements of the prior art must be arranged or combined in the same manner as in the claim at issue," Prolitec's invalidity defenses fail as a matter of law. *Solvay, S.A. v. Honeywell Int'l Inc.*, 886 F. Supp. 2d 396, 402 (D. Del. 2012), *aff'd*, 742 F.3d 998 (Fed. Cir. 2014) (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009)).

#### 1.    This Claim Construction Dispute Is Ripe for Adjudication Now

ScentAir raises what is effectively a claim construction dispute at summary judgment because it came to the forefront during expert discovery. *E.g.*, D.I. 371 at 1-2. Because this dispute arose after claim construction, the Court can resolve it as part of summary judgment. *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 507 (D. Del. 2016); *see also Conoco, Inc. v. Energy & Enviro. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order.").

This dispute is also dispositive of Prolitec's anticipation and obviousness defenses, all of which (except for those in Dr. Plock's Reply Report at ¶¶ 119-125, which are insufficient in their own way, *see* Section V.C.1.b(ii), *infra*) rest on those two claimed tables being met by a single table in the prior art. A proper construction that the "in table" and "out table" cannot be met by the same table would resolve those defenses in ScentAir's favor. The Court should resolve this "fundamental dispute." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a

claim term, it is the court's duty to resolve it.").

> ### 2. The "In Table" and "Out Table" Cannot Be Met by a Single Table

Ordinarily, "a single component of an accused product [or prior art reference] can satisfy more than one claim element." *Sun Pharma. Indus. Ltd. v. Saptalis Pharms., LLC*, No. 18-649-WCB, 2019 WL 2549267, at *7 (D. Del. June 19, 2019). But here, the plain language of the claims, the specification, and the prosecution history all clearly teach that the "in table" and "out table" are distinct components of the patented invention such that they cannot be met by a single table.

> #### a. The Claims Recite a Separate "In Table" And "Out Table"

The plain language of the '388 Patent claims prohibits the "in table" and "out table" from being met by a single table. The claim language supports this conclusion in several ways.

<u>First</u>, the independent claims recite the "in table" and "out table" as separate elements. For example, claim 1 recites "wherein the central controller stores ***an in table*** in which verification information relating to each networked scent delivery device is stored ***and an out table*** in which instructions for each networked scent delivery device are stored." Ex. 1, cl. 1 (emphasis added). The claim's use of "an" in table "and an" out table linguistically separates the two. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). So does their definition by different names, the "in table" and the "out table," as opposed to, for example "a table" and "a table." The "clear implication" of claim drafting like this is that the "in table" and "out table" are "distinct component[s]" of the patented invention. *Id.* (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)).

<u>Second</u>, beyond being recited separately, the very names of the two tables, "***in*** table" and "***out*** table," are mutually exclusive because the ordinary and customary meaning of "in" and "out" is mutually exclusive. *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359 (Fed. Cir. 2015) is informative on this point.  There, the disputed terms were an "inner lipophilic matrix" and an

"outer hydrophilic matrix." *Id*. at 1365. The Federal Circuit explained that "the logical reading of the claim requires separation between the matrices because the matrices are defined by mutually exclusive spatial characteristics—one inner, one outer." *Id*. at 1366–67. "[O]ne matrix cannot be both inner and outer…." *Id.* at 1367. Neither can one table meet both the claimed "in table" and "out table."

Third, the "in table" and "out table" are recited as having different functions. Whereas the "in table" stores "verification information" and the "status" for each networked scent delivery device, the out table stores "instructions for each networked scent delivery device." Ex. 1, cls. 1, 8, 15. And the "verification information" is used differently than the "instructions." *Id*. Namely, claim 1 recites generating command data "based on the instructions stored in the out table" while "the status stored in the in table of the central controller identifies a functionality of the networked scent delivery device, thereby providing a real-time status update for each networked scent delivery device." *Id*.

Fourth, nothing in the claim language even suggests that the in table and the out table can be the same table. *See Becton*, 616 F.3d at 1254-55 (finding two claim elements were required to be separate because "[t]here is nothing in the asserted claims to suggest that the [two elements] can be the same structure.") (citation omitted).

The claim language thus creates a presumption that the "in table" and "out table" are distinct and cannot be met by a single table absent "any evidence to the contrary." *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of … different terms in the claims connotes different meanings.")); *see also Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) ("No party has identified claim language

overcoming the presumption that the [two elements] are distinct components."); *Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*, 777 F. App'x 495, 498 (Fed. Cir. 2019) ("Nothing in the claims suggest that [two elements] can coexist as the same element.").

Dr. Plock and Prolitec cannot provide any evidence to the contrary in the claims.[2] Dr. Plock was asked at deposition for claim language support for his "same table" opinions. He answered, there is "nothing to restrict or require that the two tables be different tables" and the claims "do[] not say that there is an in table separate from an out table." Ex. 7, 92:25-93:24. Dr. Plock also referred to Paragraph 105 of his Reply Report and otherwise stated that he's "not aware of any" other support for his opinion. *Id.*, 93:25-95:8. But Paragraph 105 of the Reply does not provide any evidence to contradict the presumption that the "in table" and "out table" are distinct. It only reiterates effectively what he already testified, that "nothing in the claims precludes an interpretation wherein the status information and the instructions used to generate commands are stored in the same table." Ex. 6, ¶ 105. Dr. Plock simply is not reading the claim language at face value. Regardless, the claim language also does not affirmatively state that a single table can meet the claim language, so that leaves the presumption of separation intact. The presumption must be overcome by "*evidence* to the contrary," not a *lack of evidence*, which is all that Dr. Plock and Prolitec have. *See CAE Screenplates*, 224 F.3d at 1317.

### b.     The Specification Confirms the Plain Reading of the Claims

Claims must read in light of the specification, and the specification here confirms that the "in table" and "out table" are distinct elements that cannot be met by the same table. *See, e.g.*, *Becton*, 616 F.3d at 1254-55 (find that the specification confirmed that the elements were separate

---

[2] Or in the specification (*see* § V.A.2.b, *infra*) or prosecution history (*see* § V.A.2.c, *infra*).

as recited in the claims). <u>First</u>, the only figure of the '388 Patent that depicts the "in table" and "out table" depicts them as separate tables:



Ex. 1 at Figure 6 (annotated). <u>Second</u>, the specification consistently and exclusively discusses the "in table" and "out table" as each having separate functions. For example, "verification signals may be received and stored in an in table," and the "in table 612 may send or otherwise make accessible the verification information to the schedule control section 606." *Id.*, 16:34-38; *see also id.*, 18:67-19:3, 25:30-33. Conversely, the out table is "configured to store the updated list of instructions for each machine in the system." *Id.*, 16:7-8; *see also id.*, 16:10-30. <u>Third</u>, like with the claim language, *nothing* in the specification teaches that the "in table" and the "out table" can be the same table. Dr. Plock admitted to the same at deposition. Ex. 7, 96:19-25.

