**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROLITEC INC., | |
| Plaintiff, Counter-Defendant | C.A. No. 20-984-WCB |
| v. | **PUBLIC VERSION FILED** **November 26, 2024** |
| SCENTAIR TECHNOLOGIES, LLC, | |
| Defendant, Counter-Plaintiff | |

**SCENTAIR'S BRIEF IN OPPOSITION TO PROLITEC'S
MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY**

Of Counsel:
Vincent J. Galluzzo
K&L GATES LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Phone: (704) 331-7400
vincent.galluzzo@klgates.com

Jared R. Lund
K&L GATES LLP
70 West Madison Street, Suite 3300
Chicago, IL 60602
Phone: (312) 372-1121
jared.lund@klgates.com

November 19, 2024

Steven L. Caponi, Esq. (No. 3484)
Megan E. Hunt (No. 6569)
K&L GATES LLP
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
megan.oconnor@klgates.com

*Attorneys for Counterclaim-Plaintiff
ScentAir Technologies, LLC*

# **TABLE OF CONTENTS**

I.     RESPONSE TO PROLITEC'S STATEMENT OF FACTS ............................................1

       A.     Prolitec's § 101 Motion .....................................................................................1

       B.     Prolitec's On-Sale Bar Motion...........................................................................2

       C.     Prolitec's Non-infringement Motion...................................................................2

       D.     Prolitec's Motion to Exclude Portions of Mr. McElroy's Opinions...................2

II.    ARGUMENT ...............................................................................................................3

       A.     Prolitec Is Not Entitled to Summary Judgment Under § 101 .............................3

              1.     Prolitec Fails to Advance Its § 101 Argument Beyond Its
                     Motion for Judgment on the Pleadings ......................................................3

              2.     The '388 Patent Claims are Patentable Under *Alice* Step 1 .....................5

              3.     The '388 Patent Claims Are Patentable Under *Alice* Step 2..................12

              4.     The '388 Patent Does Not Preempt Any Field .......................................16

       B.     Prolitec Is Not Entitled to Summary Judgment Under the On-Sale
              Bar.....................................................................................................................17

              1.     Prolitec Cannot Carry Its Burden as to *Pfaff* Prong 1 ...........................17

              2.     Prolitec Cannot Carry Its Burden as to *Pfaff* Prong 2 ...........................19

       C.     Prolitec Improperly Relitigates Claim Construction Issues, and
              Material Disputes of Fact Preclude Summary Judgment of Non-
              Infringement......................................................................................................25

              1.     Prolitec Contradicts Its Prior Representations to the Court
                     About Claim Scope...................................................................................25

              2.     Prolitec Misrepresents ScentAir's Infringement Analysis
                     and What Prolitec's Own System Does ...................................................26

              3.     The Master Schedule and Out Table Need Not Be Distinct ..................30

       D.     Mr. McElroy's Opinions Should Not Be Excluded ...........................................33

              1.     Prolitec's Motion Raises a Technical Dispute, Not a
                     Damages One ............................................................................................33

              2.     Mr. McElroy Apportioned, and Prolitec's Argument That He
                     Should Have Apportioned Further Raises Disputes of Fact,
                     Not a *Daubert* Gatekeeping Concern......................................................34

              3.     Mr. McElroy Also Apportioned Under Prolitec's View of
                     the World, and Prolitec Does Not Seek to Exclude Those
                     Opinions....................................................................................................36

III.   CONCLUSION............................................................................................................36

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)...........................................................................................5, 8, 16

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
   967 F.3d 1285 (Fed. Cir. 2020)...................................................................................10

*Aspex Eyewear, Inc. v. Concepts In Optics, Inc.*,
   111 F. App'x 582 (Fed. Cir. 2004) ..............................................................................20

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)...................................................................................12

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010)...................................................................................30

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..............................................................10, 11, 12, 13

*CardioNet, LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020)..........................................................................6, 10, 11

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019)............................................................................11, 12

*Data Engine Techs. LLC v. Google LLC*,
   906 F.3d 999 (Fed. Cir. 2018).............................................................................4, 8, 9

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016)....................................................................................8

*Eolas Techs. Inc. v. Amazon.com Inc.*,
   2022 U.S. Dist. LEXIS 243302 (N.D. Cal. May 16, 2022) ......................................11

*Google LLC v. EcoFactor, Inc.*,
   92 F.4th 1049 (Fed. Cir. 2024) .............................................................................31, 32

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   343 F. Supp. 2d 272 (D. Del. 2004).............................................................................20

*Inmar Brand Soln's, Inc. v. Quotient Tech. Inc.*,
   No. 23-994, 2024 WL 1675036 (D. Del. Apr. 18, 2024)............................................5

*Int'l Bus. Mach. v. Zillow Grp., Inc.*,
  50 F.4th 1371 (Fed. Cir. 2022) ..........................................................................7

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
  549 F. Supp. 3d 362 (D. Del. 2021)..................................................................29

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
  951 F. Supp. 2d 626 (D. Del. 2013)..................................................................20

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
  607 F. Supp. 3d 464 (D. Del. 2022)................................................................7, 8

*Laboratory Skin Care, Inc. v. Limited Brands, Inc.*,
  757 F. Supp. 2d 431 (D. Del. 2010)..................................................................20

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,
  322 F.3d 1335 (Fed. Cir. 2003)........................................................................19

*Linquet Techs., Inc. v. Tile, Inc.*,
  2022 WL 2812185 (N.D. Cal. July 18, 2022).................................................11

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  336 F.3d 1373 (Fed. Cir. 2003)........................................................................18

*Northpeak Wireless LLC v. 3COM Corp.*,
  674 F. App'x 982 (Fed. Cir. 2016) ....................................................................6

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005)........................................................................17

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998)......................................................................................19, 22

*Plumtree Software, Inc. v. Datamize, LLC*,
  473 F.3d 1152 (Fed. Cir. 2006)....................................................................20, 24

*Quality Tubing Inc. v. Precision Tube Holdings Corp.*,
  75 F. Supp. 2d 613 (S.D. Tex. 1999) ...............................................................19

*Railware, Inc. v. Nat'l R.R. Passenger Corp.*,
  2023 WL 5432860 (S.D.N.Y. Aug. 23, 2023)....................................................8

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)...................................................................................5, 13

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000)....................................................................18, 19

*Sonos, Inc. v. D&M Holdings Inc.*,
    2017 WL 971700 (D. Del. Mar. 13, 2017) ..........................................................................7, 8

*SynKloud Techs., LLC v. HP, Inc.*,
    No. 19-1360-RGA, 2021 U.S. Dist. LEXIS 152333 (D. Del. Aug. 12, 2021) .................12, 13

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ...........................................................................................5

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) .........................................................................................11

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
    957 F.3d 1303 (Fed. Cir. 2020) .........................................................................................5

*United Services Auto. Ass'n v. Wells Fargo Bank, N.A.*,
    414 F. Supp. 3d 947 (E.D. Tex. 2019) ..............................................................................16

*Valmont Indus. Inc. v. Lindsay Corp.*,
    No. 15-42-LPS, 2018 WL 5962469 (D. Del. Nov. 14, 2018) ...............................................11

*Visual Memory LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017) .......................................................................................7, 8

**Other Authorities**

10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. §
    2727.1 (4th ed.) .............................................................................................................20

D. Del. LR 7.1.3(c)(2) .........................................................................................................20

Rule 702 ...........................................................................................................................35

U.C.C. § 2-106(1) .............................................................................................................18

## TABLE OF EXHIBITS

| Exhibit[1] | Description |
|---|---|
| A | **(UNDER SEAL)** Opening Expert Report of Robert Dezmelyk |
| B | **(UNDER SEAL)** Supplemental Expert Report of Robert Dezmelyk |
| C | **(UNDER SEAL)** Reply Expert Report of Robert Dezmelyk (without exhibits) |
| D | **(UNDER SEAL)** Rebuttal Expert Report of Robert Dezmelyk |
| E | **(UNDER SEAL)** Deposition of Robert Dezmelyk, held on October 30, 2024 |
| F | Excerpts from Microsoft Computer Dictionary |
| G | **(UNDER SEAL)** Deposition of Chad Morton, held on May 12, 2023 |
| H | Additional Excerpts from Patent Reexamination File History for U.S. Patent No. 10,838,388 |
| I | **(UNDER SEAL)** Expert Report of Kevin T. McElroy – Damages Relating to ScentAir Counterclaims |
| J | **(UNDER SEAL)** Reply Expert Report of Kevin T. McElroy – Damages Relating to ScentAir Counterclaims |
| K | **(UNDER SEAL)** Rebuttal Expert Report of Robert L. Vigil, Ph.D. |
| L | Compilation of Exhibits Served with Reply Expert Report on Invalidity and Supplemental Expert Report on Non-infringement by Cory Plock, Ph.D. |
| M | Prolitec Inc's Response to ScentAir Technologies, LLC's Second Set of Interrogatories (Nos. 11-21) |
| N | **(UNDER SEAL)** AYLA_SC_000080 |

---

[1] Because ScentAir used numbered exhibits for those filed with its Motion for Summary Judgment (D.I. 379), ScentAir uses lettered exhibits here to distinguish the two.