Here again, Dr. Plock and Prolitec have no "evidence to the contrary" to overcome the presumption of separate tables. When asked to identify specification support, Dr. Plock's answer mirrors his answer on the claim language: he reviewed the specification "to determine if it said anything that would preclude, you know, one table satisfying both. And I didn't come up with

anything." Ex. 7, 96:10-18. The lack of an embodiment that *precludes* the claim construction Prolitec seeks is insufficient to overcome the presumption of separateness.

c.      **The Prosecution History Confirms the Proper Construction**

The prosecution history, and in particular the recent *ex parte* reexamination record, further confirms that the "in table" must be separate from the "out table." *See*, *e.g.*, *Northpeak Wireless, LLC v. 3COM Corp.*, 674 F. App'x 982, 986 n.1 (Fed. Cir. 2016) ("Statements made during reexamination procedures before the PTO are part of the prosecution history.") (citation omitted). During reexamination, ScentAir described the "in table" and "out table" as being "***two*** specific data structures" and otherwise distinguished them before the USPTO. Ex. 3 at 277 (emphasis added); *see also id.* at 280 ("[T]he invention's out table and in table make it possible to build scent delivery devices that are more efficient."). Again, Dr. Plock and Prolitec have nothing to the contrary. When asked during deposition for prosecution record support, Dr. Plock testified that he "can't think of anything, sitting here right now, from the prosecution history, one way or the other." Ex. 7, 97:12-20.

*       *       *

The intrinsic evidence routinely and exclusively describes the claimed "in table" and "out table" as distinct elements. ScentAir's construction thus stays true to the claim language and most naturally aligns with the '388 Patent's description of the invention, so the Court should adopt it. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

3.      **Under the Correct Construction, Summary Judgement Is Warranted**

a.      **Prolitec's Anticipation Defense Relies on Only One Table**

Prolitec's lone anticipation defense relies on prior-art Hamada, but Dr. Plock only identifies one table from Hamada (the "Scent Registration Table" of Hamada's Figure 4) as meeting ***both*** the "in table" and the "out table." *See* Ex. 6, ¶ 118 ("[A]s explained in my Opening

Report, the scent service registration table (Figure 4) stored in the scent service management device in Hamada reads on both the claimed 'in table' and 'out table.'"). Dr. Plock confirmed this position at his deposition. Ex. 7, 198:8-17 ("[O]ne table meets the in table and the out table requirements."), 200:10-17 (identifying the scent service registration table in Figure 4 of Hamada as the "in table"), 207:24-208:5 (identifying the scent service registration table in Figure 4 of Hamada as the "out table"). Under a proper understanding of "in table" and "out table" prohibiting a single table from meeting both elements, Prolitec's anticipation defense cannot survive summary judgment.

### b.    Prolitec's Obviousness Defenses Rely on Only One Table

Prolitec's obviousness combinations boil down to two references at the end of the day: Hamada and Yamada. That is because those are the only two references Dr. Plock contends have either an "in table" or an "out table" as required by the asserted claims. Ex. 7, 232:6-233:1 (relying only on Hamada and Yamada for an "in table"); *id.*, 233:8-15 (relying only on Hamada for an "out table"). As discussed above, however, Dr. Plock's assertions about Hamada rely only on a single table, and Yamada likewise only has a single table. *See* Ex. 4, ¶ 267; Ex. 7, 233:2-7. Accordingly, under a proper claim construction, summary judgment is warranted on any combination of references that lacks both Hamada and Yamada, since those combinations would only have, at most, a single table.

Summary judgment is also warranted on Prolitec's obviousness combinations that include both Hamada and Yamada. The one place where Dr. Plock provides any analysis as to how or why a POSITA would combine those two references is in his Opening Report at ¶¶ 264-268, but that combination is ***not*** made to meet the requirement of the "in table" of the asserted claims. Instead, Dr. Plock's analysis is in relation to the "receiving a signal from the networked scent delivery device using the communication network, wherein the signal includes status data representing a

status of the networking [sic] scent delivery device" element. Ex. 4, ¶ 265. Dr. Plock has nowhere else proposed to combine the purported "in table" of Yamada with the purported "out table" of Hamada such that the resulting combination has two tables. Thus, ***all*** of Dr. Plock's obviousness combinations (except for his new theories in Reply at ¶¶ 119-125, addressed in Section V.C.1.b(ii), *infra*) rely on a single table and none can survive under a proper construction. Summary judgment is therefore proper.

### B.    Summary Judgment of No On-Sale Bar Is Warranted

#### 1.    Prolitec Has Failed to Show a Sale *of the Patented Invention*

The Supreme Court has interpreted the on-sale bar of § 102(b) as having two requirements that must ***both*** occur before the critical date of one year before the application: (1) "the product must be the subject of a commercial offer for sale and (2) "the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). This motion relates to that first requirement, and particularly the "more difficult" part of that requirement: whether there was a commercial sale "of the patented invention." *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006) (finding a commercial offer because "there was a binding contract" but stating, "The more difficult question is whether the commercial offer was 'of the patented invention'"). Prolitec's on-sale bar defense cannot survive summary judgment because there was no sale or offer of sale ***of the patented invention*** before the critical date.

<u>First</u>, Prolitec relies on a "ready for patenting" date of July 6, 2012, but contends there was a sale of that invention four months earlier in March 2012. That, as the Federal Circuit has said, is "illogical;" "with no conception of an invention, there cannot be an offer for sale or a sale of that invention." *Sparton Corp. v. United States*, 399 F.3d 1321, 1324-25 (Fed. Cir. 2005) ("Under the Claims Court's analysis, the patented single part release plate was the subject of an offer for sale before it was even conceived. Such a result is illogical."). Prolitec's on-sale bar defense thus cannot

survive summary judgment.

Second, the Barclays Agreement could not have sold the patented invention in March 2012 because ScentAir had not even started developing it yet. It was only after the Agreement was signed that the inventors began developing the scenting system for the Barclays Center. Ex. 15, 138:19-139:18; *see also id.*, 129:9-15; Ex. 11 (first revision date of April 5, 2012). That is because the patented invention was "inspired by" the "control system that was installed in Barclays Center." Ex. 15, 150:7-15; *id.*, 79:2-7 (the Barclays arrangement "basically spurred the development of those inventions"); *id.*, 79:11-21; (the "process of invention … actually came about because of that project"); *see also id.*, 78:13-25, 79:23-81:9 (inventions were developed "in response to a customer request"), 157:8-158:12.