# I.    RESPONSE TO PROLITEC'S STATEMENT OF FACTS

Prolitec's Statement of Facts (D.I. 383 ("Mot.") at 2-7 is more of a narrative, but ScentAir identifies the material facts (some of which are genuinely disputed, some of which cannot genuinely be disputed), any of which preclude summary judgment in Prolitec's favor, as follows:

## A.    Prolitec's § 101 Motion

1.    The arrangement claimed by the '388 Patent—separating I/O (computer input and output of data) into two distinct database tables (the in table and out table), one to control networked devices and one to receive real-time status updates for those networked devices—provides technical benefits beyond routine use of a computer. Separating incoming and outgoing data into separate tables provides technical benefits of avoiding "NULL (i.e., blank)" data, "data inconsistency," "garbage" data, deadlocking, and "bugs and other problems with the software." D.I. 382, Ex. 6 ("Plock Reply"), ¶¶ 15, 18, 30-31; D.I. 382, Ex. 7 ("Plock Dep.") 43:19-45:11, 46:12-47:11, 48:21-49:19, 50:22-51:12, 57:6-58:7. Avoiding these problems also results in various "[p]erformance benefits" conveyed by the arrangement. *Id.*; *see also* Ex. D, ¶¶ 38-42; Ex. E, 100:14-101:1, 119:25-120:16, 258:15-259:13.

2.    The '388 Patent claims' use of database tables to separate I/O for device control is unconventional. Ex. E, 39:22-41:6, 41:17-43:1, 43:9-44:9, 67:11-19, 68:20-71:5, 72:10-74:3, 99:25-101:1, 117:9-11:1, 252:4-253:4, 253:8-24, 255:9-25, 272:14-274:25, 276:7-278:5, 280:4-281:14; D.I. 382, Ex. 15 ("Chandler Dep."), 142:13-146:18. None of the prior art patents and publications used in Prolitec's invalidity defenses has two database tables. *See* D.I. 379, 12-14. And none of the textbooks, articles, and websites cited by Dr. Plock in his expert reports discloses the separation of I/O by two database tables, whether for control of network devices or otherwise. *See generally* Ex. L (collecting exhibits to Dr. Plock's Reply Report).

███████████████████████████████████████████

**B.    Prolitec's On-Sale Bar Motion**

3.      The Barclays Agreement does not constitute a "sale" before the critical date. It is an agreement to provide an unspecified "on-premise fragrance delivery system" in September 2012. D.I. 381, Ex. 13 ("Barclays Agreement") at -879 (§ 2); *e.g.*, Chandler Dep., 123:17-23. The Agreement granted "no ownership, title, property rights or interest" to the Barclays Center, and certainly not before September 2012. Barclays Agreement at -879-880 (§§ 2-3, 6, 7(B)).

4.      The Barclays Agreement is not a sale "of the patented invention." D.I. 379, 14-18.

5.      The Barclays Center Documents do not establish by clear and convincing evidence that the inventions recited in the '388 Patent claims were ready for patenting prior to the critical date. Ex. D, ¶¶ 46-54.

6.      The Barclays Center Documents do not disclose a system where a Wi-Fi controller is embedded in the scent machines. D.I. 382, Ex. 12 ("SCENTAIR_00082355") at -356; Chandler Dep., 94:16-23, 101:23-24, 136:4-24; Plock Dep., 145:3-15.

**C.    Prolitec's Non-infringement Motion**

7.      The Aera System, specifically the Aera Cloud, generates command data as required by the claims. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**D.    Prolitec's Motion to Exclude Portions of Mr. McElroy's Opinions**

8.      For a time, Prolitec sold two versions of its Aera devices, the Aera Touch and Aera

███████████████████████████████

Smart, ████████████████████████████████

████████████████████████████████████

██████████ .

9.    The Aera System always infringes at least claims 8-20, even when a user schedule is not in force. Ex. C, ¶¶ 74-75, 86, 90, 92-93; Ex. E, 260:14-261:5.

## II.    ARGUMENT

### A.    Prolitec Is Not Entitled to Summary Judgment Under § 101

#### 1.    Prolitec Fails to Advance Its § 101 Argument Beyond Its Motion for Judgment on the Pleadings

This is the second time that Prolitec has sought judgment under § 101, the first time for judgment on the pleadings. Then, ScentAir argued for denial not just on the merits but because Prolitec's motion asked the Court to artificially ignore "the panoply of facts and expert testimony" already developed that bear directly on the § 101 issue. D.I. 332 at 1. The Court appropriately denied Prolitec's motion because of a threshold, but not the only, factual issue: "[w]hether the 'in table' and 'out table' are more than generic data structures" such that "the claims call for 'a generic network' to be used 'in a normal way.'" D.I. 347 at 7-8. Now, whether by design or oversight, Prolitec's Motion fails to address the "panoply of facts" previously available or much of the additional testimony that both parties' experts have provided on the § 101 issue since. *See generally* Mot. at 8-18. The likely reason is that Prolitec's own expert, Dr. Plock, was unusually helpful to ScentAir in both his Reply Report and in his deposition.

The '388 Patent claims are directed to a specific, technical configuration of a central controller of networked devices whereby the outbound control of the devices and the inbound monitoring of "real-time" status of those devices is decoupled into two distinct database tables: the "in table" and the "out table." Far from ScentAir's expert providing the "only support" for

patentability (Mot. at 12), Prolitec's own Dr. Plock confirms that this arrangement would provide technical benefits beyond routine use of a computer. He testified that separating incoming and outgoing data into separate tables would avoid problems of having "NULL (i.e., blank)" data in most of the fields and problems of "data inconsistency" where outgoing data can "mistakenly be stored in rows that are designated for 'incoming data'" or incoming data can be "mistakenly stored in rows that are supposed to be [for] 'outgoing data.'" Plock Reply, ¶ 15. Dr. Plock also testified that there would be "[p]erformance benefits" to separating incoming and outgoing data into two distinct tables. *Id.*, ¶ 18; *see also* Plock Dep., 48:21-49:19. Those performance benefits come from avoiding deadlock, where two processes (e.g., reading outgoing data and writing incoming data) try to access the same data resource at the same time. Plock Reply, ¶ 31. Like two cars going different ways down a one-way street, the processes are "deadlocked" because each is waiting for the other to proceed. *E.g.*, Ex. Plock Dep., 46:12-47:11. Deadlocking can also put data in "an inconsistent state" where it is "half new data, half old data" and is "effectively garbage;" the data is "corrupt" or "dirty" and can "cause bugs and other problems with the software." *Id.*, 43:19-45:11, 50:22-51:12. These issues are not solved just by the use of databases, since databases also experience the same problems. *Id.*, 57:6-58:7.

While Dr. Plock presents the above testimony *in support* of Prolitec's § 101 position, it is only to argue the design and arrangement of the '388 Patent claims would be "obvious" to a POSITA based on these benefits. *E.g.*, Plock Reply, ¶¶ 14, 16 ("a POSITA would find it obvious …."). Obviousness, however, is not the province of § 101, but § 103. *E.g.*, *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018) ("The eligibility question is not whether anyone has ever used tabs to organize information. That question is reserved for §§ 102 and 103."). What matters is that Dr. Plock has explicitly linked the structure and design of the '388

Patent claims to numerous, significant technical benefits. Prolitec would thus have the Court resolve factual disputes not only against ScentAir and the testimony of its expert, but also against the testimony of Dr. Plock. This the Court cannot do. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In essence, Prolitec is worse off than it was five months ago, and the Court should again deny its Motion.

### 2.    The '388 Patent Claims are Patentable Under *Alice* Step 1

#### a.    The '388 Patent Is Directed to Specific Improvements to Control Technology in the Field of Networked Device Control

The first step of the *Alice* test is to determine what the claims are "directed to." The Federal Circuit has warned against "oversimplifying the claims because '[a]t some level, all inventions … embody, use, reflect, rest upon, or apply … abstract ideas.'" *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (quoting *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014)); *see also Inmar Brand Soln's, Inc. v. Quotient Tech. Inc.*, No. 23-994, 2024 WL 1675036, at *1 (D. Del. Apr. 18, 2024). Software innovations often "turn[] on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020).

The claims of the '388 Patent are directed to a specific, technical design of a central controller whereby it separates I/O (computer input and output of data) into two distinct database tables (the "in table" and the "out table"), one to control networked devices and one to receive "real-time" status updates for those networked devices. This bifurcation of the real-time monitoring and the controlling of the devices by the in table and the out table, respectively, is clearly explained in the intrinsic record:

> The '388 patent introduces the idea of using a controller with one or more master schedules and with two specific data structures—an "out table" and an "in table"—

to create a highly efficient, scalable, and reliable dynamic real-time control system; one that sends command data via a network to control the operation of the distributed networked scent delivery devices.

D.I. 381, Ex. 3, at 277; *see also id.* at 278-281 (explaining what the claims are directed to by their constituent elements). The intrinsic record also supports that this divided I/O arrangement of the in table and out table to control and monitor distributed devices based on a centralized schedule provides technical benefits not previously available. As stated in the *ex parte* reexamination record,

> [i]n addition to enhancing the efficiency and scalability of the central controller, and the reliability and scalability of the scent delivery system, the invention's out table and in table make it possible to build scent delivery devices that are more efficient, have lower power consumption, and cost less to build because the scent delivery device can include less processing and data storage locally.