The timeline here is crucial, and inventor Chandler provided detailed testimony on that timeline.[3] ScentAir was (and still is) in the business of selling "off-the-shelf systems." *Id.*, 79:23-80:8. But if a customer had a desire for something different, ScentAir's "sales team and the customer could work together" to discuss what could be done. *Id.*, 80:9-17. As relevant here, an individual at Barclays "was very much on board with the possibility of using fragrance" and thought "together with the ScentAir sales team" that they could come up with a solution. *Id.*, 80:18-81:5. The only details of that solution were a "control system" that needed to be "on a schedule," it had to "be controlled by an iPad," it had to "support multiple fragrances" at different areas of the arena, and it had to "coordinate a particular fragrance … with a particular event." *Id.*, 85:7-88:14. Those high-level requirements "filtered [their] way down to the product development team," including inventor Chandler, who was urged to develop a solution "pretty soon because the

---

[3] Inventor Morton was not asked about, and did not refute, any of these topics of Chandler's testimony.

thing [the Barclays Center] is going to open in however many months." *Id.*, 81:5-9.

"[A] lot of the design issues and challenges" of developing the system "were not immediately apparent from" the initial customer request and requirements. *Id.*, 88:15-24. "It's only in the process of actually – of actually developing it" that Chandler and Morton solved those challenges. *Id.*, 88:24-89:12. Some of those developments happened after the critical date (or at least after the date of the latest document cited by Prolitec, July 6, 2012) and relate directly to the network communication aspects of the asserted claims. *Id.*, 128:13-129:7. There was "lots of grueling technical stuff" involved in the project, including a late switch of communications networks and interfaces. *Id.*, 138:19-139:18.

Importantly, the development "certainly was not done" by July 6, 2012, including because other versions contained not just the user interface but also "the PHP code and the SQL code" to run the software. *Id.*, 129:25-130:16, 138:10-17. And the control system installed at the Barclays Center was completed even later—"essentially the day that the Center actually opened," which was in September 2012. *Id.*, 92:17-94:7, 123:17-125:23, 158:14-18. That included not just installation, but programming the WiFi controllers, configuring the back-end computer server, and resolving other technical details. *Id.*, 94:8-95:4.

Mr. Chandler's testimony puts this case outside of the on-sale bar not just by the Court's reasoning in *Sparton*, but also based on longstanding and well-settled precedent that the on-sale bar is triggered only when an invention "is complete, rather than merely one that is 'substantially complete.'" *Pfaff*, 525 U.S. at 66; *see also id.* at 68 n.14 (rejecting a bright-line rule for the on-sale bar proposed by the Solicitor General because "the possibility of additional development after the offer for sale" could negate that an invention was "ready for patenting at the time of the sale"). Whether under that principle, or the "experimental use exception" to the on-sale bar, ScentAir's

post-Agreement development prior to and continuing after the critical date precludes the application of the on-sale bar. *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 294-297 (D. Del. 2004) (rejecting application of on-sale bar under similar circumstances); *see also Space Systems/Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed. Cir. 2001) (deferring to inventor uncertainty regarding whether the inventor's drawings could be made to work in rejecting application of on-sale bar).

Third, the Barclays Agreement does not demonstrate that what ScentAir was selling in March 2012 was the patented invention. By its own terms, the Agreement is for "an environmental scent service" that "is provided by means of an on-premise fragrance delivery system in the [Barclays Center]" and "that uses replaceable scent cartridges or containers." Ex. 13 at SCENTAIR_00081879. The Barclays Agreement still has fragrances "TO BE DETERMINED" and its Addendum I for "Scent System Pricing" has installation and recurring charges for various areas of the Barclays Center. *Id.* at SCENTAIR_00081879, -882. The last item of Addendum I for "Control Panel/Networking System" also does not specify anything about the patented invention, and especially lacks any details regarding, for example, whether and how the "Control Panel/Networking System" would manage data input and output to a central controller, the data structures it would use, or whether it enabled "real time" status updates. *Id.* at SCENTAIR_00081883. At most, Prolitec can show that a "control panel/networking system" was sold to Barclays, but like in *Plumtree*, "[t]he patented invention is not the [control panel/networking system] itself." *Plumtree*, 473 F.3d at 1155; *see also Sparton*, 399 F.3d at 1324 (rejecting arguments that the post-sale conception of the invention triggered the on sale bar under either a "conforming goods" or "contract for future goods" theory).

Moreover, the Barclays Agreement takes the same form and terms as all of ScentAir's scent

service agreements, further demonstrating that the agreement is not for something new, such as the patented invention. *See*, *e.g.*, Ex. 14 at SCENTAIR_00004706. Just like the Barclays Agreement, ScentAir's standard agreement for individual scent machines describes the "Service" to be provided as "an on-premise fragrance delivery system … that uses replaceable scent cartridges or containers." *Id.* It also includes "Equipment Installation charge[s]" and "recurring charges." *Id.* The only substantive difference between the Barclays Agreement and all of ScentAir's other agreements is the listing of "Control Panel/Networking System" but, as discussed above, the patented invention is not just a control panel/networking system and the detail in the Barclays Agreement comes far short of demonstrating that it covers the scope of the later-conceived invention.

Without a sale *of the patented invention* prior to the critical date of July 10, 2012, ScentAir is entitled to summary judgment on Prolitec's on-sale bar defense.

## 2.    Prolitec Has Failed to Show "Command Data" Required by the Claims

A claim is anticipated under the "on-sale" bar of § 102(b) "if each and every element limitation is found, either expressly or inherently, in a single prior art reference." *Noven Pharms., Inc. v. Amneal Pharms. LLC*, No. 18-699-LPS, 2020 WL 11191445, at *24 (D. Del. Sept. 4, 2020) (citation omitted). That is why "testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and *explain in detail how each claim element is disclosed in the prior art reference*." *Aspex Eyewear, Inc. v. Concepts In Optics, Inc.*, 111 F. App'x 582, 588 (Fed. Cir. 2004) (citation omitted) (emphasis added).

Prolitec has not met its burden to show that each and every element of the asserted claims is disclosed in the "Barclays Center Design Documents" because Dr. Plock has not adequately identified what in his opinion meets the "command data" recited in the asserted claims. Paragraph

90 of Dr. Plock's Opening Report addresses this claim element. There, Dr. Plock recites the claim element in the first sentence, discusses other parts of the claim language in the second sentence, and then states, "Further, as discussed above, the out table 'consists of the data needed to command the control program," citing SCENTAIR_00042351. Ex. 4, ¶ 90. Nowhere does Dr. Plock identify what the "command data" is or how it is "generated based on the instructions stored in the out table of the central controller" or how there is a "transmitting the command data to the networked scent delivery device using the communication network" as recited in each claim. *See* Ex. 1, cls. 1, 8, 15. Dr. Plock's Reply Report says no more on this subject.