*Id.* at 280. Prolitec's Motion entirely ignores the prosecution history, including that of the *ex parte* reexamination it brought, which bears directly on the *Alice* analysis. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372-73 (Fed. Cir. 2020) ("In determining what the claims are directed to and whether they are directed to an abstract idea, a court may well consult the plain claim language, written description, and prosecution history."); *Northpeak Wireless LLC v. 3COM Corp.*, 674 F. App'x 982, 986 n.1 (Fed. Cir. 2016) ("Statements made during reexamination procedures before the PTO are part of the prosecution history.") (citation omitted).

The specification backs up the prosecution history's characterization of the '388 Patent claims as improving the technological capabilities of both the central controller computer system *and* the functioning of the distributed scenting devices:

1. The specification teaches that by utilizing the out table to store instructions from which to generate command data to control the operation of each networked scent delivery device, scent devices can be designed with less computing power—a marked technological benefit—since the complex processing necessary for their proper operation can be centralized in the out table. *E.g.*, '388 Patent at 16:15-38, 16:59-17:2.

2. The separate in table structure enables the scenting devices to function as intended: to provide a dynamic scent experience for occupants and a reliable and efficient

controlled delivery method for users. '388 Patent, 18:62-19:3, 25:30-33.

3.      In operation, a networked device may become disconnected or otherwise disabled. Based on the real-time status updates, the system may deactivate the disconnected device and activate other devices to compensate for this loss in the system. *E.g.*, '388 Patent at 16:30-38.

Prolitec glosses over the claimed "real-time status update," explicitly recited as related to the in table. *See* Mot. at 14-15 (mischaracterizing this as "not part of the claims"). Regardless, the intrinsic record makes clear that the '388 Patent claims are not abstract because they "focus on specific asserted improvements in computer capabilities," *not* a process where "computers are invoked merely as a tool." *Int'l Bus. Mach. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022).

Prolitec also mischaracterizes testimony and evidence as supporting its position. Mr. Dezmelyk's testimony that the in table and out table are "simply 'database tables'" is an improper chop-quote of that testimony. Mot. at 9. In the very next answer, not cited by Prolitec, Mr. Dezmelyk describes how Figure 6 also "indicates the data flow direction and the way those tables are used," as well as the relationship of the data in those flows. Ex. E, 82:3-83:9; *see also id.*, 80:9-81:3. Prolitec's citations to the deposition of inventor Chandler are also misstated. There, Mr. Chandler was discussing the Barclays Center system installed in September 2012, not the '388 Patent claims, and in any event, his description of the system and the tables is vastly more complex than Prolitec's summary would lead the Court to believe. *See* Chandler Dep., 142:21-146:18.

The '388 Patent claims' division of structure and functions in device controlling and device monitoring by the out table and the in table is patentable subject matter for the same reasons as in three similar decisions from this Court and the Federal Circuit: *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), *IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464 (D. Del. 2022), and *Sonos, Inc. v. D&M Holdings Inc.*, No. 14-1330-RGA, 2017 WL

971700 (D. Del. Mar. 13, 2017). In *Visual Memory*, the claims "separat[ed] the functionality for the caches and defin[ed] those functions based on the type of processor" being used with the memory system. *Visual Memory*, 867 F.3d at 1256. Because the claims captured an improved computer memory system, they were patent eligible. *Id*. at 1259-62. Likewise, in *IOENGINE*, the Court explained that while the "claimed components standing alone…can fairly be considered as generic," the claims "recite a specific structure and division of functions that are represented to constitute a technological improvement." *IOENGINE*, 607 F. Supp. 3d at 483-84. Those claims were patent eligible too. *Id*. at 487. Just as the specific structure of the claims captured technological improvements in *Visual Memory* and *IOENGINE*, so do the claims of the '388 Patent. Finally, *Sonos* involved patents directed to volume control and pairing of networked multimedia players in a multi-zone system. *Sonos*, 2017 WL 971700, at *1-2. The Court found that the *Sonos* claims went well beyond the abstract idea of collecting, organizing, and storing data because they included meaningful, tangible limitations tied to specific devices that changed the way they operated. *Id*. at *5-6. So too here, the claims of the '388 Patent recite limitations that fundamentally alter the way the central controller and scent delivery devices operate together, rendering the claims sufficiently concrete.

### b.    Prolitec's Analysis Misses the Forest for the Trees

Rather than address the improvements to which the '388 Patent claims are directed, Prolitec oversimplifies the claims as being directed only to "monitoring and controlling networked scent delivery devices." Mot. at 9. Prolitec's Motion also isolates the in table and out table to argue that they "are generic data structures," Mot. at 9-11, but *Alice* Step 1 "requires that the claims be read as a whole." *Data Engine*, 906 F.3d at 1011 (citing *Alice*, 573 U.S. at 218 n.3). Prolitec thus "misses the forest for the trees." *Railware, Inc. v. Nat'l R.R. Passenger Corp.*, 2023 WL 5432860, at *8 (S.D.N.Y. Aug. 23, 2023); *see Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed.

Cir. 2016) (explaining that "a high level of abstraction . . . all but ensures that the exceptions to § 101 swallow the rule"). It is doubly important to avoid generalities when analyzing technical fields like the control of devices in the '388 Patent claims because the particular way data structures are organized and used "has significant and often determinative effects on the outcome or the behavior of the program, what it does, [and] how well it performs." Ex. E, 35:8-20. Prolitec's argument misses all of that by analyzing each table in isolation.

Prolitec's argument here is much like the one rejected by the Federal Circuit in *Data Engine*. There, the claims recited a specific structure of notebook tabs within a spreadsheet display that performs certain functions. *Data Engine*, 906 F.3d at 1010–11. The defendant argued that humans have long used tabs to organize information, and the claims were directed to the abstract idea of methods of organizing and presenting information. *Id*. The court rejected that argument, finding that "[w]e must consider the claim as a whole to determine whether the claim is directed to an abstract idea or something more." *Id.* at 1011. Looking to the whole claim, the court found "functional improvement[s] achieved by the specifically recited notebook tabs in the claimed methods" and that they are "specific structures." *Id*. The court thus held the claims not directed to an abstract idea. *Id*. Just as the defendant in *Data Engine* did no more than boil the claims down to "tabs to organize information," Prolitec does boils the '388 Patent claims down to "generic database tables." Mot. at 8. Prolitec's improper approach fails to consider the claims as a whole. ScentAir has never contended that the '388 Patent claims recite tables that, when isolated, have an "inventive characteristic." Instead, the innovation of the claims is reflected in the combined use of the specific structure of the in table and out table to separate system functions and control networked scent delivery devices. Prolitec "fails to appreciate the functional improvement achieved by" the '388 Patent claims when only focusing on the two tables in isolation. *Data*

*Engine*, 906 F.3d at 1011. Thus, Prolitec's analysis of the claims, specification, and factual record is largely off-base. *See* Mot. at 9-11.

### c.    The Factual Record Supports Patentability Under Step 1

While *Alice* Step 2 clearly involves questions of fact, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018), so too can Step 1, where the Court can consider the "prior art" or other "extrinsic evidence" to determine whether the claims are directed to an abstract idea. *See CardioNet*, 955 F.3d at 1373 (noting that a court may engage in such an inquiry). Here, the prior art is quite instructive because ***none of it includes two database tables at all***. *See* D.I. 379 at 12-14 (demonstrating that Prolitec's invalidity defenses all rely on a single database table). The same is true of the barrage of textbooks, articles, and websites cited by Dr. Plock in his expert reports: not a single one includes the separation of I/O by two separate database tables, let alone for the control of networked devices and enablement of "real-time" status updates. *See generally* Ex. L (collecting exhibits to Dr. Plock's Reply Report). At most, those documents show the possibility of multiple tables in a database, but that is neither remarkable nor the extent of what the claims recite. In fact, Dr. Plock's own expert report and testimony (discussed at pages 4-5 above) further support that the '388 Patent claims are directed to specific technical improvements in device-control technology. And Dr. Plock's report and testimony confirm that of Mr. Dezmelyk, which Prolitec tries to denigrate as mere "technical jargon." Mot. at 13. In fact, it is remarkable how consistent Mr. Dezmelyk and Dr. Plock's testimony is about these technical benefits. *Compare* pages 4-5, *supra*, *with* Ex. D, ¶¶ 38-42; Ex. E, 100:14-101:1, 119:25-120:16, 258:15-259:13.

Prolitec's rebuttal here is that these technical benefits are not relevant because they are not claimed, Mot. at 11, but Prolitec misunderstands the law. Precedent requires that "features" be claimed to be relevant to *Alice*, *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020), but there is no requirement that "benefits" be claimed too. Instead, courts

are to "analyze the asserted claims and determine whether they capture" the alleged improvements. *Berkheimer*, 881 F.3d at 1369 (citation omitted). Here, the claims recite the exact *features* that provide the technical benefits on which both Dr. Plock and Mr. Dezmelyk agree: the separation of the in table and out table, the use of those tables for decoupled I/O functions, their use in the control of networked devices, and the receipt of "real-time" data, among other elements. Neither precedent nor § 101 requires that the claims also say, "and these features provide the following benefits…." Nor do the improvements have to be disclosed in the specification. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019) ("As long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional."). They can be found in the "prior art" or other "extrinsic evidence," as detailed above. *See CardioNet*, 955 F.3d at 1373.