At his deposition, Dr. Plock was asked, "Do you point out anything specifically in your report about what the command data is?" to which he answered, "I discuss, you know, that the out table consists of the data needed to command the control program. But *aside from paragraph 90, I don't get into specific details.*" Ex. 7, 188:1-9 (emphasis added). Dr. Plock's implicit assessment of Paragraph 90 is too generous; he does not "get into specific details" there either. *See* Ex. 4, ¶ 90. Because Dr. Plock fails to identify what the "command data" is or how it is "generated based on the instructions stored in the out table of the central controller," Prolitec is without any ability to prove up those claim elements.

### C. Dr. Plock's Opinions on Obviousness and Anticipation Should Be Excluded, and Summary Judgment Should Be Granted to ScentAir

This case is not "one of those rare cases where the invention is so simple that expert testimony is not required." *Aspex Eyewear*, 111 F. App'x at 588. Dr. Plock is Prolitec's only technical expert and thus the only person who can carry the water on Prolitec's anticipation and obviousness defenses. Yet Dr. Plock fails to provide legally sufficient opinions to support either defense. Dr. Plock's failings are many. He lists seven references that he could combine in dozens, if not hundreds, of ways, using the same formulaic, generic motivation to make each combination.

These hindsight-ridden, generic-benefit-driven motivations to combine are divorced from the references themselves and demonstrate a subjective desire to invalidate the claims, not an objective motivation in the art to arrive at the claimed invention. The Court should thus exclude Dr. Plock's opinions as unsupported, unreliable, and in violation of *Daubert* and Rule 702. *See*, *e.g.*, *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 140 F. App'x 236, 244 (Fed. Cir. 2005) (affirming exclusion of conclusory expert testimony that was unsupported other than by the expert's subjective belief).

Without Dr. Plock's fundamentally flawed opinions, Prolitec has no basis to prove its defenses and certainly cannot meet its clear and convincing burden to overcome the presumption of validity. *See Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 96-97, 101-02 (2011) (party challenging patent on obviousness grounds bears a high burden of persuasion); *Extang Corp. v. Truck Accessories Grp., LLC*, No. CV 19-923 (KAJ), 2022 WL 610451, at *1 (D. Del. Feb. 18, 2022) ("the party challenging validity must prove that the claims are invalid by clear and convincing evidence.") (citation omitted). Should the Court exclude Dr. Plock's opinions, the Court should also grant summary judgment of no obviousness and no anticipation.

### 1.    Dr. Plock's Obviousness Opinions Are Legally Insufficient

Dr. Plock's obviousness opinions[4] should be excluded, and ScentAir should be granted summary judgment of non-obviousness, because Dr. Plock's obviousness analysis is insufficient under the law. First, Dr. Plock's opinions consist of little more than a long (and ambiguous) "pick and choose" menu option of prior art references that he contends disclose one or more of the elements of the asserted claims. The sheer number of Dr. Plock's potential combinations, in view

---

[4] The obviousness opinions to be excluded are expressed at Ex. 4, ¶¶ 264-332 and Ex. 6, ¶¶ 69, 119-125, 132-133.

of his scant analysis of each, violates Rule 26 and improperly road maps against the claims. Second, Dr. Plock's motivations to combine follow a rote formulation that has the same, generic-benefits-based reasons to combine regardless of the particulars of the references being combined (or the number of them being combined). Dr. Plock's generalized motivations are of the type commonly rejected by the Federal Circuit as improper hindsight. At base, it is not enough to "merely list[] a number of prior art references and then conclude[]" obviousness. *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1373 (Fed. Cir. 2008). Dr. Plock's faulty opinions should be excluded because "[t]he risk is great that the confusion or generality is the result, not of an inarticulate witness or complex subject matter, but of a witness who is unable to provide the essential testimony." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1316 (Fed. Cir. 2002) (finding it "improper" to "accept confusing or generalized testimony as evidence of invalidity").

### a.    Dr. Plock's "Pick and Choose" Opinions Are Based in Hindsight Alone and Are Practically Boundless in Scope

A viable obviousness defense rests on a clear articulation of "the scope and content of the prior art," the "differences between the prior art and the claims at issue," and "the level of ordinary skill in the pertinent art;" it is against this backdrop that "the obviousness or nonobviousness of the subject matter is determined." *Acceleration Bay, LLC v. Amazon Web Servs., Inc.*, CV 22-904-RGA, 2024 WL 4164876, at *3 (D. Del. Sept. 12, 2024) (quoting *KSR*, 550 U.S. at 406). Rather than follow this beacon, however, Dr. Plock took an unfortunately all-too-familiar path that puts the onus on ScentAir and the Court to determine what Dr. Plock's opinions were. Dr. Plock's obviousness opinions take one of the following improper forms:

- "To the extent any limitation is explicitly or inherently missing from [Reference 1], the claim charts illustrate that ***either*** [Reference 2], [Reference 3], [Reference 4], [Reference 5], [Reference 6], ***and/or*** [Reference 7] cure any such deficiency." Ex. 4, ¶¶ 264, 282-286 (emphasis added).

- "To the extent [Reference 1] does not meet this limitation, ***at least*** [Reference 2] cures

this deficiency," but then goes on to analyze also References 3 and 4 as well. *Id.*, ¶¶ 296-303, 305 (emphasis added).

- "To the extent [Reference 1] does not disclose this limitation" it "was well-known in the art. [Reference 1], [Reference 2], [Reference 3], [Reference 4], [Reference 5], ***and/or*** [Reference 6] provide such functionality." *Id.*, ¶ 308 (emphasis added).

- "Claims 1-20 are obvious over ***at least*** the following combination of references: … [Reference 1] in view of [Reference 2] and one of [Reference 3], [Reference 4], [Reference 5], [Reference 6], ***or*** [Reference 7]." *Id.*, ¶¶ 287, 329 (emphasis added).

It is impossible to make heads or tails of the sheer number of possible combinations of Dr. Plock's "[t]o the extent ***any limitation***" is missing, "either … and/or," and "at least" formulations of potentially seven references in combination. Dr. Plock certainly did not know the answer to that at his deposition. When asked if he could articulate how many obviousness combinations he was proposing, he answered, "Sitting here right now, I don't know." Ex. 7, 212:20-213:7. Even after he consulted his report, he still could not answer the question. All he could do is point to the paragraphs of his report for ScentAir to figure it out. *Id.*, 216:24-217:14. If Dr. Plock cannot enumerate the combinations he is proposing, it should not be up to ScentAir and the factfinder to figure it out.