Prolitec's cited cases do not hold otherwise and are distinguishable. The case of *Linquet Techs., Inc. v. Tile, Inc.*, 2022 WL 2812185 (N.D. Cal. July 18, 2022) is nothing like this one. There, the court was faced with a motion to dismiss, and the complaint only provided "conclusory statements" regarding technical solutions. *Id.* at *2. It cannot be said that ScentAir "conjure[s] up technological improvements" when Mr. Dezmelyk and Dr. Plock both identify these benefits from the intrinsic evidence. Another motion to dismiss case, *Valmont Indus. Inc. v. Lindsay Corp.*, No. 15-42-LPS, 2018 WL 5962469 (D. Del. Nov. 14, 2018), fails for similar reasons. In *Eolas Techs. Inc. v. Amazon.com Inc.*, 2022 U.S. Dist. LEXIS 243302, *46 (N.D. Cal. May 16, 2022), the court declined to prioritize extrinsic evidence that was "inconsistent with the claim language and specification." The evidence here is not inconsistent, and Prolitec has failed to show otherwise. The case *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017) is distinguishable for similar reasons, since the claims there did not recite the patentable features

identified by the plaintiff.

### 3.    The '388 Patent Claims Are Patentable Under *Alice* Step 2

The '388 Patent claims recite specific inventive concepts which "involve[] more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367. The claims recite *specific* structures and arrangements of a central controller for networked devices that improves device-control technology through the in table and out table and their divided I/O, as well as their ability to enable "real-time" status updates. These claim limitations confine any alleged abstract idea to practical applications and provide real-world advances over the prior art. *See Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) (claim inventive that made prior art "dynamic and efficient").

Prolitec's short argument on Step 2 follows the same path as for Step 1: it ignores the technical improvements of the '388 Patent, arguing that "conjured up [improvements]… without support in the specification are insufficient to save the claims." Mot. at 16 (citing *SynKloud Techs., LLC v. HP, Inc.*, No. 19-1360-RGA, 2021 U.S. Dist. LEXIS 152333, at *12 (D. Del. Aug. 12, 2021)). As with the precedent discussed in Section II.A.2.c. above, Prolitec is again wrong on the law: the "specification need not expressly list all the reasons why this claimed structure is unconventional." *Cellspin*, 927 F.3d at 1317. Prolitec also mischaracterizes the holding of its prime case, *SynKloud Techs*. Quite different from Prolitec's parenthetical characterization (Mot. at 16), the Court in *SynKloud* explained that the claims failed because the patent owner "cite[d] no support in the specification *or other rationale* to explain" the inventive concept. *SynKloud Techs.*, 2021 U.S. Dist. LEXIS 152333, at *12 (emphasis added). Unlike the patent owner in *SynKloud*, ScentAir identifies pages of expert analysis and inventor testimony regarding the technological improvements. *See* Section II.A.3.a., *infra*. And notably, the court in *SynKloud **did not*** confine the

patent owner to the specification as Prolitec attempts to do here. *Id.*, n.5.

**a.     The '388 Patent Involves More Than "Well-Understood, Routine, and Conventional" Claim Scope**

Prolitec must present clear and convincing evidence that the claims of the '388 Patent are "well-understood, routine and conventional," but Prolitec has failed to do so because there are genuine disputes of material fact on that issue. *Berkheimer*, 881 F.3d at 1368. Prolitec's expert, Dr. Plock, believes the arrangement of the claims is conventional (despite his utter inability to find a single prior art document or reference to show such an arrangement), but still recognizes the technical benefits in the arrangement of the '388 Patent claims, as described on pages 4-5 above. Perhaps that is why Dr. Plock does not make a single appearance in Prolitec's § 101 argument, a surprising choice that demonstrates Prolitec's lack of belief in the factual support for its arguments. ScentAir's expert, Mr. Dezmelyk, agrees with Dr. Plock that there are technical benefits but vehemently disagrees that the arrangement is conventional. And the inventor testimony is in support of Mr. Dezmelyk. Prolitec thus asks the Court to weigh witness credibility and to resolve factual disputes against ScentAir, something the Court cannot do on Prolitec's Motion. *Reeves*, 530 U.S. at 150.

**(i)     Both Experts Recognize Technical Improvements, and Mr. Dezmelyk's Testimony Shows Non-Conventionality**

Prolitec cannot meet its burden here first because both experts agree that there are technical improvements provided by the '388 Patent claims. Starting with Mr. Dezmelyk, he opined that the "claims of the '388 patent specify a very particular data structure that is used for specific purposes." Ex. D, ¶ 37. And based on the claimed structure, a POSITA would have understood the technological benefit of "provid[ing] significant run time performance enhancements for the central controller." *Id.*, ¶¶ 37-42; *id.*, ¶ 40 ("The choice of a separate "in table" avoids the code complexity, and execution burdens, such as inter-process or inter-thread semaphores, that would

occur without the decoupling."), ¶ 42 ("[T]he invention enables lower cost, and potentially lower power consumption scent delivery devices to be built."). Dr. Plock tells the same story, as recounted at pages 4-5 above.

While Dr. Plock disagrees on the conventionality point, Mr. Dezmelyk testified extensively about how and why the arrangement of the '388 Patent claims is unconventional. Prolitec has failed to explain why Mr. Dezmelyk's testimony should not be credited; indeed, Prolitec's Motion ignores the testimony entirely. Regardless, Mr. Dezmelyk testified at deposition, on Prolitec's counsel's questioning, consistent with his Rebuttal Report. *E.g.*, Ex. D, ¶¶ 36-38. He testified that database tables like the in table and out table are not commonly used in the control of devices, which is the domain of the '388 Patent claims. Ex. E, 39:22-41:6, 41:17-43:1. Mr. Dezmelyk testified that he has developed hundreds of programs, many of which are related to controlling devices. *Id.*, 41:17-23; 252:4-253:4, 272:14-274:25, 276:7-278:5. While he has used databases for other programs unrelated to controlling devices, he has never used (and never seen used) database tables for controlling devices. *Id.*, 41:24-43:1, 253:8-24. Instead of using database tables, programs to control devices use transient, in-time-allocated data structures and generally utilize the same data structure for both incoming and outgoing data. *Id.*, 43:9-44:9, 255:9-25. It is an "uncommon, novel way of organizing the data to do that functional task" of controlling devices. *Id.*, 253:14-24; *see also id.* at 280:4-281:14.

The design of the '388 Patent claims to use separate tables for I/O also goes against common design principles, which say to store related data together in a single table. *Id.*, 52:17-53:5. But even though the data held in the in table and out table is related, the '388 Patent recites a structure separating them. *Id.*, 257:9-22. A POSITA would immediately recognize the benefits after seeing the arrangement because it "does an unanticipated thing," is "an unconventional

approach," and is a "clever use" of database tables. *Id.*, 99:25-101:1, 117:9-118:1. It simply is "not common to store incoming data in one data structure and outgoing data in a separate data structure." *Id.*, 67:11-19, 68:20-71:5 (providing examples of common designs to the contrary), 72:10-74:3 (providing additional examples of designs to the contrary).

### (ii)    The Inventors Recognize Technical Improvements

Prolitec also is not entitled to summary judgment because the testimony of the inventors of the '388 Patent supports the technological benefits captured by the claims, and Prolitec has provided no reason why the Court can properly discredit or ignore that testimony here. Inventor Morton highlighted the benefits of a centralized controller and separate I/O because, in use, networked scent delivery devices can report real-time information to the central controller hundreds of thousands of times a day. Ex. G, 91:17-92:1. Further to that point, inventor Chandler testified that the Barclays Center system filled up a 500 gigabyte hard drive with "hundreds of millions" of entries in just a four-year period. Chandler Dep., 206:11-209:10. Inventor Chandler also testified to the problems in distributed device control that their design overcame: control systems are "very interlocking" by incoming and outgoing data, all of which is "happening in parallel" with "dozens and dozens of machines" all of which are working "in parallel at the same time." *Id.*, 144:22-146:18. So the inventors configured two tables, the in table and the out table, with different I/O functionalities in the control program. *Id.*, 144:5-17 (note that Chandler's testimony, as he suspected, "ha[d] it backwards"). It was "not an enormously trivial thing" to design. *Id.*, 146:7-18.

Mr. Chandler's testimony also supports that the '388 Patent claims recite an unconventional arrangement for the same exact reason testified by Mr. Dezmelyk noted above: "people never think about using databases to run control systems," but Chandler and Morton designed a way, using Morton's database experience, where "you actually can." *Id.*, 142:13-

143:16.

Despite the overwhelming amount of evidence supporting technical improvements, Prolitec simply concludes that "the in table and out table are nothing more than generic data structures." Mot. at 17. This is exactly what Prolitec did in previous briefing, and the Court should give Prolitec a similar result: denial of its Motion.