Further complicating the matter is Exhibit D to Dr. Plock's Opening Report, which also forms part of Dr. Plock's opinions. *Id.*, 222:10-23. Exhibit D is a slightly modified version of Prolitec's invalidity contentions claim chart for the '388 Patent, containing scant analysis but pages of copy/paste from various references with no discernable care to whether any of it has anything to do with Dr. Plock's opinions.[5] *See generally* Ex. 5. To discern what Dr. Plock's obviousness opinions are, Dr. Plock suggested the following approach: "start with the report" because it

_____

[5] Dr. Plock testified he "[does not] believe he wrote Exhibit D. Ex. 7, 225:25-226:3. He also testified he was not involved in creating the invalidity contentions for Prolitec. *Id.*, 226:20-24.

"provides the combinations" (meaning those innumerable potential combinations above), then, "if after reading the combinations there is some doubt as to whether one of the combinations does not expressly or inherently disclose a particular claim limitation, one may refer to Exhibit D." Ex. 7, 221:1-222:9. But that only confuses matters more. *Cf. id.*, 230:9-231:21. When asked whether citations to the prior art in Exhibit D means Dr. Plock "contend[s] that the prior art reference meets or has [that element]," Dr. Plock responded, "I don't think that's a fair characterization" and instead pointed back to his report. *Id.*, 230:12-231:21. The result is an endless loop. Where the report lacks detail, the reader should consult Exhibit D, but Exhibit D does not fairly characterize Dr. Plock's opinions, so the reader should refer back to the report. This circularity demonstrates how unworkable Dr. Plock's opinions are. The jury should be shielded from this unhelpful, confusing analysis.

"The purpose of the expert disclosure rule is to 'provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (citation omitted). Dr. Plock's expert disclosures did not accord ScentAir that opportunity, and Dr. Plock's deposition shows that there is no universe where ScentAir could reasonably obtain that opportunity. *See* Ex. 7, 212:20-213:7, 216:24-217:14. Dr. Plock and Prolitec certainly have a plan to present a limited set of obviousness combinations at trial and should have clearly identified those earlier. Trial by ambush should not be tolerated.

Separate from Dr. Plock's disclosure problem, the "pick and choose" nature of Dr. Plock's obviousness combinations is improper. The Federal Circuit has rejected this very same hindsight-based analysis because Congress has "prevent[ed] evaluation of the invention part by part. Without this important requirement, an obviousness assessment might," as Dr. Plock has done, "break an

invention into its component parts, then find a prior art reference corresponding to each component." *Princeton Biochemicals v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005); *see also Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*, 101 F. Supp. 2d 1257, 1259-60 (N.D. Cal. 1999) (denying reconsideration of summary judgment of no obviousness where expert's analysis was "to 'pick and choose' elements from among [the prior art] and, with explicit reference to the [asserted] patent, to establish obviousness with 'hindsight.'"). Obviousness "cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention," but that is exactly how Dr. Plock went about his analysis. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998); *see also Princeton Biochemicals*, 411 F.3d at 1337 (finding the patent cannot serve "as a roadmap to find its prior art components"). Dr. Plock's opinions are insufficient to go to the jury.

### b. Dr. Plock's Motivation to Combine Opinions Are Generic and Bear No Relation to Any Specific Combination of the Prior Art

Dr. Plock's obviousness opinions should also be excluded, and summary judgment of non-obviousness should be granted to ScentAir, because Dr. Plock's motivations to combine all follow the same improper, hindsight-based formula. According to Dr. Plock, it would be obvious to a POSITA to make each of the innumerable combinations he proposes (as discussed above) because a first reference is missing a requirement of the asserted claims and a second reference provides some benefits. *See*, *e.g.*, Ex. 4, ¶¶ 264, 288, 330. But generic benefits, standing alone, are not enough for obviousness, especially where Dr. Plock failed to explain deficiencies in any of the references that would suggest filling a gap or solving a problem with a secondary reference and for that generic benefit. *TQ Delta, LLC v. Cisco Sys. Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) (quoting *In re Van Os*, 844 F.3d 1359, 1361-62 (Fed. Cir. 2017)) ("'[A] conclusory assertion with no explanation is inadequate to support a finding that there would have been a motivation to

combine' because '[t]his type of finding, without more, tracks the *ex post* reasoning KSR warned of and fails to identify any actual reason why a skilled artisan would have combined the elements in the manner claimed.'"); *Koito*, 381 F.3d at 1152 ("General and conclusory testimony . . . does not suffice as substantial evidence of invalidity.") (citation omitted). Other than filling in holes he needs to achieve an opinion that the claims are obvious, Dr. Plock's motivation to combine opinions "bear[] no relation to any specific combination of prior art elements." *Adasa Inc. v. Avery Dennison Corp.*, No. 6:17-cv-01685-MK, 2020 WL 5518184, at *6-7 (D. Or. Sept. 14, 2020), *aff'd in part, rev'd in part on other grounds*, 55 F.4th 900 (Fed. Cir. 2022). Examples from both of Dr. Plock's operative reports follow.

### (i)    Dr. Plock's Obviousness Opinions in His Opening Report Are Insufficient

As a first example, Dr. Plock opines that if Hamada is missing the claimed requirement "receiving a signal from the networked scent delivery device using the communication network, wherein the signal includes status data representing a status of the networking [sic] scent delivery device," then it "would be obvious to a POSITA" to add Yamada "at least because Yamada explains that its system allows power consumption benefits to be obtained." Ex. 4, ¶¶ 265, 268. Dr. Plock fails to provide any explanation what signal status features have to do with power consumption benefits, or what it was about Hamada or Yamada that would lead a POSITA to make that combination. Dr. Plock also fails to explain why a POSITA would look to decrease power consumption in Hamada or even that Hamada is concerned with power consumption such that a POSITA would look to references like Yamada to address that need. Dr. Plock also does not explain how adding a signal status feature to Hamada would decrease that power consumption, even if one were to make the combination. Dr. Plock's cursory discussion of power consumption benefits could be copied and pasted into a motivation to combine opinion for any electronic

component patent claim, which shows that Dr. Plock's opinions are untethered to anything of import in this case.