### b.    Prolitec Fails to Address the Elements as an Ordered Combination

Prolitec also fails at *Alice* Step 2 because it fails to analyze whether the "combination of elements" recited in the claims is well-understood, routine and conventional. *Alice*, 573 U.S. at 217 (The court must consider the elements of each claim "both individually" and "as an ordered combination."); *see United Services Auto. Ass'n v. Wells Fargo Bank*, *N.A.*, 414 F. Supp. 3d 947, 959 (E.D. Tex. 2019) (rejecting § 101 defense where the defendant "provided no evidence that the claim elements as an ordered combination were well-understood, routine, and conventional"). At each point in Step 2, Prolitec exclusively focuses on the in table and out table in isolation. *See* Mot. at 16 ("the purported inventive concept is provided by generic data structures, namely, the in table and the out table"), 16 ("[t]he use of 'out table' or 'in table' cannot save the claims"), 17 ("the in table and out table are nothing more than generic data structures"). Prolitec provides no holistic analysis of the substance of the claims, such as the division of I/O by an in table and out table to enable real-time status information and distributed control of devices. Because Prolitec does not analyze the claims as a whole it cannot correctly analyze the technical benefits provided by those claims.

### 4.    The '388 Patent Does Not Preempt Any Field

Prolitec's "concern" of preemption (Mot. at 18) is baseless, highlighted by Prolitec's failure to identify any particular field that the patents purportedly preempt, let alone explain how

it would be preempted. Instead, the '388 Patent recites particular methods with particular arrangements of the I/O and data structures to improve the control of networked scent delivery devices, leaving many others open for use. There are many other methods of "sending commands to and receiving status updates from scent delivery devices" that do not use an out table or an in table, or the other limitations of the '388 Patent. Mot. at 18. Mr. Dezmelyk's testimony about conventional systems for control of devices illustrates many such arrangements that do not use database tables at all, let alone divide the I/O of the centralized system into two separate database tables. *E.g.*, Ex. E, 67:11-19, 68:20-71:5, 72:10-74:3. Another still-open way is illustrated by Hamada, which illustrates a method of remote scent delivery not preempted by the '388 Patent, as proven by Hamada's failure to anticipate or render obvious the '388 Patent claims during *ex parte* reexamination. Prolitec's preemption argument should be rejected.

### B.    Prolitec Is Not Entitled to Summary Judgment Under the On-Sale Bar

#### 1.    Prolitec Cannot Carry Its Burden as to *Pfaff* Prong 1

##### a.    No Sale "Of the Patented Invention"

At the outset, Prolitec is not due summary judgment under the on-sale bar because there is no genuine dispute of material fact that the Barclays Agreement is *not* a sale "of the patented invention." *See* D.I. 379 at 14-18. In fact, Prolitec's own Motion confirms the appropriateness of granting relief to ScentAir because Prolitec's Motion focuses only on whether the Barclays Agreement was a *sale*, not whether it was a sale *of the patented invention*. *See* Mot. at 18-20.

##### b.    Genuine Disputes of Material Fact Exist as to Whether the Barclays Agreement Is a "Sale" at All

Prolitec also is not entitled to summary judgment because the parties genuinely dispute whether the Barclays Agreement was a "sale" at all. "[T]he ordinary meaning of a sale includes the concept of a transfer of title or property" and also "a thing capable of being transferred." *NTP,*

████████████████████████

*Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (case regarding § 271); *see also* U.C.C. § 2-106(1) (describing a "sale" as requiring "the passing of title from the seller to the buyer for a price"). Here, the Barclays Agreement transferred no title or property, and, at the time of the Agreement, the eventual Barclays system was not capable of being transferred because it did not exist yet. *See* D.I. 379 at 14-18. That is why the *Minton* case Prolitec cites (Mot. at 19) does not help it. There, the leased product, TEXCEN, was available at the time of the agreement and was actually provided to the leasing party before the critical date. *See Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1375 (Fed. Cir. 2003).

The Barclays Agreement is a contract for future services: ScentAir is to provide unspecified scenting services using ScentAir-owned equipment to the Barclays Center starting in September 2012, months after the critical date. The contract term of the Barclays Agreement also did not begin until then. Barclays Agreement at -879 (§ 2); *e.g.*, Chandler Dep., 123:17-23. Barclays thus had no rights to receive any scenting services or use any ScentAir equipment and had no obligation to pay anything to ScentAir until September 2012. Barclays Agreement at -879-880 (§§ 2-3, 7(B)). Even then, ScentAir only promised to provide an "environmental scent service" such that— importantly—the Barclays Center "acquire[d] ***no ownership, title, property rights or interest*** in or to the Equipment," but only the limited-time right to use the equipment during the term. *Id.* at -881 (§ 10) (emphasis added). After September 2012, ScentAir was obligated at no additional fee to "maintain the ScentAir-owned Equipment." *Id.* at -880 (§ 6). At the end of the term, the Barclays Center was obligated to "return to ScentAir all such Equipment." *Id.* (§ 5).

The "sale" issue comes up often in relation to infringement, and because "[b]oth sections invoke traditional contractual analysis" it is appropriate to use § 271(a) jurisprudence to interpret the on-sale bar of § 102(b). *See Rotec Indus., Inc. v. Mitsubishi Corp.,* 215 F.3d 1246, 1254-55

(Fed. Cir. 2000). In that context, courts have found that the "negotiation and execution of a contract to sell is not, standing alone, a sale." *Quality Tubing Inc. v. Precision Tube Holdings Corp.,* 75 F. Supp. 2d 613, 621 (S.D. Tex. 1999). That is because a "sale" does not occur merely by an "agreement to sell, but [by] performance of that agreement." *Id.* It is not enough to "contract to make infringing devices" or to "begin[] construction of infringing devices" because intent and preparation to sell do not constitute an infringing sale. *Rotec Indus.*, 215 F.3d at 1251 (citation omitted). So too here. A contract to provide services in the future is not a present sale of anything. And, to the extent the Court finds the parties' expectations relevant in this analysis, that is another reason to deny summary judgment to Prolitec. *See Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003) (remanding finding of an offer for sale for the Court "to take additional evidence on the practice in the industry to determine if the activities by Lacks rise to an offer for sale under the UCC").

### 2.    Prolitec Cannot Carry Its Burden as to *Pfaff* Prong 2

#### a.    Prolitec's Cursory, Attorney-Based Analysis Fails to Establish the Absence of a Material Dispute of Fact

Prolitec does not contend an invalidating reduction to practice, so Prolitec must show—with clear and convincing evidence—that "prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). Prolitec has failed to do so in four ways.

##### (i)    Prolitec's Failure to Rely on Its Expert Dooms Its Motion

Prolitec's Motion is notable for what it does not do. While Prolitec asked its expert, Dr. Plock, to opine on whether the '388 Patent was "ready for patenting" prior to the critical date, Prolitec's Motion chooses to present its defense ***mostly without reference to Dr. Plock's opinions***.

*See* Mot. at 20-28. It is a basic premise of patent litigation that expert testimony is required to prove invalidity in all but the simplest patent cases. *See Aspex Eyewear, Inc. v. Concepts In Optics, Inc.*, 111 F. App'x 582, 588 (Fed. Cir. 2004); *INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 626, 652 (D. Del. 2013). This is not one of those cases, so Prolitec needed expert testimony to support its defense at summary judgment just as much as it would at trial. Having failed to present sufficient testimony in support, Prolitec cannot show that "the record is so one-sided as to rule out the prospect of the nonmovant prevailing." 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 2727.1 (4th ed.). Prolitec's near-abandonment of Dr. Plock is puzzling, but having made that strategic decision, Prolitec cannot change course now. *See* D. Del. LR 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."); *see also Laboratory Skin Care, Inc. v. Limited Brands, Inc.*, 757 F. Supp. 2d 431, 439 (D. Del. 2010) (excluding expert testimony referenced in reply brief but not in opening brief on summary judgment).

### (ii)    Prolitec's Attorney-Based Analysis Misses the Mark

Prolitec's Motion also fails to show by clear and convincing evidence that "the invention that is the subject matter of the offer for sale [] satisf[ies] each claim limitation of the patent." *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006). Where a patent challenger relies on written description to prove the second prong of *Pfaff*, a disclosure must fully enable the invention of the patent, and even virtually identical disclosures may not suffice if a claim element is missing. *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 301 (D. Del. 2004), *aff'd*, 488 F.3d 982 (Fed. Cir. 2007) (holding that patent was not invalid under on-sale bar because pre-critical date design notes were not enabling, "[a]lthough much of the text, figures and formulas in the Design Notes are virtually identical to the corresponding description in the…patent specification."). Here, Prolitec's mapping of the Barclays

Center Documents to the '388 Patent claims clearly fails as to several claim elements, or at a minimum demonstrates a genuine dispute of material fact.

<u>No "networked scent delivery devices" and no "communication network including a central controller and one or more networked scent delivery devices"</u>

Prolitec contends these claim elements are met because the Barclays Center Documents disclose a configuration where an external relay board (essentially a power switch) with a wireless module provides power to a separate scenting machine through a power cord. *E.g.*, Mot. at 20-21; SCENTAIR_00082355 at -356-357; D.I. 382, Ex. 11 ("SCENTAIR_00082577") at -579. There are two problems with this: the claims require a "networked scent delivery device," not a "networked relay switch operably connected to a scent delivery device," and the claims require that there is a "communication network" established with the delivery device, as opposed to a communication network that terminates at an intermediary device. The Barclays Center Documents thus are not "sufficiently specific" to disclose this claim element.