Another example is Dr. Plock's opinion that a POSITA would be motivated to add a signal status feature to Hamada because Van Roemburg can improve dispersion of scent. *E.g.*, Ex. 4, ¶ 276. Again, Dr. Plock has no explanation of what it is about Hamada that would lead a POSITA to even look to improve its scent dispersion, or even if that POSITA was interested in improving scent dispersion, why the POSITA would look to add a status signal feature to achieve that goal. Dr. Plock's motivations to combine all follow this pattern in one way or another. *See id.*, ¶¶ 271, 274, 276, 278, 280 (Hamada-based combinations); *id.*, ¶¶ 282-286 (incorporation by reference); *id.*, ¶¶ 299, 301, 309-314 (Van Roemburg-based combinations); *id.*, ¶¶ 317, 319, 328 (incorporation by reference). They are formulaic too; Dr. Plock uses the same motivation to combine rationale regardless of the primary reference. *Compare id.*, ¶ 268 *with id.*, ¶¶ 301, 310; *compare id.*, ¶ 271 *with id.*, ¶¶ 303, 311; *compare id.*, ¶ 274 *with id.* ¶ 312; *compare id.* ¶ 278 *with id.*, ¶ 313; *compare id.*, ¶ 280 *with id.*, ¶ 314. To avoid any doubt, Dr. Plock confirmed that his motivation opinions were fully stated in his reports, so the Court only need evaluate the four corners of those reports to evaluate the propriety of those opinions. *See* Ex. 7, 228:17-24.

Dr. Plock's opinion that the seven cited references "are directed to the use of a centralized system to direct the operation of remote appliances and devices, including scent dispensing devices" is nothing more than an insufficient reason to combine because the references are analogous to one another. Ex. 4, ¶¶ 289-290, 331-332. As this Court recently found in *Acceleration Bay*, an opinion that "the prior art references are analogous to each other and to the claimed invention" is insufficient to survive *Daubert* or summary judgment, especially where, as here, the expert failed to sufficiently explain how or why a POSITA would have "combined elements" from

the prior art "in the way the claimed invention does." *Acceleration Bay*, 2024 WL 4164876 at *18

(quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir.

2012)); *see also Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, 82 F.4th 1355, 1364 (Fed. Cir. 2023).

Dr. Plock's conclusory analysis on expectation of success (in its entirety: "A POSITA

would expect success in combining these references because they all describe using similar and

compatible communication protocols") also cannot save Prolitec's obviousness case from

summary judgment. *See* Ex. 4, ¶¶ 290, 332. The Federal Circuit's *ActiveVideo* opinion is

instructive. There, the expert provided "a conclusory statement that a person of ordinary skill in

the art would have known, based on the 'modular' nature of the claimed components, how to

combine any of a number of references to achieve the claimed inventions." *ActiveVideo*, 694 F.3d

at 1327. The court found that opinion was "not sufficient and [] fraught with hindsight bias." *Id.*

Dr. Plock's opinion is no different in its characterization of the seven references having "similar

and compatible communication protocols." Ex. 4, ¶¶ 290, 332. Besides being conclusory, this

opinion is a red herring because Dr. Plock is not proposing to combine their communication

protocols (as far as ScentAir understands) but other features of their underlying structure,

components, and actions. The references' communication protocols thus have nothing to do with

Dr. Plock's proposed combinations.

### (ii)    Dr. Plock's New Obviousness Opinions in His Reply Report Are Insufficient

Dr. Plock's new opinions in his Reply Report are also insufficient. There, Dr. Plock opines

that it would have been obvious to supplement prior art references Hamada, Yamada, WebCTRL,

and Van Roemburg with "separate tables for controlling and monitoring a device" or, alternatively,

to supplement the references with one database table and then also to "split [that] single table by

database partitioning." Ex. 6, ¶ 119. These opinions explicitly use the '388 Patent as a roadmap,

discussing the "performance benefit" of the arrangement of the '388 Patent and then working backward to find disparate documents that discuss generic performance benefits of general design techniques in the art. *Id.*, ¶¶ 120-125. Paragraph 124 is the most egregious. It looks to the claimed arrangement of the '388 Patent in the first sentence, identifies a performance benefit of that arrangement in the second sentence; and concludes that if a POSITA were to do what the '388 Patent requires "in the first place," they would be able to achieve those benefits. *Id.*, ¶ 124. The circularity (and insufficiency) of this opinion cannot be overstated.

The other paragraphs of Dr. Plock's new Reply Report combinations also lack any relation to any specific combination of prior art elements and espouse nothing more than generic, hindsight-fraught reasons to arrive at the claimed invention. *See id.*, ¶¶ 120-122. For example, if it were true that "[b]oth common sense and standard database design practices would indicate using separate tables, one for incoming data and a second for outgoing data," *id.*, ¶ 121, one would think that Dr. Plock could identify even a single reference with this architecture. Yet none of his cited textbooks or publications have such an arrangement, and the only two prior art references that use tables (Hamada and Yamada) effectively teach away from this arrangement because both disclose using a single table for both incoming and outgoing data, and neither state any problems with this configuration. *See* Ex. 8, ¶¶ [0037]-[0038]; Ex. 9, ¶¶ [0238]-[0242]. Furthermore, Dr. Plock's opinions that a POSITA would add tables or modify tables of WebCTRL and Van Roemburg, which by Dr. Plock's own admission have no tables at all, are not fit for a courtroom. *See generally* Ex. 6, ¶¶ 119-125.

Compounding the fundamental problems with Dr. Plock's obviousness analysis, especially in his Reply Report, is that he contends obviousness of the same exact claim elements that the

USPTO found—twice—to be the '388 Patent claims' point of novelty over the prior art.[6] *E.g.*, *id.*, ¶ 123. In both original prosecution and during the recent reexamination, the USPTO found the claims of the '388 Patent patentable over the prior art because of its recited "in table in which verification information related to each networked scent delivery device is stored" and its recited "out table in which instructions for each networked scent delivery device are stored." *See* Ex. 2 at 155-56; Ex. 3 at 458-59. It is the epitome of hindsight bias for Dr. Plock to claim that those elements, having not been found in *any* of the prior art at the Patent Office either time or in *any* of the prior art he relies on, is somehow just "obvious."

Additionally, Dr. Plock's obviousness position grafted into his on-sale bar opinions in Reply also falls victim to the same hindsight-based and improperly non-specific reasoning. Ex. 6, ¶ 69. Dr. Plock asserts it would have been obvious to redesign a preexisting scent machine so that its electronics now include a controller, a relay, and a network module simply because "[d]oing so is well within the knowledge of [a] POSITA" and because the integration would perform the same functions together as they exist separately. *Id.* Nothing is said about the specifics of the scent machine, the relay, or what it is about those components that would suggest to a POSITA to make that combination. Dr. Plock just wants the Court, and the jury, to take his word for it.