Prolitec ignores the dispute between the experts here, with Mr. Dezmelyk opining that "there is no network connection to the scent delivery devices." Ex. D, ¶ 46. Instead, the central controller "connects to a power 'on/off' switch" and "thus the system cannot create a communication network with the scent delivery device, transmit command data [to] a scent delivery device, or receive a signal from the scent delivery device or status of the scent delivery device." *Id.*; *see also id.* at ¶¶ 47-54 (describing additional, related reasons why the Barclays Center Documents did not disclose the requirements of the claims).

Prolitec's argument that the Wi-Fi controllers disclosed in the Barclays Center Documents were "embedded in the machines," Mot. at 21, is off base. <u>First</u>, Prolitec's on-sale bar theory is not one of reduction to practice but one based on whether two documents—Exhibits 6 and 8 to Prolitec's Motion—are "of the invention" and "sufficiently specific" to enable a POSITA to

practice it. *E.g.*, *Pfaff*, 525 U.S. at 67; Mot. at 20. Thus, it is irrelevant what the inventors testified about the Barclays Center system in general or as it was installed in September 2012; what matters is what the documents themselves disclose to a POSITA. Prolitec's reliance on inventor testimony in this element and in several others (Mot. at 23-25) should be disregarded. <u>Second</u>, the documents disclose a different arrangement than represented by Prolitec, where Wi-Fi modules are placed in relay boards, not in scenting machines. *See* SCENTAIR_00082355 at -356. <u>Third</u>, the inventor Chandler did not testify to what Prolitec says he did. Mr. Chandler testified that he spent time in September 2012 configuring "system nodes and programming embedded WiFi controllers" and that all "the devices" had "WiFi transceivers in them." Chandler Dep., 94:16-23, 101:23-24. "The devices" refers to the ProXR relay boards, not to the scenting devices. *See id.*, 136:4-24 (discussing that the Wi-Fi modules were in the relay boards), 160:18-22 (referring to the relay boards as the "control nodes"). <u>Fourth</u>, Prolitec's own expert disagrees with Prolitec's characterization. Dr. Plock testified that, in his analysis, the network modules were on relay boards, not scent machines. *E.g.*, Plock Dep., 145:3-15.

Prolitec's reliance on the '388 Patent's embodiment of column 3, lines 35-41 is misplaced. There is no indication that that embodiment is a claimed embodiment; it does not refer to "master schedules," does not explain that such pre-existing scent machines can receive a transmission of command data, does not say whether such machines can transmit status data or whether the status data is a real-time status update of the scent machine. '388 Patent, 3:35-41; Plock Dep., 255:9-257:5. As Prolitec states elsewhere, "[t]he specification describes several different embodiments with different configurations and the claims do not cover all of them." Mot. at 32. Regardless, there is at least a dispute between the experts how a POSITA would read this embodiment. Mr. Dezmelyk opines that the embodiment permits a separate network module so long as the module

"extends *the network* to the scenting device." Ex. E, 243:24-244:15 (emphasis added); *id.*, 265:14-267:8. Rather than extend network connectivity to the scenting machines, the Barclays Center Documents explain extending only electric power to them through the relay board. *E.g.*, *id.*, 244:25-245:23, 267:9-268:20.

"master schedules," "verification information," and "instructions"

Prolitec's attorney argument glosses over these various claim elements and fails to identify what in the Barclays Center Documents that Prolitec contends meet them. For "master schedules," Prolitec ignores the Court's construction of "master schedules," which is a "list of scheduled events." D.I. 119. Prolitec does not identify what it believes that list of scheduled events to be, where it resides, or what information the list contains. Mot. at 23. As to "verification information" and "instructions," Prolitec does no more than identify what it contends are the "in table" and the "out table." Mot. at 23-24. It fails to specify what allegedly meets the "verification information" and "instructions" of the claims.

"generating command data …"

Summary judgment should be granted to ScentAir because Dr. Plock failed to identify what he contended met the "command data" of the Barclays Center Documents, as ScentAir argues in its Motion. *See* D.I. 379 at 18-20. Prolitec's Motion highlights the need for summary judgment in ScentAir's favor because, like ScentAir's motion essentially predicted, Prolitec does not identify what it contends meets the "command data" requirement of the claims. Prolitec only points generally to the data in the "out table" and that the relay boards may be switched on and off. Mot. at 24. What the command data is, what fields it contains, how it is generated—none of that is provided by Prolitec. And, as stated above, Prolitec cannot fill in gaps with inventor testimony about the system in general or what was done at the time of installation months after the critical date. *See* pages 21-22, *supra*.

<u>Prolitec's Cursory Analysis of Claims 2-20 Is Not Enough</u>

Although Prolitec spent several pages of attorney argument going element-by-element for Claim 1 of the '388 Patent, Prolitec only spends ***a single conclusory paragraph on the remaining 19 claims***. *See* Mot. at 26. Prolitec expects the Court to find that this single paragraph satisfies its burden of clear and convincing evidence in spite of it being totally devoid of expert support. *See id.* And although unaddressed by Prolitec, there are similarly disputes of fact as to whether the Barclays System documents disclose these claims, as evidenced by Mr. Dezmelyk's opinions about the same. *See, e.g.*, Ex. D, ¶¶ 52-54. As such, summary judgment should be denied.

### (iii)    Prolitec Does Not Address the Differences in the Independent Claims

Prolitec and Dr. Plock gloss over the fact that there are three types of claims at issue here: computer-implemented methods of delivering scents (claims 1-7), systems for delivering scents (claims 8-14), and computer-program products (claims 15-20). Whereas Prolitec and Dr. Plock do not distinguish among them, those distinctions matter for application of the on-sale bar. *See Plumtree*, 473 F.3d at 1162 (reversing district court's conclusion that method claims are invalid under the on-sale bar because the district court relied on sale of a physical product). Prolitec has not met its burden to prove, for the method claims, that ScentAir "in fact performed each of the steps of the patented process before the critical date pursuant to the contract." *Id.* at 1163. The system was not installed at Barclays Center and put into use until September 2012, well within the one-year statutory period.

### b.    Prolitec's Motion Ignores Genuine Disputes That Exist

Prolitec's Motion also must fail because it ignores the classic "battle of the experts" whether the Barclays Center Documents demonstrate that the claimed invention was "ready for patenting." *See generally* Ex. D, ¶¶ 45-57. Prolitec's Motion mentions nothing of these disputes,

nor does Prolitec make any attempt to demonstrate that Mr. Dezmelyk's opinions fail to raise a triable issue of fact. *See* Mot. at 20-28.

### C.    Prolitec Improperly Relitigates Claim Construction Issues, and Material Disputes of Fact Preclude Summary Judgment of Non-Infringement

#### 1.    Prolitec Contradicts Its Prior Representations to the Court About Claim Scope

Prolitec's motion regarding non-infringement should be denied primarily because it contradicts the prior representations it made to the Court during the supplemental claim construction proceedings. As background, the Court's Order on that issue noted that "the parties do not disagree as to the scope of the claim." D.I. 349, 5. Indeed, both parties quoted or cited various descriptions of command data from the '388 Patent in their briefs, namely that command data can be "1) 'command data that is made up of a series of on and off commands,' 2) command data made up of 'a single turn ON command that corresponds to a scheduled activation and a single turn OFF command that corresponds to a scheduled deactivation,' and 3) 'command data that contains all required information for each scent delivery unit 104 to perform as scheduled (e.g., transmits command data directing the unit to activate from 1:30 pm to 3:30 pm on Wednesday, July 7th using a scent cycle time of 300 seconds and a 50% scent duty cycle).'" D.I. 342, 14 (quoting '388 Patent, 5:36-37, 5:47-50, 5:56-61); D.I. 345, 14 (citing the same). Prolitec previously told this Court that "all of these embodiments require that the command data include activating the scent delivery device." D.I. 342, 14; *see also* D.I. 345, 14.

Despite agreement that all three embodiments are within the scope of "generating command data" just a few months ago, Prolitec now asserts that the third embodiment at 5:55-61 of the '388 Patent is *not* covered by the claims. Mot. at 32. Prolitec cannot be right. The Court's Order did not explain that it was excluding that embodiment, and, under the circumstances of the parties' agreement, it would make no sense for the Court to do so. Prolitec also makes no effort

whatsoever to explain why this embodiment is not covered by the claims, which is nowhere near sufficient to overcome its own prior representations to the Court. *See* Mot. at 32. And Prolitec's argument here on non-infringement is inconsistent with its argument on the on-sale bar that an adjacent embodiment is within the scope of the claims because "[n]either the claim language nor the prosecution history excludes this embodiment." Mot. at 22-23. That is even more true here, where the prosecution history *confirms* that the claims include this embodiment. *See* Ex. H at 260, 281, 287-288 (discussing the embodiment in question as encompassed by the claims to distinguish over Hamada).