### (iii)    All of Dr. Plock's Obviousness Opinions Fail to Satisfy Controlling Precedent

None of Dr. Plock's obviousness opinions, whether his Opening Report or Reply, have a "rational underpinning" as required by controlling precedent. *Innogenetics*, 512 F.3d at 1373; *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be

---

[6] ScentAir agrees that this is *one* point of novelty but, to the extent the USPTO's writings could be read as limiting, ScentAir disagrees that this is the *only* point of novelty.

sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."); *see also Securus Techs., Inc. v. Glob. Tel\*Link Corp.*, 701 F. App'x 971, 977 (Fed. Cir. 2017) ("Securus' case against the patentability of the claimed invention amounts to 'mere conclusory statements,' which fall short of 'some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'").

Quite different from the way Prolitec and Dr. Plock did things,[7] precedent requires that "[t]here must be a teaching or suggestion within the prior art, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources of information, to select particular elements, and to combine them in the way they were combined by the inventor." *ATD*, 159 F.3d at 546 (citation omitted); *see also InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1348-49 (Fed. Cir. 2014) (to demonstrate obviousness, it is not enough to show "all of the elements of the claims disparately existed in the prior art"). Dr. Plock's opinions, on the other hand, are "generic and bear[] no relation to any specific combination of prior art elements." *ActiveVideo*, 694 F.3d at 1328.

The Federal Circuit routinely rejects generic, benefit-driven motivation opinions like those of Dr. Plock here. In *ActiveVideo*, for example, the expert opined, "[t]he motivation to combine would be because you wanted to build something better.  You wanted a system that was more efficient, cheaper, or you wanted a system that had more features . . . ." *Id.* The Federal Circuit excluded those opinions, which track Dr. Plock's opinions here, for failing to "explain why a person of ordinary skill in the art would have combined elements from specific references *in the*

---

[7] In a humorous moment at the deposition, Dr. Plock testified that his previous experiences drafting expert reports on obviousness "were not quite the same as this one." Ex. 7, 223:10-21.

*way the claimed invention does*." *Id.* (citing *KSR*, 550 U.S. at 418) (emphasis in original). Similarly, the Federal Circuit has previously held that "argument[s] that other art recognized advantages" of the claimed invention "boil[] down to no more than hindsight reconstruction." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 726 (Fed. Cir. 1990). Hindsight has long been forbidden in the obviousness analysis, and as a result, Dr. Plock's opinions must be excluded. *See Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("[W]e cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention.").

"As [Prolitec]'s invalidity contentions rely on [Dr. Plock]'s testimony, [Dr. Plock]'s failure to opine on a POSA's motivation to combine the asserted prior art references proves fatal to Defendant's obviousness theory." *Acceleration Bay*, 2024 WL 4164876 at *19. Accordingly, this Court should follow in the footsteps of *Acceleration Bay*, exclude the faulty opinions of Dr. Plock, and grant summary judgment of non-obviousness to ScentAir. *Id.*

### 2.    Dr. Plock's Opinions on Inherency, Relating to Obviousness and Anticipation, Are Improper

In addition to his failings on anticipation and obviousness above, Dr. Plock also misuses the inherency doctrine as a shorthand for hindsight-based gap-filling out of step with what the law requires.[8] Dr. Plock does this for his opinions that Hamada anticipates claims 1-4 and for his opinions that Van Roemburg renders obvious claim 1. Ex. 4, ¶¶ 144, 152-160 (Hamada); *Id.*, ¶¶ 295, 304 (Van Roemburg).

Inherency is a doctrine that is easy to abuse and thus has strict requirements. To invoke it, Dr. Plock needed to demonstrate, by clear and convincing evidence, that a particular claim element

---

[8] The inherency opinions to be excluded are at Ex. 4, ¶¶ 144, 148-160, 295, 304.

is "necessarily" present or is "the natural result of the combination of elements explicitly disclosed by the prior art." *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1381 (Fed. Cir. 2018) (citation omitted); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (reasoning that "[i]nherency . . . may not be established by probabilities or possibilities [and] [t]he mere fact that a certain thing *may* result from a given set of circumstances is not sufficient") (internal quotations and citations omitted). Additionally, "inherency may supply a missing claim limitation in an obviousness analysis," but the concept of inherency "must be carefully circumscribed" in this context and the party arguing inherency must "meet a high standard" for inherency to apply. *PAR Pharm, Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194-96 (Fed. Cir. 2014). Dr. Plock's opinions do not come close to the high standard set by precedent. He failed to explain "how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, No. 15-819-LPS-CJB, 2018 WL 1785033, at *6 (D. Del. Apr. 4, 2018) (citation omitted); *Gen. Elec. Co. v. Joiner*, 118 S. Ct. 512, 519 (1997) (affirming exclusion of *ipse dixit* expert opinion).

### a. Hamada

Dr. Plock opines in relation to the "verification information" element of claim 1 and in relation to the "operation status" of claims 2-4 that "[t]he system of Hamada would inherently have this capability." Ex. 4, ¶ 152; *see also id.*, ¶¶ 144, 159-160. Essentially, Dr. Plock opines that Hamada communicates via the internet, systems that communicate via the internet use acknowledgement message protocols, and those acknowledgement messages meet the claim elements. *Id.*, ¶¶ 152-158; *see also id.*, ¶¶ 144, 159-160 (regarding claims 1, 3, and 4). Putting aside that there is nothing about an *operation* status, as required by claims 2-4, in an

acknowledgement message, Dr. Plock is misusing the doctrine of inherency. Dr. Plock's inherency arguments are facially improper because he relies on another reference, Kurose, to fill the gap of Hamada. *Id.*, ¶¶ 152-155. Combining references is for obviousness, not anticipation or inherency. Regardless, inherency is also not appropriate here because Dr. Plock conceded that Hamada's disclosure did not ***necessarily*** impose the internet but permits "non-internet communication networks" by its open-ended "such as" language. Ex. 7, 205:15-206:1; *see also id.*, 202:22-203:19, 204:18-205:14. A POSITA would read it the same way and choose the proper communication network "depend[ing] on the use case." *Id.*, 203:20-204:17, 205:23-206:1; *contra Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("[T]he [prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference."). Because Dr. Plock's inherency opinion relies on a POSITA necessarily using the internet while Hamada permits non-internet communication networks, Dr. Plock's inherency opinion fails.

Dr. Plock's inherency opinions also disregard the requirements of the claim, further demonstrating the unhelpfulness of his testimony. For example, claim 1 requires a receipt of "status data representing a status of the networked scent delivery device," and Dr. Plock opines that the "provided flag" of Hamada's Figure 4 meets that "status data." Ex. 4, ¶ 148; Ex. 8 at Fig. 4; Ex. 7, 206:10-207:16. Dependent claims 2-4 add further requirements on that "status data," but Dr. Plock says nothing about the "provided flag" in his opinions on claims 2-4. Instead, those are the claims on which he (mis)uses inherency to point to a *different* type of data in a *different* type of message. *See* Ex. 4, ¶¶ 148-160. Having identified the "provided flag" as meeting the recited "status data," Dr. Plock cannot point to something else entirely that has nothing to do with the

"provided flag" to meet dependent claims 2-4.