If Prolitec is right, however, and if the Court's construction excludes that embodiment, then the Court's supplemental claim construction order was wrong, the Court did not accord ScentAir its due process rights to address a *sua sponte* claim construction that neither party raised, and ScentAir requests relief from that construction and entry of the construction that ScentAir *did* agree to. Either way, Prolitec is not entitled to summary judgment.

### 2. Prolitec Misrepresents ScentAir's Infringement Analysis and What Prolitec's Own System Does

Prolitec also misrepresents ScentAir's infringement theory and Mr. Dezmelyk's opinions on infringement (*e.g.*, Mot. 29) and whether there are disputes or concessions on certain contentions (*e.g.*, Mot. 30), so ScentAir first sets the record straight.

### a. ScentAir's Infringement Position

ScentAir contends, and Mr. Dezmelyk opines, that ██████████ of the Aera System meets the "out table" requirement of the '388 Patent claims and includes "instructions for each networked scent delivery device" as required. *E.g.*, Ex. B, ¶ 42; Ex. C, ¶ 22. Some—but not all—of the data in ██████████ also represents a "master schedule" because that data makes up a "list of scheduled events" as construed by the Court. Ex. B, ¶¶ 35-36 (listing

████████████████████████████████████████████████████

████████████████████████████████████████████████); Ex. C, ¶ 21; Ex. E, 173:24-174:9. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

The Aera Cloud generates command data based on the instructions stored in ████ ████████████████. Certain code ████████████████████████████████████ ███████████████████████████████, which in and of itself refutes Prolitec's argument that the Aera Cloud only ████████████████████. Ex. B, ¶¶ 22, 43; Ex. C, ¶ 27. Beside that, the Aera Cloud generates command data in three steps. Ex. C, ¶ 24. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

That command data generated by the Aera Cloud is indeed configured to control the operation of an Aera Device. It provides all the information needed for the Aera Device to perform

██████████████████████████████████

as scheduled. *E.g.*, Ex. C, ¶ 35. And the code on the Aera Device side explicitly recognizes that it has received commands from the Aera Cloud: █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████. The Aera Device ████████

███████████████████████████████ and, as is required by

the Court's construction, █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### b.    Prolitec's Arguments Prove the Existence of a Genuine Dispute

With ScentAir's actual infringement analysis and Mr. Dezmelyk's testimony in mind, Prolitec's arguments have no merit but, for purposes of Prolitec's motion, do no more than prove the existence of a genuine dispute that precludes summary judgment. What is generated by the Aera Cloud is not simply a ██████████████ of the instructions generated by the user, and ScentAir makes very clear the distinction between the instructions (as in t██████████████) and the command data (as generated starting with ███████████████████████████

████████████████). *Contra* Mot. at 29, 30 (incorrectly arguing ScentAir does not distinguish between "schedule," "instructions," and "command data"). There also *is* a dispute about what the Aera Device receives from the Aera Cloud. *Contra* Mot. at 30. The Aera Device receives ████████████, and the Aera Device █████████████████████████

██████████████████████████. If the Aera Device never received the command data from the Aera Cloud, the Aera Device would never operate in accordance with the specified schedule. That alone proves that the command data generated by the Aera Cloud indeed is "configured to control the operation" of the Aera Device. Mr. Dezmelyk's testimony on these

██████████████████████████████

points cannot be discredited at this stage, especially because Mr. Dezmelyk is **the only expert** who actually reviewed the code for what the Aera Cloud does; Prolitec's counsel only gave Dr. Plock excepted printouts and did not permit Dr. Plock to review the complete code even though he "wanted to." *Compare* Ex. E, 153:17-158:13 *with* Plock Dep., 16:25-21:22, 23:12-22.

The fact that ████████████████████████████████ ████████████ does not take the Aera Device out of the scope of infringement because nothing in the claims prohibits further processing of the command data. Indeed, as ScentAir represented in supplemental claim construction briefing and as the Court presumably adopted by its Order, the command data "must *in one way or another lead* to the device being *operated* (i.e., turned on or off)." D.I. 345 at 1 (first emphasis added). All the claims require is that the command data is "configured to control the operation of a networked scent delivery device," and Mr. Dezmelyk's testimony demonstrates—at the very least—a genuine dispute of material fact whether the identified command data is so "configured to control." *Intuitive Surgical, Inc. v. Auris Health, Inc.*, 549 F. Supp. 3d 362, 373 (D. Del. 2021). Accordingly, summary judgment of noninfringement would contradict the facts surrounding the operation of the Aera System, so Prolitec's motion should be denied. *Id.* at 374.

### c.    Dr. Plock Again Undermines Prolitec's Position Here

Dr. Plock may be the most helpful witness to ScentAir in defeating Prolitec's motions for summary judgment, and his testimony again assists ScentAir here too. In complete contradiction to Prolitec's position on non-infringement, Dr. Plock's opinions on invalidity are that "instructions" and "command data" can be the same thing—no generation of any different data even need be done. For example, in relation to prior-art Hamada, Dr. Plock opines that the "instructions" of the asserted claims are met by "the terminal ID, the service ID and the scent content information" in the table of Hamada's Figure 4. Plock Dep., 208:14-24. Yet he also asserts

that the "command data [] generated based on the instructions" is met by the same three fields; "it's trivially based on itself," he testified. *Id.*, 210:23-211:25. If Prolitec's own expert Dr. Plock believes for invalidity that "command data" and "instructions" can be the identical data sets and yet still meet the '388 Patent claims, Prolitec cannot credibly disagree in an attempt to win summary judgment of non-infringement.

### 3.    The Master Schedule and Out Table Need Not Be Distinct

Prolitec next chides ScentAir for "contend[ing] that the same data structure meets both" the claimed "one or more master schedules" and the claimed "out table in which instructions for each networked scent delivery device are stored." Mot. at 32. As an initial matter, Prolitec is wrong on the facts. ScentAir identifies a subsidiary data set as meeting the "master schedule" element, not the entire ███████████ as it identifies for the "out table" element, as described on pages 26-27 above. Prolitec is also wrong as a matter of claim construction.

For support, Prolitec relies on *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010). But the mere claim that *Becton* applies does not mean it does. In *Becton*, the claim listed four separate elements, each of which built upon the previous element. *Id.* at 1254. The master schedule and out table recited in the '388 Patent do not follow the building-block approach of the *Becton* claims. Unlike the *Becton* claims, the '388 Patent does not recite "an out table connected to the master schedule," "an out table derived from the master schedule," or describe any physical relation whatsoever between the master schedule and out table, other than that both must be in the central controller. Ex. E, 262:12-263:6. It is not a physical or logical impossibility that the master schedule and out table could be met by the same "schedules table" in the Aera System. Thus, *Becton* is inapposite to the claims of the '388 Patent.

The claims of the '388 Patent, when read as a whole, further contradict the notion that a separate structure is needed for the master schedule and out table. For example, the claims recite

"the central controller is configured to control an operation of each of the one or more networked scent delivery devices, wherein ***controlling the operation*** is based on one or more master schedules." The claims describe the out table as storing "instructions for each networked scent delivery device" and "generating command data . . . based on the instructions stored in the out table of the central controller." That command data is "configured to ***control the operation*** of a networked scent delivery device." The act of controlling the operation of the scent delivery devices is both based on the master schedules, and on the command data derived from the out table. The claims do not require separate structures for two things that accomplish the same purpose.

Prolitec's contention that the claims and specification of the '388 patent "at no point . . . indicate that the master schedule may be stored in the out table" is also misleading. "The specification contains no restrictive language and does not explicitly require that the [master schedule and out table] be separate." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024). For example, the '388 Patent describes that "[b]ased on the master schedule and the machine-specific information available from the database, the central controller 102 can generate a set of machine-specific command data that corresponds to the desired schedule." '388 Patent, 5:31-34. This generation of command data "according to the master schedule" aligns with the description of the generation of command data in the claims of the '388 Patent. *E.g.*, *id.*, 14:6-10 ("Before generating and/or sending command data according to the master schedule in order to activate and/or deactivate the individual scent delivery units the central controller 102 if configured to resolve any conflicts observed in the scheduled events.").

The prosecution history also undermines Prolitec's argument here. During the *ex parte* reexamination proceedings that Prolitec initiated, the Examiner rejected the '388 Patent claims over Hamada by reading the same table of Hamada's Figure 4 on both the "one or more master

schedules" and on the "in table" of the claims. *See* Ex. H at 365-366. While the in table and out table are distinct structures, the Examiner's willingness to read the same structure as meeting both the "master schedule" element and the "in table" element demonstrates that, indeed, the recited master schedule does not require an independent structure. Dr. Plock is in accord and again contradicts Prolitec's brief. Dr. Plock's invalidity position for prior-art Hamada is that the same table shown in Hamada's Figure 4 meets both the "master schedule" and the "out table" of the asserted claims. Plock Dep., 207:17-208:5.