Dr. Plock also misuses the inherency doctrine in his obviousness combinations stemming from Hamada. For example, Dr. Plock's Paragraph 281 of his Opening Report, arguing that status information from any of six different prior art references "would naturally be provided in real-time," comes nowhere close to meeting the "high standard" required to invoke inherency to meet a claim requirement missing from the prior art. *PAR Pharm.*, 773 F.3d at 1194-96; Ex. 4, ¶ 281. Dr. Plock's reports lack any discussion of how or why provision in "real-time" would ***necessarily*** be the result of the receipt of status information, even assuming for argument's sake that those six prior art references disclose such status information.

### b.    Van Roemburg

Dr. Plock also opines in conclusory fashion that "Van Roemburg's system would inherently include 'an out table in which instructions for each networked scent delivery device are stored.'" Ex. 4, ¶¶ 295, 304. Why? All Dr. Plock says is that "Van Roemburg's system uses software which enables an operator to communicate between a computer and the wired or wireless dispenses" and that "[a] POSITA would understand that 'software' serves as a 'computer-implemented method' that can process instructions." *Id.* Dr. Plock omits any discussion of an "out table," what about Van Roemburg makes an out table "necessarily" present, or anything other than Dr. Plock's say-so. *Id.*; *see also id.*, ¶ 315. "The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Integra Lifesciences*, 2018 WL 1785033, at *6 (citation omitted). The Court should exclude these improper opinions as well.

### D.    Summary Judgment of No Inequitable Conduct Is Appropriate Because Prolitec Has No Evidence of a Specific Intent to Deceive the USPTO

To prevail on its Seventh Affirmative Defense for inequitable conduct (D.I. 193 ¶¶ 7-33), Prolitec needs to present clear and convincing evidence of materiality and a specific intent to

deceive the USPTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287, 1290 (Fed. Cir. 2011) (en banc). But Prolitec—like many accused patent infringers who assert the defense—lacks any evidence to support a specific intent to deceive the USPTO; its only evidence and testimony goes to materiality.[9] "Intent and materiality, however, are separate requirements" and must be analyzed and proven separately. *Luv N' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1097 (Fed. Cir. 2024); *see also Therasense*, 649 F.3d at 1290 ("[A] district court may not infer intent solely from materiality."); *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1373 (Fed. Cir. 2012) ("A court can no longer infer intent to deceive from non-disclosure of a reference solely because that reference was known and material. Moreover, a patentee need not offer any good faith explanation for his conduct unless and until an accused infringer has met his burden to prove an intent to deceive by clear and convincing evidence."). Prolitec thus has no way of establishing evidence "sufficient to *require* a finding of deceitful intent," especially not the clear and convincing evidence it needs. *Therasense*, 649 F.3d at 1290. In cases like this, summary judgment on a litigant's inequitable conduct defense is appropriate. *See Greatbatch Ltd. v. AVX Corp.*, No. CV 13-723-LPS, 2015 WL 9171042, at *13 (D. Del. Dec. 11, 2015) ("Because Mr. Stevenson's failure to disclose the Cox prior art, by itself, is insufficient to show intent—yet that is the only evidence of intent to which AVX points—the record does not support a reasonable finding that Mr. Stevenson acted with deceptive intent.").

Prolitec's Seventh Affirmative Defense alleges that there was inequitable conduct by "the applicant and named inventors, John Thurston Chandler and Chad Alan Morton, *and/or* their representatives involved in the prosecution of the patents." D.I. 193 at ¶ 7 (emphasis added).

---

[9] ScentAir disputes that the Barclays System is an invalidating reference or that it was material to the USPTO's issuance of the '388 Patent, but those disputes are ancillary to this Motion.

Inferentially, those "representatives" might be patent agent Hyun Jin In and attorney Sameer Vadera. *See id.*, ¶¶ 18, 22. Prolitec asserts inequitable conduct on the basis of the lack of disclosure of a "networked controlled scent delivery system for the Barclay's [sic] Arena" to the USPTO. *See generally id.*, ¶¶ 7-33. Prolitec's affirmative defense pleads intent only in a lone paragraph "[o]n information and belief," and Prolitec has not adduced *any* evidence or testimony to support a specific intent to deceive. *Id.*, ¶ 28. Prolitec's "belief" is thus the only thing it has to demonstrate a specific intent to deceive, which is to say it has no evidence at all.

Prolitec had sufficient opportunity to seek evidence of intent yet still came up empty. The requirements specifications underlying the Barclays Center system (the same documents that form the basis of Prolitec's defense, D.I. 193 Exs. C-E) were produced to Prolitec on April 24, 2023, two weeks before Prolitec's deposition of the two inventors, Chandler and Morton. Galluzzo Decl., ¶¶ 19-20. Prolitec thus asked the inventors numerous questions about those documents and about the Barclays Center system, yet Prolitec came away with nothing on intent to deceive—because there was none. Likewise, Prolitec knew no later than ScentAir's second production of documents in this case, on January 13, 2021, that Messrs. In and Vadera were involved in the prosecution of the '388 Patent, but Prolitec declined to depose either. *Id.*, ¶¶ 18, 21. Prolitec thus has no evidence or testimony to support a specific intent by them to deceive the USPTO either—again, because none exists. Without any evidence to support a specific intent to deceive, the Court should grant summary judgment to ScentAir of no inequitable conduct.

## VI.    CONCLUSION

ScentAir respectfully requests that the Court grant its motions for summary judgment of no anticipation, no obviousness, no on-sale bar, and no inequitable conduct, and to exclude the challenged opinions of Dr. Plock.

Dated: November 5, 2024

                                        **K&L GATES LLP**

Of Counsel:                             */s/ Steven L. Caponi*
                                        Steven L. Caponi (No. 3484)
Vincent J. Galluzzo                     Megan E. Hunt (No. 6569)
K&L GATES LLP                           600 N. King Street, Suite 901
300 South Tryon Street, Suite 1000      Wilmington, DE 19801
Charlotte, NC 28202                     Phone: (302) 416-7000
Phone: (704) 331-7400                   steven.caponi@klgates.com
vincent.galluzzo@klgates.com            megan.hunt@klgates.com

Jared R. Lund                           *Attorneys for Counterclaim-Plaintiff*
K&L GATES LLP                           *ScentAir Technologies, LLC*
70 West Madison Street, Suite 3300
Chicago, IL 60602
Phone: (312) 372-1121
jared.lund@klgates.com