Finally, ScentAir's position on the construction of "master schedule" and "out table" does not undermine or contradict its position in its motion for summary judgment that "in table" and "out table" cannot be met by the same database table. *See* D.I. 379, 8-12. The claimed "in table" and "out table" are mutually exclusive because "in" and "out" are mutually exclusive. *Id.*, 8-9. There is no comparable linguistic relationship between "master schedule" and "out table." The claimed "in table" and "out table" are recited as having different functions; the "in table" stores "verification information" and the "status" of each scent delivery device, whereas the "out table" stores "instructions for each networked scent delivery device." *Id.*, 9. The claimed "master schedule" and "out table," in contrast, are directed to the same function: "controlling the operation" of the scent delivery devices. Thus, while the claimed "in table" and "out table" must be distinct, the same is not true of the "master schedule" and "out table." "Here, the claim language and specification rebut any presumption that the [master schedule is a] distinct component[] that must be used distinctly from [the out table]." *Google*, 92 F.4th at 1058. And, contrary to the Examiner's reading of the same element of Hamada on both the "master schedule" and "in table" elements as discussed above, the Examiner never read a single table as meeting both the "in table" and "out table" requirements of the claims. *See*, *e.g.*, Ex. H at 193-94, 213-14, 366. Accordingly, the Court

should deny Prolitec's motion for summary judgment of noninfringement.

### D.    Mr. McElroy's Opinions Should Not Be Excluded

Prolitec's motion to exclude Mr. McElroy should be denied for three essential reasons: (1) it presupposes that the Court resolves, in Prolitec's favor, a dispute between the technical experts that Prolitec does not raise for disposition; (2) it essentially concedes that Mr. McElroy apportioned but believes, based solely on Dr. Plock's disputed testimony, that Mr. McElroy should have apportioned further; and (3) it leaves out that Mr. McElroy's Reply Report does indeed apportion further under Prolitec's view of the facts, even though ScentAir and Mr. McElroy disagree that such further apportionment is necessary.

### 1.    Prolitec's Motion Raises a Technical Dispute, Not a Damages One

Prolitec's motion is no more than a stalking horse for an underlying technical dispute between Prolitec's Dr. Plock and ScentAir's Mr. Dezmelyk regarding the scope of infringement by the Aera System. Dr. Plock and Prolitec contend that the Aera System only infringes when a user utilizes the scheduling functionality of the Aera System, but there are two reasons Dr. Plock and Prolitec are wrong. First, Prolitec and Dr. Plock fail to account for apparatus claims 8-14 and computer-program product claims 15-20, none of which require an affirmative act of "controlling the operation [] based on one or more master schedules," like method claims 1-7 do. Instead, claims 8-14 are infringed by a system having "instructions" which, when executed, perform operations including such control. *E.g.*, '388 Patent, cl. 8. And claims 15-20 are infringed by a computer-program product having "instructions configured to" perform operations including such control. *E.g.*, '388 Patent, cl. 15. As discussed in Section II.C.2.a. above, ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ In other words, the Aera System always infringes at least

██████████████████████████████████████████████

claims 8-20. <u>Second</u>, Prolitec and Dr. Plock fail to account for ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

For either reason, there is at least a genuine dispute whether there are non-infringing operations of the Aera System, and thus, there is no sufficient factual predicate to exclude the opinions of Mr. McElroy based only on Prolitec's view of the world.

Further to the battle of the technical experts, and also ignored by Prolitec, Mr. McElroy relies entirely on Mr. Dezmelyk to identify the technical footprint of the '388 Patent as against the accused Aera System. Ex. I, ¶¶ 28-29. Particularly, Mr. McElroy understood "from Mr. Dezmelyk that the invention claimed by the '388 Patent is directed to aspects of fundamental architecture of a system for providing connected scent device experience." *Id.*, ¶ 29. Mr. McElroy offers no technical opinions and, thus, there are no technical opinions about apportionment of Mr. McElroy for Prolitec to exclude. To the extent Prolitec thought those opinions insufficient or inappropriate, it was incumbent on Prolitec to use some of its expanded 36 pages to move to exclude Mr. Dezmelyk on that basis, just like ScentAir did in moving to exclude Dr. Hultmark and Dr. Vigil on Prolitec's side of the case. *See* D.I. 220 at 28-40. Having not done so, Prolitec is free to cross-examine Mr. Dezmelyk about this characterization at trial, but exclusion of Mr. McElroy would be inappropriate.

### 2.     Mr. McElroy Apportioned, and Prolitec's Argument That He Should Have Apportioned Further Raises Disputes of Fact, Not a *Daubert* Gatekeeping Concern

Technical opinions aside, Prolitec effectively concedes that Mr. McElroy apportioned because it accuses him of basing his royalty "on the entire value of the remote control features of the Aera system," rather than on the entire value of the Aera system. Mot. at 34. Prolitec is partly right; Mr. McElroy did indeed apportion. As background, for a time, Prolitec sold two versions of

its Aera devices: the "Aera Touch" and the "Aera Smart." *E.g.*, Ex. I, ¶ 110. The Aera Touch was a non-network-connected device that could only be manually operated by push buttons on the device. The Aera Smart was otherwise identical, except it included the network control and monitoring features accused of infringement here. *E.g.*, *id.*, ¶¶ 121-123. Mr. McElroy "isolate[d] the portion of Prolitec's profit from the Accused System that is enabled by the '388 patent" and "estimate[d] the 'economic footprint' of the allegedly infringing aspects of the Accused System," as he understood from Mr. Dezmelyk, by the only difference between the two: the ███ price premium (and related profit premium) for the accused Aera Smart over the non-accused Aera Touch. *Id.*, ¶¶ 122, 126. Mr. McElroy then used that profit premium as his starting point for his *Georgia-Pacific* hypothetical negotiation rate. *E.g.*, *id.*, ¶ 137; Ex. J, ¶ 48 (explaining his apportionment methodology).

This is an appropriate analysis under the law and does not run afoul of Rule 702 or *Daubert*. Mr. McElroy does not base his damages on an EMVR theory or on the entire value of the Aera Devices (which retail for approximately $200). At the very least, even Prolitec does not dispute that Mr. McElroy's isolation of that price and profit premium is an important apportionment step.

Moreover, unmentioned by Prolitec is the important fact that Prolitec has never contended that there is an acceptable non-infringing alternative in the market against which Mr. McElroy should have instead compared the Aera Smart. Instead, the only "non-infringing alternative" that Prolitec has identified is the same exact device accused of infringing—a legally insufficient alternative for purposes of a damages analysis. *See* Ex. M at 9 (response to Interrogatory No. 15). Even still, as discussed above, the Aera System always infringes.

By comparing the accused Aera Smart to a comparable system that lacks the infringing features, coupled with the lack of any non-infringing alternatives, Mr. McElroy relied on the best

market-based indication of the value of the infringing functionality, apportioned separate from all other features of the Aera Devices that exist in both the Aera Smart and the Aera Touch. Mr. McElroy captures no value of scent diffusion, fragrance quality, brand name and recognition, aesthetics, product quality, or any other non-accused feature. Mr. McElroy's Opening Report opinions apportioned, and sufficiently so under the technical expert testimony on which he relied (and which Prolitec does not seek to exclude).

### 3. Mr. McElroy Also Apportioned Under Prolitec's View of the World, and Prolitec Does Not Seek to Exclude Those Opinions

Prolitec's Motion does not address it, but Mr. McElroy also did a further apportionment based on Prolitec's understanding of infringement and claim scope. Mr. McElroy's Reply Report responds to the opinions of Prolitec's expert, Dr. Vigil, who relies on Dr. Plock to introduce a different means of apportioning based on four arbitrary characteristics of the Aera System. *See* Ex. K, ¶¶ 46-48, 51-53. While Mr. McElroy believed he already sufficiently apportioned in his Opening Report, and while there are disputes between the technical experts regarding which of those features are attributable to the '388 Patent claims, Mr. McElroy engaged in Dr. Vigil's apportionment rubric in his Reply Report to further demonstrate that his opined range of royalty rates is reasonable under that analysis too. *See* Ex. J, ¶¶ 40-51. Prolitec does not mention or move to exclude those opinions in the Reply Report. Thus, to the extent the Court determines—contrary to the summary judgment standard—that Prolitec's characterization of the facts is right and that further apportionment is necessary, Mr. McElroy can present that testimony and his royalties based on such further apportionment to the jury.

## III. CONCLUSION

ScentAir respectfully requests that the Court deny Prolitec's Motion in its entirety.

Dated: November 19, 2024

|                                              |                                              |
|----------------------------------------------|----------------------------------------------|
|                                              | K&L GATES LLP                                |
| Of Counsel:                                  | */s/ Steven L. Caponi*                       |
|                                              | Steven L. Caponi (No. 3484)                  |
| Vincent J. Galluzzo                          | Megan E. Hunt (No. 6569)                     |
| K&L GATES LLP                                | K&L Gates LLP                                |
| 300 South Tryon Street, Suite 1000           | 600 N. King Street, Suite 901                |
| Charlotte, NC 28202                          | Wilmington, DE 19801                         |
| Phone: (704) 331-7400                        | Phone: (302) 416-7000                        |
| vincent.galluzzo@klgates.com                 | steven.caponi@klgates.com                    |
|                                              | megan.hunt@klgates.com                       |
| Jared R. Lund                                |                                              |
| K&L GATES LLP                                | *Attorneys for Counterclaim-Plaintiff*       |
| 70 West Madison Street, Suite 3300           | *ScentAir Technologies, LLC*                 |
| Chicago, IL 60602                            |                                              |
| Phone: (312) 372-1121                        |                                              |
| jared.lund@klgates.com                       |                                              |