## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PROLITEC INC.,

              Plaintiff/Counter-Defendant,

v.

SCENTAIR TECHNOLOGIES, LLC,

              Defendant/Counter-Plaintiff.

C.A. No. 20-984-WCB

## **[JOINT PROPOSED] FINAL JURY INSTRUCTIONS**[1]

---

[1] The parties' disputes are noted and juxtaposed herein.

## 1.  Introduction.[2]

You have heard all the evidence in this case. I will now instruct you on the law that you are to apply. Following my instructions, the lawyers for each side will make their final arguments to you. After that, you will retire to the jury room to begin your deliberations.

These instructions will be a little lengthy, and they may be somewhat difficult to follow at times. To help you, I have made copies of the instructions for each of you that you can use during your deliberations. I mention this so you won't feel that you have to take notes right now. In fact, I would suggest that you just listen to these instructions without trying to write anything down. If you miss something, you will be able to check the written copy of these instructions once you return to the jury room.

When you return to the jury room, your job will be to consider the evidence you have heard and to decide the case in light of the legal principles that I will explain now. You will record your decisions on the various issues in the case by answering the questions on the verdict form that will be waiting for you in the jury room.

The decision you make is yours and yours alone. Please remember that nothing I say now or may have said, or any questions I may have asked, during the trial are intended to suggest, or should be taken by you as suggesting, what I think your verdict should be.

---

[2] Final Jury Instructions, D.I. 301 at 2 [hereinafter *Prolitec* Jury Instructions] (instruction 1); Court's Final Jury Instructions, ECF No. 497 at 2, *Ingenico Inc. v. IOENGINE, LLC*, Case No. 18-826-WCB (D. Del. July 15, 2022) [hereinafter *Ingenico* Jury Instructions].

### 1.1. Preponderance of the Evidence / Clear and Convincing Evidence.[3]

I am going to start by returning to the subject of the burden of proof, which we discussed at the beginning of the case. There are two different burdens of proof that are used in a patent case such as this.

On the issue of whether Prolitec infringes ScentAir's U.S. Patent No. 10,838,388 ("the '388 patent"), ScentAir's burden of proof is the preponderance of the evidence. The preponderance of the evidence means that ScentAir has the burden of persuading you that its claim of infringement is more likely to be true than untrue. [ScentAir: To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting the claims of the party asserting infringement—here, ScentAir—must make the scales tip somewhat toward its side.][4] ScentAir also has the burden by a preponderance of the evidence to prove willful infringement and damages. If the evidence does not persuade you that ScentAir's claims are more likely to be true than untrue, that means that ScentAir has failed to satisfy its burden. If that happens, you should find in favor of Prolitec on these issues.

As I said before trial, the issue of whether the ScentAir '388 patent is invalid carries a different burden of proof. A patent is presumed to be valid. Therefore, on that issue, Prolitec's burden to prove invalidity is by clear and convincing evidence. Clear and convincing evidence

---

[3] *Prolitec* Jury Instructions at 3-4 (instruction 1.1); *Ingenico* Jury Instructions at 3 (instruction 1.1); with additions from *e.g.*, Final Jury Instructions, D.I. 605, at 12, *Natera, Inc. v. ArcherDx, Inc.*, No. 20-125 (D. Del. May 12, 2023); 35 U.S.C. § 282; AIPLA Model Jury Instruction 1.2.

[4] ScentAir's Position: This language assists the jury in understanding in visual terms how the burden of proof works for preponderance of the evidence. It is the same language commonly used in jury instructions for this purpose.

Prolitec's Position: In the January 2024 trial on Prolitec's claims, the parties proposed this language, and the Court omitted them in the Final Jury Instructions. *Compare Prolitec* Jury Instructions at 3 (instruction 1.1) *with* D.I. 268 at 3-4 (instruction 1.1). Prolitec believes that the *Prolitec* Jury Instructions strike a good balance between explanation and concision.

means that Prolitec has the burden of leaving you with a clear conviction or belief that the evidence supports Prolitec's invalidity defense. [ScentAir: Put another way, clear and convincing evidence means that it is highly probably that a fact is true.]⁵ This is a higher standard of proof than preponderance of the evidence, which means it is harder to prove something by clear and convincing evidence than by a preponderance of the evidence. If the evidence does not persuade you that Prolitec's claim of invalidity is supported by clear and convincing evidence, that means Prolitec has failed to satisfy its burden. If that happens, you should find in favor of ScentAir on the issue of validity.

[ScentAir: Finally, some of you may have heard the phrase "proof beyond a reasonable doubt." That burden of proof is a higher burden of proof than those at issue in this case, applies only in criminal cases and has nothing to do with a civil case like this one. You should therefore not consider it in this case.]⁶

---

⁵ <u>ScentAir's Position</u>: This language comes straight from the AIPLA Model Jury Instructions (Instruction 2) and from Federal Circuit precedent: *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (clear and convincing evidence is that "which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are highly probable") (alteration in original) (citation and internal quotation marks omitted).

<u>Prolitec's Position</u>: In the January 2024 trial, the parties proposed this language, and the Court omitted them in the Final Jury Instructions. *Compare Prolitec* Jury Instructions at 3 (instruction 1.1) *with* D.I. 268 at 3-4 (instruction 1.1). Prolitec believes that the *Prolitec* Jury Instructions strike a good balance between explanation and concision.

⁶ <u>ScentAir's Position</u>: This language is important in ensuring jurors, who may be influenced by popular crime shows and movies that often reference the "beyond a reasonable doubt" standard, do not use that standard here. The language also comes from AIPLA Model Jury Instruction 2 and FCBA Model Jury Instruction A.5.

<u>Prolitec's Position</u>: In the January 2024 trial, the parties proposed this language, and the Court omitted them in the Final Jury Instructions. *Compare Prolitec* Jury Instructions at 3 (instruction 1.1) *with* D.I. 268 at 3-4 (instruction 1.1). Prolitec believes that the *Prolitec* Jury Instructions strike a good balance between explanation and concision.

**1.2. Evidence in the Case; Credibility of Witnesses.[7]**

As the finders of the facts, you are responsible for weighing the evidence in this case, including the testimony of the witnesses you have heard and the exhibits that have been introduced as evidence, and any facts that the parties have agreed are true. As a reminder, the lawyers' statements and characterizations of the evidence are not evidence. While the opening statements and closing arguments may have been helpful to you, your decision should ultimately depend on your evaluation of the evidence.

As part of your job as jurors, you are entitled to weigh the testimony of the witnesses. That's a job well suited for jurors like yourselves who have heard and seen the witnesses. For example, if two witnesses offer testimony that is in conflict, you should use your common sense in deciding whether the testimony can be reconciled and, if not, which witness you think is more believable. You can consider, for example, each witness's motive, state of mind, knowledge, and manner while on the witness stand. If there is a question as to the relative expertise of two witnesses, you should again use your common sense to decide which witness you find more knowledgeable and more believable. You are entitled to give the testimony of each witness whatever weight you feel is appropriate. You may choose to believe or disbelieve any witness's testimony, either entirely or in part.

Evidence can be direct or circumstantial. Direct evidence is evidence that directly proves a fact. If a witness testified that she saw it raining outside, that would be direct evidence that it was raining. Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was

---

[7] *Prolitec* Jury Instructions at 4 (instruction 1.2); *Ingenico* Jury Instructions at 4 (instruction 1.2).

raining. The law makes no distinction between the weight you should give to direct evidence as opposed to circumstantial evidence.

### 1.3. Number of Witnesses.[8]

Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

---

[8] Final Jury Instructions, D.I. 605, at 12, *Natera, Inc. v. ArcherDx, Inc.*, No. 20-125 (D. Del. May 12, 2023).

**1.4. Expert Witnesses.**[9]

Some of the witnesses have testified as expert witnesses because of their special knowledge in their relevant fields. The fact that a witness has testified as an expert does not mean you must accept that witness's opinions as true. As with all other witnesses, it is up to you to decide whether you find the witness's testimony convincing.

---

[9] *Prolitec* Jury Instructions at 5 (instruction 1.3); *Ingenico* Jury Instructions at 5 (instruction 1.3).

**1.5. Depositions—Use as Evidence.**[10]

During the trial, some of the testimony was presented not through a live witness, but through video excerpts from a deposition. The deposition testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with evidence. You should not attribute any significance to the fact that the deposition videos may appear to have been edited. The deposition testimony that you heard at trial is entitled to the same consideration as any other evidence in the case, and you should judge its credibility and weight just the same as if the witness had been present and testified in person here in the courtroom.

---

[10] *Ingenico* Jury Instructions at 6 (instruction 1.4).

### 1.6. Demonstratives.[11]

During the course of the trial, the lawyers and witnesses occasionally presented slides, charts, and animations that were not formally admitted into evidence. Those items are commonly referred to as demonstratives. They are not evidence and were intended only to aid in your understanding of the evidence in the case. It is the underlying testimony of the witnesses and the admitted trial exhibits that are the evidence in this case on which you should base your decisions.

---

[11] *Prolitec* Jury Instructions at 5 (instruction 1.4).

**1.7. The Parties Contentions and Questions to Decide.**[12]

ScentAir alleges that Prolitec's Aera System infringes claims 1-20 of ScentAir's '388 patent. Prolitec denies that it has infringed any claims of ScentAir's '388 patent.

Prolitec also argues that the asserted claims of the ScentAir patent are invalid under the legal doctrines of anticipation, obviousness, on-sale bar, and [ScentAir: patent-eligible][13] [Prolitec: patent-ineligible] subject matter. ScentAir denies that any claims of the '388 patent are invalid.

I will now summarize the issues that you must decide according to instructions that I will give you. You must decide the following issues separately:

First, for each asserted claim of the ScentAir patent, you must decide whether ScentAir has proved, by a preponderance of the evidence, that Prolitec has directly infringed that patent claim.

Second, if you find that any of the asserted claims are infringed, you must decide whether ScentAir has proved, by a preponderance of the evidence, that Prolitec's infringement of the ScentAir patent was willful.

Third, if you find that any of the asserted claims are infringed, you must decide whether Prolitec has proved, by clear and convincing evidence, that each asserted claim is invalid.

---

[12] *See Ingenico* Jury Instructions at 8 (instruction 1.6).

[13] ScentAir's Position: As discussed further below in relation to the instruction on *Alice* Step 2, the prior instructions from this Court referenced in the next footnote frame this instruction as "Eligibility," not "Ineligibility," which is appropriate and consistent with the "Inventions Patentable" framing of the title of 35 U.S.C. § 101.

Prolitec's Position: As discussed further below in relation to the instruction on *Alice* Step 2, this issue is appropriately framed in terms of what the party with the burden of proof is attempting to prove. Further, courts have used "ineligibility" in final jury instructions. *See* Final Jury Instructions, D.I. 483, *SB IP Holdings LLC v. Vivint, Inc.*, No. 4-20-cv-00886 (E.D. Tex. Oct. 23, 2023) (instruction 15-16); Final Jury Instructions, *Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*, D.I. 845 at 22-23, No. 4-18-cv-00474 (E.D. Tex. Sept. 2, 2020).

Fourth, if you find that any of the asserted claims are both infringed and valid, you must decide what amount of monetary damages ScentAir has proved, by a preponderance of the evidence, that it should be awarded as compensation for Prolitec's infringement prior to trial.

## 2.  Patent Claims[14]

To decide what is covered by a patent, we look at the patent's claims. As you have heard, the claims are the numbered paragraphs at the end of the patent. The figures and text in the rest of the patent provide a description of the invention or context for the claims, but it is the claims that define what the patent covers. You will be called upon to decide whether Prolitec infringed any of claims 1 to 20 of the ScentAir patent. You don't have to remember those numbers. Those claims are all set out at the back of these instructions, and they will be listed for you on the verdict form.

When an accused device, system, or method satisfies all the requirements of a claim, the claim is said to "cover" that thing, or that the thing "falls within the scope" of the claim. In other words, for example, a claim covers a system if all the claim requirements are present in that system. To find infringement, you must find that each of the requirements of a particular claim are satisfied. In patent law, the requirements of a claim are sometimes referred to as elements or limitations. Those terms all mean the same thing.

Many of the terms used in the claims will be familiar to you, but others may not be. One term that is used a lot in patents, and is used in the patent in this case, is the term "comprising." In the patent context, "comprising" means "including" or "containing." So if a claim states that an invention is "comprising" a particular feature, that means that a system can infringe that claim if it contains that feature, even if it also contains other features beyond those claimed in the patent.

Additionally, I have defined several of the terms that are used in the claims. You are to apply the following definitions when considering what the claims cover.

The term "**master [scenting] schedule**" means "list of scheduled events."[15]

---

[14] *See Ingenico* Jury Instructions at 9–10 (instruction 2).

[15] Markman Order, D.I. 119.

The term "**generating command data that is configured to control the operation of a networked scent delivery device**" means "generating, by the central controller, command data that is configured to control the operation of a networked scent delivery device, including turning the device on and off."[16]

[ScentAir: The terms "**in table**" and "**out table**" cannot be met by the same element and therefore must be separate tables.[17]]

[Prolitec: The terms "**in table**" and "**out table**" refer to distinct components. Distinct components may overlap buy may not be the same. [18]][19]

[Prolitec: The terms "**master schedule**" and "**instructions**" refer to distinct components.[20] Distinct components may overlap but may not be the same.[21]][22]

---

[16] Supplemental Claim Construction Order, D.I. 349.

[17] Summary Judgment Order, D.I. 408 at 31-32.

[18] Summary Judgment Order, D.I. 408 at 31-32.

[19] ScentAir's Position: The Court's Order is clear an unequivocal on this construction: "ScentAir's contention that the in table and the out table must be separate tables is undisputed. Because there is no dispute as to that claim construction issue, and the agreed-upon claim construction is consistent with the specification, … I adopt that claim construction." D.I. 408 at 31-32. Prolitec's proposal attempts to rewrite the Court's construction into the opposite of what the construction says by permitting in table and the out table not to be separate tables but to "overlap." Whether or not the Court ruled on the admissibility under *Daubert* of an opinion of Dr. Plock does not, and cannot, change the Court's construction.

Prolitec's Position: ScentAir's proposal fails to take into account that the "in table" and "out table" may refer to distinct components that overlap. The Court acknowledged that Dr. Plock's "sub-table" theory could go the jury. See Summary Judgment Order, D.I. 408 at 33.

[20] *Id.* at 29-30.

[21] *Id.*

[22] ScentAir's Position: This is not a claim construction issued by the Court. Prolitec did not seek such a construction, nor did the Court provide one. If Prolitec wanted a construction, it was incumbent on Prolitec to request it, not to shoehorn it into a jury instruction. Further, contrary to Prolitec's position below, the Court need not recite all of the Court's rulings at summary judgment in the jury instructions. This pre-trial ruling is no exception.

<u>Prolitec's Position</u>: That the "master schedule" and "instructions" are distinct but may overlap was a crucial aspect of the Court's denial of Prolitec's motion for summary judgment of noninfringement.  Accordingly, and due to the confusion that these terms might elicit for the jury, it is appropriate to include the Court's finding here.

**2.1. Independent and Dependent Claims**

The '388 patent includes both "independent claims" and "dependent claims."

An independent claim does not refer to any other claim of the patent. An independent claim must be read separately from the other claims to determine the scope of the claim.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes all elements recited in the dependent claim, as well as all elements of the independent claim to which it refers.

In this case, claims 1, 8, and 15 are independent claims. The remainder of the claims in the '388 patent are dependent claims.

### 3. Infringement Generally.[23]

I will now instruct you on how to decide whether or not Prolitec has infringed claims 1-20 of ScentAir '388 patent.

[ScentAir: United States patent law gives the owner of a U.S. patent the right to exclude others from making, using, or selling something that is covered by one of the patent claims during the term of the patent. Any person or business entity that has engaged in any of those acts in the United States without the patent owner's permission infringes the patent.][24]

Infringement is determined on a claim-by-claim basis. Therefore, it is possible for there to be infringement as to one claim but not as to another.

In order to prove infringement, ScentAir must prove that the requirements of infringement are met by a preponderance of the evidence, which is to say that it is more likely than not that all the requirements of infringement have been proved.

---

[23] *Prolitec* Jury Instructions at 9 (instruction 2.2); FCBA Model Jury Instruction B.3.1.

[24] ScentAir's Position: This language is important to the jury understanding the purpose of a patent as related to the trial and the jury's job in rendering a verdict. The language also comes from AIPLA Model Jury Instruction 3.0.

Prolitec's Position: In the January 2024 trial, the parties proposed this language, and the Court omitted them in the Final Jury Instructions. *Compare Prolitec* Jury Instructions at 7 (instruction 2) *with* D.I. 268 at 14 (instruction 3). Prolitec believes that the *Prolitec* Jury Instructions strikes a good balance between explanation and concision.

### 3.1. Direct Infringement.[25]

In this case, ScentAir asserts that Prolitec has directly infringed ScentAir's '388 patent. Prolitec is liable for directly infringing the '388 patent if you find that ScentAir has proven that it is more likely than not that Prolitec made, used, imported, offered to sell, or sold the invention defined in at least one claim of the '388 patent.

You may also find that Prolitec directly infringed if you find that Prolitec did not itself perform all acts necessary to infringe so long as Prolitec directed or controlled the acts of the other party performing those acts, such as where the other party is an agent of Prolitec or where the other party is contractually obligated to Prolitec to carry out those acts.

A party can directly infringe a patent without knowing of the patent or without knowing that what they are doing is an infringement of the patent. A party also may directly infringe a patent even though they believe in good faith that the patent is invalid.

---

[25] 2024 AIPLA Model Patent Jury Instructions at 3.1, 3.3; *see Prolitec* Jury Instructions at 9 (instruction 2.3); *see* FCBA Model Jury Instruction B.3.7.

### 3.2. Direct Infringement – Literal Infringement.[26]

ScentAir argues that Prolitec directly infringes the '388 patent literally. To determine literal infringement, you must compare Prolitec's accused Aera System with each patent claim ScentAir asserts is infringed. You must determine literal infringement separately for each patent claim. A patent claim is literally infringed only if Prolitec's accused Aera System includes each and every element recited in that patent claim. [ScentAir: The same element of the Aera System may satisfy more than one element of a patent claim.][27] [Prolitec: Distinct claim elements may be met by components of the Aera System that share features or overlap. But two distinct claim elements may not both be met by the same component of the Aera System unless there is evidence from the patent specification saying that they can. If there is no such evidence, one component in the accused product cannot be used to meet two separate claim elements.[28]][29] If Prolitec's accused

---

[26] AIPLA Model Jury Instruction 3.2.

[27] ScentAir's Position: This language comes straight from the model used here, AIPLA Model Jury Instruction 3.2, and is a correct statement of the law as applied to the facts here. *E.g.*, *Powell v. Home Depot*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011).

Prolitec's Position: This language is not a correct statement of law and is contrary to the Court's Opinion on summary judgment. *See* Summary Judgment Order, D.I. 408 at 30; *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010); *Powell v. Home Depot*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011).

[28] *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010).

[29] ScentAir's Position: This language is confusing and is not a correct statement of the law because it attempts to stretch the fact-based holding of *Becton* to be a general statement of the law (which it is not). Prolitec's language in the proposed second sentence would also contradict the Court's Opinion on summary judgment (D.I. 408 at 30) which reasoned that "nothing in the specification prohibits those two data sets [master schedule and instructions] from containing overlapping data."

Prolitec's Position: This language follows directly from the Court's Opinion on summary judgment. D.I. 408 at 30. It also accurately reflects the case law. *See, e.g., Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010); *Powell v. Home Depot*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011).

Aera System does not literally contain one or more elements recited in a claim, Prolitec does not literally infringe that claim.

### 4.  Willful Infringement.[30]

If you find that [ScentAir: it is more likely than not that][31] Prolitec infringed of one or more claims of ScentAir's '388 patent, you must next decide whether Prolitec's infringement was willful.

To show that Prolitec's infringement was willful, ScentAir must prove by a preponderance of the evidence that Prolitec knew of ScentAir's '388 patent and intentionally infringed at least one asserted claim of the patent. You may consider whether Prolitec's behavior was deliberate or intentional. However, you may not find that Prolitec's infringement was willful merely because Prolitec knew about the patent. In determining whether ScentAir has proven that Prolitec's infringement was willful, you must consider all of the circumstances and assess Prolitec's knowledge at the time the challenged conduct occurred.

[Prolitec: You may consider factors such as whether Prolitec acted inconsistently with the standards of behavior for its industry; whether Prolitec actually copied or attempted to copy the inventions covered by the ScentAir patent; whether Prolitec failed to make a good-faith effort to avoid infringing the ScentAir patent such as by attempting to design around the ScentAir patent; and whether Prolitec reasonably believed it did not infringe or that the '388 patent was invalid.[32]

You may not assume that merely because Prolitec did not obtain a legal opinion about whether it infringed the '388 patent, that the opinion would have been unfavorable. The absence

---

[30] AIPLA Model Jury Instruction 11.0.

[31] ScentAir's Position: This language is straight from the model used here, AIPLA Model Jury Instruction 11.0, and is an appropriate reminder to the jury of the burden of proof.

Prolitec's Position: This language is redundant and potentially confusing as it incorporates language that is included separately in Section 3.1

[32] *See* FCBA Model Patent Jury Instruction 3.10 (2020).

of a legal opinion may not be used by you to find that Prolitec acted willfully. Rather, the issue is whether, considering all the facts, ScentAir has established that Prolitec's conduct was willful.[33]][34]

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement. I will take willfulness into account later if you find it.

---

[33] FCBA Model Patent Jury Instruction 3.10 (2020).

[34] ScentAir's Position: This additional language is unnecessarily redundant of the language already present in the AIPLA Model Instruction used that says the jury "must consider all of the circumstances and assess Prolitec's knowledge at the time the challenged conduct occurred." This additional list of potential circumstances also improperly suggests items to the jury that may not have been presented at trial. Jury instructions are not a place for argument or evidence.

Prolitec's Position: This language is not redundant and is pulled from the FCBA's model jury instructions. *See* FCBA Model Patent Jury Instruction 3.10 (2020). A bare statement that the jury should consider "all of the circumstances" is likely to be confusing to the jury, and elucidation of relevant factors to consider will aid the jury in its deliberations. The statements are neutral and do not present argument or evidence.

**5.  Invalidity.**

I will now instruct you on the rules you must follow in deciding whether or not Prolitec has proved that any asserted claims of the ScentAir '388 patent is invalid. Prolitec has the burden of proving invalidity by clear and convincing evidence, which as I've said before means the evidence must leave you with a clear conviction or belief that the claims in question are invalid.

Prolitec contends that claims 1-20 of the '388 patent are invalid because the inventions set forth in those claims: (1) were not new but were anticipated by a prior invention, (2) would have been obvious to a person of skill in the art in light of what came before, (3) were on sale prior to July 10, 2012, and (4) do not contain patent-eligible subject matter.

### 5.1. Prior Art.[35]

To determine whether a patent claim is anticipated or obvious in light of what came before, it is important to know how patent law defines what came before. What came before, as you've heard this week, is referred to as the "prior art."

Prolitec contends that each of the following is prior art because each is a publication, a patent, or published patent application that names another invention that was filed before the filing date of the ScentAir patent: Japanese Patent Publication No. JP 2009-217641 ("Hamada"); U.S. Pat. Pub. No. 2011/0089260 ("Van Roemburg"); U.S. Pat. No. 7,783,380 ("York"); U.S. Pat. Patent No. 9,541,912 ("Grossman"); PCT Publication No. Wo 02/083190 ("Messager"); U.S. Publication No. 2013/0131883 ("Yamada"), and Using WebCTRL 2.0 ("WebCTRL").

[Prolitec: The fact that any particular reference was or was not considered by the Patent Office does not change Prolitec's burden of proof.[36]] [ScentAir: The fact that a particular reference was or was not considered by the Patent Office does not change Prolitec's burden to prove by clear and convincing evidence that the patent claim is invalid. This burden may be even more difficult to meet when Prolitec attempts to rely on prior art that was before the Patent Office during prosecution or reexamination.][37]

---

[35] *Prolitec* Jury Instructions at 18 (instruction 3.1).

[36] Final Jury Instructions, D.I. 528 at 23, *Arendi S.A.R.L. v. Google LLC*, No. 13-919-JLH (D. Del. May 2, 2023); *see, e.g.*, *Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 719 F.3d 1346, 1357 (Fed. Cir. 2013) ("No decision of the Supreme Court or [the Federal Circuit] has ever suggested that there is an added burden to overcome PTO findings in district court infringement proceedings.").

[37] ScentAir's Position: Prolitec's language is not legally incorrect but is confusingly stated in that it leaves ambiguous what "Prolitec's burden of proof" is. Additionally, this language need be accompanied by reference to relevant language from the U.S. Supreme Court, *Microsoft Corp. v. i4i Ltd. P'Ship*, 564 U.S. 91, 110-11 (2011) ("If the PTO did not have all material facts before it … the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain."). AIPLA Model Patent Jury Instruction 5.1 proposes that such

**5.2. Level of Ordinary Skill.**[38]

The term "person of ordinary skill in the art" is a term frequently used in patent law, and it has an important role in deciding whether an invention was described in the prior art or would have been obvious at the time it was invented.

A person of ordinary skill in the art is a person of average education and training in a particular field, who is also aware of all the relevant prior art in that field. The level of ordinary skill in the art often depends on the nature of the field of the invention. So, for example, if the invention is a way to generate additional energy in a nuclear power plant, the level of ordinary skill in the art is likely to be significantly higher than if the invention is a new way to fold cardboard boxes to make them stronger.

In deciding what the level of ordinary skill in the art of the invention is, you should consider the evidence introduced at trial, including the levels of education and experience of the inventors and other persons actively working in the field; the types of problems encountered in the field; prior art solutions to those problems; and the sophistication of the technology in the field at the time of the invention.

In this case, ScentAir contends that a person of ordinary skill in the art would have a bachelor's degree in electrical engineering or computer science, or an equivalent subject, or have

---

an instruction may be appropriate. Prolitec's response below tries to downplay the AIPLA Model, but Prolitec has no response to the clear articulation of law from the Supreme Court, or why the jury should not be aware of such a important and relevant characterization of the law.

Prolitec's Position: The language that ScentAir seeks to add paraphrases the "Practice Note" associated with AIPLA Model Instruction 5.1. The introduction to the AIPLA Model Instructions specifically states that "[t]he Practice Notes are not meant to be statements of law or included in the instructions." AIPLA Model Instructions § I.

[38] *See Ingenico* Jury Instructions at 22–23 (instruction 4.5); Opening Report of Robert Dezmelyk, ¶ 44 (June 14, 2023); Declaration of Cory Plock ISO Answering Brief in Response to ScentAir's Claim Construction Brief, ¶ 20 (November 2, 2022).

two to three years of experience designing or implementing systems used to control networked devices. More experience would compensate for less formal education, and vice versa.

Prolitec contends that a person of ordinary skill in the art would have held a bachelor's degree in computer science or computer engineering or an equivalent subject, or three years of experience in fields related to computer technologies used in networked devices and systems. More experience would compensate for less formal education, and vice versa.

### 5.3. Anticipation.[39]

In this case, Prolitec contends that claims 1-20 of the '388 patent are anticipated. Prolitec must convince you of this by clear and convincing evidence.

Specifically, Prolitec contends that the "Hamada" prior art reference anticipates the asserted claims of the '388 patent. Anticipation must be determined on a claim-by-claim basis. For each asserted claim, Prolitec must prove by clear and convincing evidence that all of the requirements of that asserted claim are present in a single piece of prior art.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied— such that a person having ordinary skill in the art in the technology of the invention, looking at that one reference, could make and use the claimed invention.

---

[39] 2020 FCBA Model Patent Jury Instruction at 4.3b-1.

**5.4. Obviousness – In General.**[40]

Prolitec next contends that claims 1-20 of the '388 patent are invalid because the claimed inventions would have been "obvious." Prolitec must convince you of this by clear and convincing evidence. A claimed invention is invalid for obviousness if it would have been obvious to a person of ordinary skill in the art at the time the invention was made. Unlike anticipation, which allows consideration of only one item of prior art, obviousness can be shown by considering a single item of prior art or a combination of multiple items of prior art. [Prolitec: Obviousness can also be found in one or more prior art references in combination with the knowledge of a person of ordinary skill in the art.  Like anticipation, the claim elements may be disclosed either expressly or inherently in the prior art item so that a person of skill in the art, looking at that one item, could make and use the invention in the asserted claim.][41]

In determining whether a claimed invention is obvious, you must consider several factors: the level of skill of a person of ordinary skill in the art at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and other considerations that may suggest whether the asserted claim was obvious or not obvious.

In considering whether an invention is obvious based on a combination of items in the prior art, you must ask whether there is anything that would have prompted a person of ordinary skill in the art to combine the elements or concepts in the prior art in the same way the invention does. A patent claim that consists of several elements is not necessarily rendered obvious merely because

---

[40] *See Ingenico* Jury Instructions at 21 (instruction 4.4).

[41] ScentAir's Position: This additional language is redundant of what comes before and after it.

Prolitec's Position: This language is not redundant regarding "what comes before or after it" because it expands on what can constitute "multiple items of prior art," e.g., knowledge of a POSITA.  Similarly, this language about claim elements being disclosed expressly or inherently in an obviousness analysis is not redundant as this concept is not explained elsewhere.

each of the separate elements was known in the prior art. For example, you could say that a piano is really just a combination of wood, ivory, metal, and wires, all of which were known before the first piano was invented, but that does not mean that inventing the piano would be obvious if you just started with a pile of wood, some wire, some pieces of ivory, and a few chunks of metal.

### 5.5. Obviousness - Differences Between the Claimed Inventions and the Prior Art[42]

You should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention. Your analysis must determine the impact, if any, of such differences on the obviousness or non-obviousness of the claimed invention as a whole, and not merely on some portion.

In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention. You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention. For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more likely that the claimed invention was obvious. On the other hand, if the combination of known elements yielded unexpected or unpredictable results, or if the prior art teaches away from combining the known elements, then this evidence would make it more likely that the claimed invention that successfully combined those elements was not obvious.

A claim is not proven obvious merely by demonstrating that each of the elements was independently known in the prior art. Most, if not all, inventions rely on building blocks long-known, and claimed discoveries almost of necessity will likely be combinations of what is already known. Therefore, you should consider whether a reason existed at the time of the inventions that would have prompted a person of ordinary skill in the art in the relevant field to combine the teachings in the way the claimed invention does. The reason could come from the prior art, the

---

[42] AIPLA Model Patent Jury Instructions at 7.2.

background knowledge of one of ordinary skill in the art, the nature of any problem or need to be addressed, market demand, or common sense.

If you find that a reason existed at the time of the inventions to combine the elements of the prior art to arrive at the claimed invention, and there would have been a reasonable expectation of success in doing so, this evidence would make it more likely that the claimed invention was obvious. [ScentAir: If, on the other hand, you find that no reason existed at the time of the inventions to combine the elements of the prior art to arrive at the claimed invention, or there would have been no reasonable expectation of success for doing so, this evidence would make it more likely that the claimed invention was not obvious.][43]

Similarly, you may consider the possibility that a reference teaches away from the claimed invention. A reference teaches away from the invention when it would have discouraged a person of ordinary skill in the art as of July 10, 2013 from practicing the claimed invention, or when such a person would be led in a different direction than practicing the claimed invention.

You must undertake this analysis separately for each claim that Prolitec contends is obvious.

[Prolitec: In comparing the scope and content of each prior art reference to a patent claim, you may find that inherency may supply a claim element that is otherwise missing from the explicit disclosure of a prior art reference. The inherent presence of an element so found by you may be used in your evaluation of whether the claimed invention would have been obvious in view of the prior art. But, to rely on inherency to establish the existence of a claim element in the prior art in

---

[43] ScentAir's Position: This additional language is appropriate to counterweight the language of the instruction essentially suggesting obviousness.

Prolitec's Position: This instruction is pulled straight from AIPLA Model Instruction 7.2. ScentAir's addition is redundant because the jury would understand that the inverse of the preceding statement would also be true.

an obviousness analysis, that element necessarily must be present in, or the natural result of, the combination of elements explicitly disclosed by the prior art. Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from an explicit disclosure is not sufficient to find inherency. However, if the disclosure is sufficient to show that the natural result flowing from the explicit disclosure *would* result in the claim element in question, inherency may be found. Something inherent from the explicit disclosure of the prior art must be limited when applied in an obviousness analysis and used only when the inherent element is the natural result of the combination of prior art elements explicitly disclosed. An important consideration when determining whether a reference inherently discloses a previously unknown property of something is whether that property is unexpected. Although all properties of something are inherently part of that thing, if a property is found to be unexpectedly present, then the property may be nonobvious.][44]

---

[44] <u>ScentAir's Position</u>: This language on inherency comes from AIPLA Model Patent Jury Instruction 7.2 but does not follow its warning that "Care should be taken to tailor this Instruction to the evidence admitted in the case." This language is highly likely to cause jury confusion where Prolitec will only raise, at most, a couple of inherency issues in its many proposed invalidity theories. Moreover, inherency has already been addressed in Instructions 5.3 and 5.4 above, per the method of addressing them in the FCBA Model, making this redundant.

<u>Prolitec's Position</u>: This instruction is needed because inherency is not explained in the earlier instructions.

**5.6. Obviousness – Other Considerations.**[45]

In determining whether the claimed invention would have been obvious, you may consider factors such as the following:

(1)  whether the claimed invention was more than the predictable result of using prior art elements according to their known functions;

(2)  whether the claimed invention provided more than an obvious solution to a known problem in the relevant field;

(3)  whether the prior art suggested the desirability of combining elements claimed in the invention or, instead, pointed away from combining elements in the claimed invention; and

(4)  whether there was a design need or market pressure to solve the problem addressed by the claimed invention.

In deciding the issue of obviousness, you are not to use hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent. You should not use the patent as a road map for selecting and combining items of prior art.[46] You must consider only what was known at the time of the invention and view the issue of obviousness from the perspective of a person of ordinary skill as of the date of the invention.

Finally, in assessing whether a claimed invention would have been obvious or not, you may consider any other evidence that sheds light on the obviousness or non-obviousness of the claimed invention, such as:

---

[45] *See Ingenico* Jury Instructions at 24–25 (instruction 4.6).

[46] Jury Instructions, D.I. 695, *Nippon Shinyaku Co. v. Sarepta Therapeutics, Inc.*, No. 21-1015-JLH (D. Del. Dec. 19, 2024).

(1)  whether products covered by the claims were commercially successful as a result of the merits of the claimed invention (rather than as the result of advertising, promotion, or features of the product other than those found in the claims);

(2)  whether the invention satisfied a long-felt need for a solution to a problem, which was satisfied by the claimed invention;

(3)  whether the invention achieved unexpectedly superior results over the closest prior art; and

(4)  whether others in the relevant industry praised the invention.

In weighing this kind of evidence, you should consider whether those factors were attributable to the claimed features of the invention as opposed to features already found in the prior art.

As with anticipation, you must determine obviousness on a claim-by-claim basis. For each asserted claim, the claim is invalid if you find that Prolitec has proved by clear and convincing evidence that the claim would have been obvious.

**5.7. On-Sale Bar.**[47]

Prolitec also contends that claims 1-20 of the '388 patent are invalid because the invention defined in those claims [Prolitec: or a system similar enough to render the claimed invention obvious][48] was on sale before July 10, 2012. This is called the "on-sale bar." Prolitec must convince you of this by clear and convincing evidence.

Under the on-sale bar, the patent claims are invalid if before July 10, 2012 an embodiment of the claimed invention [Prolitec: or a system similar enough to render the claimed invention obvious] was both (1) the subject of a commercial sale or offer for sale, and (2) ready for patenting.

---

[47] *See* AIPLA Model Patent Instruction 6.3 (2025).

[48] ScentAir's Position: Dr. Plock's Reply Report at ¶ 69 is the only disclosure of an obviousness theory under the on-sale bar, but it is premised on (and thus limited to) "Mr. Dezmelyk contend[ing] that simply because the controller with the relay and network module are separately connected to the scent delivery devices they would fall outside the scope of the claims." That, however, is not Mr. Dezmelyk's contention. Mr. Dezmelyk instead contends that the Barclays Center documents do not show that the invention is ready for patenting because, among other reasons, the networked relay control board does not extend networking functionality to the scent delivery device, making that scent delivery device *not* the required "networked scent delivery device." Moreover, the framing of Dr. Plock's obviousness opinion is as a rebuttal to Mr. Dezmelyk, not an affirmative basis for invalidity. Therefore, because Mr. Dezmelyk does not and will not contend at trial "that simply because the controller with the relay and network module are separately connected to the scent delivery devices they would fall outside the scope of the claims," there should be no such obviousness presentation from Dr. Plock at trial in Prolitec's case in chief or in rebuttal, so jury instructions on this matter are not necessary.

Prolitec's Position: Prolitec disagrees. Whether Mr. Dezmelyk explicitly says or not, his opinion's rationale, according to Dr. Plock, for why the Barclays Center system is not networked is because the switch/relay and network card are external to the scent delivery device. First, Dr. Plock's opinion is that the scent device and the relay is one system. Mr. Dezmelyk isolates the relay/network card from the system by opining that only the relay is networked. As such, if the relay is isolated in this manner, then it would be obvious to make it internal to the system. Second, the Barclays Center system is directed to the dumb device embodiment of the '388 patent. The dumb device only turns on/off, which uses a switch. In a dumb device such as this, the communications are to the switch. This switch could be internal to the device or, if it is external, it would be obvious to install it internal to the scent delivery device. As long as SA argues that the device is not networked, then Prolitec's expert can testify about this.

A commercial offer for sale was made if another party could make a binding contract by simply accepting the offer. An invention was subject to an offer for sale if, prior to July 10, 2012, an embodiment of the claimed invention was conceived and that embodiment was commercially sold or offered for sale, even if it was done confidentially. [ScentAir: It is not required that the terms of the sale disclose the details of the invention.][49] [Prolitec: It is not required that a sale was made, nor that the terms of the sale or offer for sale disclose the details of the invention.] [Prolitec: Similarly, it is not required that all embodiments of the claimed invention were commercially sold or offered for sale. It is sufficient even if one embodiment of the invention is the subject of a

---

[49] ScentAir's Position: The additional language proposed by Prolitec, "It is not required that a sale was made" is irrelevant to this case because Prolitec's disclosed on-sale bar defense is based on an actual sale, not an offer for sale. Prolitec may now be attempting to change its defense, but it is too late to do so. To the extent that Prolitec is relying on what it says below that a sale "incorporates an offer to sell," that is an issue that relates only to pre-sale conduct and activities, not post-sale conduct and activities. Thus, Prolitec's new attempt at a defense and proposed language are inappropriate.

Prolitec's Position: Prolitec's defense is based on both an offer to sell and an actual sale, as the agreement in question incorporates an offer to sell.

commercial sale or offer for sale.[50]][51] [Prolitec: The essential question is whether there was an attempt to obtain a commercial benefit from the claimed invention prior to July 10, 2012.[52]][53]

[Prolitec: An invention that was not conceived when a commercial sale or offer for sale took place is considered to be the subject of that commercial sale or offer for sale as of the date it is conceived.[54] In other words, a commercial sale or offer for sale of an invention that is later conceived satisfies this first prong of the on-sale bar if it was conceived prior to July 10, 2012. An invention is conceived when the inventor has a definite idea of the complete and operative invention, even if the inventor did not know for sure at the time that the invention would work.[55]][56]

---

[50] *Partsriver, Inc. v. Shopzilla, Inc.*, No. C 09-811 CW, 2009 WL 2591355, at *6 (N.D. Cal. Aug. 21, 2009); *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1330 (Fed. Cir. 2001).

[51] ScentAir's Position: The additional language proposed by Prolitec is redundant to what is discussed above (several times referencing "an embodiment" as needing to be on sale). The language also does not align with the evidence to be presented to the jury in that there is no dispute between the parties about the number of embodiments sold. Instead, ScentAir's contention is that no embodiments were on sale.

Prolitec's Position: This language is important because the specification discloses a number of embodiments, including one that ScentAir appears to be relying on for its infringement position where the "command data" includes schedule data.  Thus, it is important to specify that not all embodiments need to be sold or offered for sale to avoid jury confusion.

[52] *See* Final Jury Instructions, D.I. 623 at 45, *Greatbatch Ltd. v. AVX Corp.*, No. 1:13-cv-00723 (D. Del. Jan. 25, 2016) (Stark, J.) (instruction 4.6); Final Jury Instructions, D.I. 281 at 31, *Silver Peak Sys., Inc. v. Riverbed Tech., Inc.*, No. 1:11-cv-00484 (D. Del. Apr. 1, 2014) (instruction 4.4).

[53] ScentAir's Position: This additional language proposed by Prolitec uses an impermissible "essential question" framing. By stating this as the "essential question," it impermissibly suggests to the jury to disregard all of the other instructions given in lieu of the "essential question."

Prolitec's Position: The instruction is consistent with the cited jury instructions in FN 52.

[54] *Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1289 (Fed. Cir. 2011).

[55] *Ingenico* Jury Instructions at 16 (instruction 4.2).

[56] ScentAir's Position: The additional language proposed by Prolitec is not a correct statement of the law, or to the extent it is, it is redundant of the language in this instruction that comes before and after. It is also confusingly written and will lead only to jury confusion.

[Prolitec: In this context, a sale is a transfer of property or title for a price. In determining whether ScentAir sold or offered to sell a system, you should consider whether ScentAir entered or offered to enter into a contract for a commercial transaction that transferred title or possession of the system for an extended period and for a price. If the transaction has the attributes of a conventional sale, then you may treat the transaction as a sale of the system.[57]][58]

The invention also must have been ready for patenting [ScentAir: at the time of the sale][59] [Prolitec: prior to July 10, 2012]. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose. An invention is ready for patenting when the inventor has prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person of ordinary skill in the art to practice the invention. [ScentAir: Those drawings or other descriptions must come before (or pre-date) the time of the sale, and any information that

---

Prolitec's Position: This instruction is in line with *August Tech.* where conception can occur after offer for sale/sale. Thus, an explanation of what constitutes conception is important and is consistent with the cited law.

[57] *Prolitec* Jury Instructions at 9 (instruction 2.2).

[58] ScentAir's Position: This language is redundant and unnecessary given the language about what a sale is earlier in this instruction. It also is not an accurate rework of the Court's prior instruction in the *Prolitec* trial because the instruction in that case was about infringement, and there was no dispute about what the product was at the point of the alleged sale. Here, there is significant dispute about what was the subject of the alleged sale.

Prolitec's Position: This language is necessary because ScentAir has asserted that the agreement at issue does not constitute a sale.  Thus, the Court's prior ruling is on point, including because courts interpret the infringement question consistent with the on-sale bar question. Regarding "invention," Prolitec has proposed to use "system" instead.

[59] ScentAir's Position: This language comes straight from AIPLA Model Jury Instruction 6.3 and is an accurate statement of the law as applied to the facts here, where Prolitec's disclosed on-sale bar theory has a sale in March 2012, not a later sale, and not an offer to sell at any point. In response to Prolitec's position about the "time of sale" language, Prolitec's on-sale bar defense has always been based on a *sale* and never based on an *offer for sale*. Accordingly, whether or not there was a *sale* and what existed at the time of the *sale* is the important inquiry.

Prolitec's Position: This language "at the time of sale" contradicts *August Tech.* and is inconsistent with the Court's denial of ScentAir's motion for summary judgment. D.I. 408 at p. 25.

comes after (or post-dates) the time of the sale cannot serve as a substitute for a lack of sufficient specificity or disclosure in those earlier drawings or descriptions. In other words, Prolitec cannot meet its clear and convincing burden of proving invalidity under the on-sale bar on an issue solely by relying on documents or information for that issue that post-date the time of the sale.][60]

[Prolitec: An enabling disclosure is one that has sufficient information to enable or teach persons of ordinary skill in the field of the invention as of the effective filing date of the claimed invention to make and use the full scope of the claimed invention without undue experimentation.[61] If the prepared drawings or other descriptions of the invention are at least as enabling as the specification of the '388 patent, then the prepared drawings or other descriptions are enabling and show that the invention was ready for patenting.[62]][63]

---

[60] ScentAir's Position: This language is necessary in light of the Court's overruling of ScentAir's evidentiary objections to a series of documents that post-date the '388 Patent's critical date, and which Prolitec intends to use to prove up its on-sale bar defense. In response to Prolitec's position about the "time of sale" language, Prolitec's on-sale bar defense has always been based on a *sale* and never based on an *offer for sale*. Accordingly, whether or not there was a *sale* and what existed at the time of the *sale* is the important inquiry.

Prolitec's Position: This language is misleading and contrary to law. There is no basis to use "time of sale" language as it misleadingly suggests that all the Barclays Center documents should be excluded because they post-date the agreement date of March 2012. This language directly contradicts *August Tech*.

[61] AIPLA Model Patent Jury Instruction 8 (2025).

[62] *Minton v. Nat'l Ass'n of Sec. Dealers*, 226 F. Supp. 2d 845, 859 (E.D. Tex. 2002), *aff'd*, 336 F.3d 1373 (Fed. Cir. 2003); *Minerva Surgical v. Hologic, Inc.*, 550 F. Supp. 3d 158, 169 (D. Del. 2021).

[63] ScentAir's Position: This additional language proposed by Prolitec is a mish-mash of a jury instruction about a § 112 challenge to enablement and some case law ancillary to this case, at least as far as the jury need be concerned. Prolitec's instruction would impermissibly turn this trial into one about enablement, when Prolitec has no § 112 challenge to present to the jury. If the Court desires certain language about enablement be added here, the language by Prolitec is not the appropriate language to use.

Prolitec's Position: This language is consistent with the case law cited and is on point to the issues in this case, namely, whether the Barclays Center documents provide an enabling disclosure to be

ready for patenting. The case law is also clear that enabling disclosure for on-sale bar can be judged in reference to the disclosure in the patent. Prolitec disagrees that this instruction turns this into a trial about § 112 as the instruction says nothing on this point, but simply provides a reference point for the enablement inquiry as it relates to ready for patenting.

**5.8. Patent [ScentAir: Eligibility][64] [Prolitec: Ineligibility].[65]**

Prolitec contends that the claims of ScentAir's '388 patent are invalid because they claim

subject matter that is not eligible for patent protection.

You must decide if Prolitec has proven by clear and convincing evidence that the elements

in each of these claims considered individually and as an ordered combination [Prolitec: identified

by ScentAir[66]][67], involve only activities or technology, if any, which a person of ordinary skill in

---

[64] ScentAir's Position: The prior instructions from this Court referenced in the next footnote frame this instruction as "Eligibility," not "Ineligibility," which is appropriate and consistent with the "Inventions Patentable" framing of the title of 35 U.S.C. § 101. Prolitec's reliance on instructions in other courts with other local practices (including not ruling on *Alice* Step 1 until after trial) is misplaced.

Prolitec's Position: This language is consistent with the title of Section 5 ("Invalidity") and the prior subtitles (as well as the remainder of the instructions). Sections are titled with what the party with the burden of proof is attempting to prove. Further, courts have used "ineligibility" in final jury instructions. *See* Final Jury Instructions, D.I. 483, *SB IP Holdings LLC v. Vivint, Inc.*, No. 4-20-cv-00886 (E.D. Tex. Oct. 23, 2023) (instruction 15-16); Final Jury Instructions, *Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*, D.I. 845 at 22-23, No. 4-18-cv-00474 (E.D. Tex. Sept. 2, 2020).

[65] Final Jury Instructions, D.I. 295 at 26, *TrustID, Inc. v. Next Caller Inc.*, No. 18-172 (MN) (D. Del. July 16, 2021) (instruction no. 3.10); *see also* Final Jury Instructions, D.I. 306 at 25, *Tracktime LLC v. Amazon.com Services LLC*, No. 18-1518-MN (D. Del. Sept. 19, 2023) (instruction R); Final Jury Instructions, D.I. 288 at 17, *VB Assets, LLC v. Amazon.com Services LLC*, No. 19-1410 (MN) (D. Del. Nov. 8, 2023) (instruction J).

[66] *Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 17-CV-05928-YGR, 2021 WL 1421612, at *16 (N.D. Cal. Apr. 14, 2021) ("Thus, where the defendants have established a prima facie case that individual elements or concepts are conventional in the first instance, the Court finds it appropriate to place the burden of production on the patentee to come forward with evidence and argument that the "ordered combination" requires additional or different analysis.")

[67] ScentAir's Position: This additional language from Prolitec is not in any of the cited instructions on *Alice* Step 2 from this Court (or from any other court's instructions as far as ScentAir can tell), and for good reason: it impermissibly puts the burden on ScentAir to identify the elements or "ordered combination" that permit the claims to survive § 101. It also is incorrect on the law that Step 2 can be satisfied by analysis of a limited number of claim elements. Instead, it is Prolitec's clear and convincing burden to show that the claim elements, individually *and as an ordered combination*, are not inventive. *See* D.I. 408 at 20 ("Prolitec bears the burden of proof on the issue of whether there is an inventive concept."). In response to Prolitec's position below, nowhere has

---

the art would have considered to be well-understood, routine, and conventional at the time the patent application was filed. The '388 patent was filed on July 10, 2013. [Prolitec: Merely implementing the idea of monitoring and controlling networked scent delivery devices with generic or conventional computer components performing conventional tasks does not make the claims patent-eligible.[68]][69] [Prolitec: This is true even if implementing the idea of monitoring and controlling networked scent delivery devices with conventional or generic computer components is new or novel. Similarly, that the elements of the Asserted Claims that ScentAir contends constitute the inventive concept have not previously been employed in a particular field is not

---

Prolitec met that *prima facie* case, nor even if it has does its pre-trial meeting of that case relieve its burden to do so before the jury.

Prolitec's Position: This statement does not shift the burden of proof as ScentAir contends. Instead, it simply reflects that where the defendants have established a prima facie case that individual elements or concepts are conventional in the first instance, as has been done here, it is "appropriate to place the burden of production on the patentee to come forward with evidence and argument that the 'ordered combination' requires additional or different analysis." *Cellspin Soft, Inc.*, 2021 WL 1421612, at *16.

[68] *Specialized Monitoring Sols., LLC v. ADT LLC*, 367 F. Supp. 3d 575, 588-89 (E.D. Tex. 2019).

[69] ScentAir's Position: This additional language from Prolitec is not in any of the cited instructions on *Alice* Step 2 from this Court (or from any other court's instructions as far as ScentAir can tell), and for good reason: it is incredibly prejudicial to ScentAir because it essentially suggests the jury find ineligibility. Prolitec is doing no more than trying to relitigate summary judgment through jury instructions, with no basis to do so, other than a mish-mash of cherry-picked citations from various cases. The jury will surely be prejudiced against ScentAir with such instructions, which is why this Court has previously taken a more neutral, simple approach to the question, which ScentAir advocates for here.

Prolitec's Position: This statement makes clear that the novel inventive concept cannot be found in the abstract idea itself, which is an essential component of the analysis under Alice Step 2. *See supra*.

sufficient to transform the idea of monitoring and controlling networked scent delivery devices into patent-eligible subject matter.[70]][71]

Whether a particular technology was well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something was disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional. [Prolitec: At the same time, a lack of invalidating prior art does not mean that the elements of a claim are not well-understood, routine, and conventional.[72]][73] In determining whether a patent claim involves the performance of well-understood, routine, and conventional activities, you may

---

[70] *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016)

[71] Prolitec's Position: The law is clear that the mere fact that claims are novel or not obvious does not mean that they are patent eligible. *See supra; see also Specialized Monitoring Sols.*, 367 F. Supp. 3d at 589. This instruction simply states that law.

ScentAir's Position: This additional language from Prolitec is not in any of the cited instructions on *Alice* Step 2 from this Court (or from any other court's instructions as far as ScentAir can tell), and for good reason: it is incredibly prejudicial to ScentAir because it essentially suggests the jury find ineligibility. Prolitec is doing no more than trying to relitigate summary judgment through jury instructions, with no basis to do so, other than a mish-mash of cherry-picked citations from various cases. The jury will surely be prejudiced against ScentAir with such instructions, which is why this Court has previously taken a more neutral, simple approach to the question, which ScentAir advocates for here.

[72] Final Jury Instructions, D.I. 485 at 44, *Provisur Techs., Inc. v. Weber, Inc.*, No. 5-19-cv-06021 (W.D. Mo. Oct. 28, 2022) (instruction no. 32).

[73] ScentAir's Position: This additional language from Prolitec is not in any of the cited instructions on *Alice* Step 2 from this Court, and is unnecessary given the sentences immediately before and after.

Prolitec's Position: The law is clear that the mere fact that claims are novel or not obvious does not mean that they are patent eligible. *See supra; see also Specialized Monitoring Sols.*, 367 F. Supp. 3d at 589. This instruction simply states that law.

consider statements made in the patent's specification, [ScentAir: as well as evidence of the prior art][74].

[Prolitec: Importantly, when considering what activities or technology a particular claim element involves, you must rely on what is actually captured by the claims, not just what is described in the specification; that is, you must rely on what the claims require, not just what they allow.[75]

Also importantly, when considering whether a particular technology required by the claims constitutes an inventive concept, the specification does not need to expressly list all of the reasons why the technology is inventive. However, a contention of inventiveness cannot be wholly divorced from the specification and the claims. That is, the inventive concept must be disclosed somewhere in the specification and be rooted in the language of the claims.[76]][77]

---

[74] ScentAir's Position: This language comes straight from the prior instructions from this Court on this issue and is only made redundant because Prolitec's loading up this instruction unnecessarily has made it so. The Court should adopt the same construction it has given in the past.

Prolitec's Position:  This language is redundant given the multiple statements about the prior art immediately preceding it.

[75] *Cellspin Soft, Inc. v. Fitbit, Inc.*, No. 17-cv-05928-YGR, 2021 WL 1421612, at *15 (N.D. Cal. Apr. 14, 2021).

[76] *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019)

[77] ScentAir's Position: This additional language from Prolitec is not in any of the cited instructions on *Alice* Step 2 from this Court (or from any other court's instructions as far as ScentAir can tell). Nevertheless, it is confusingly written, touches on issues that are not before the jury for determination, and, while Prolitec provides citations, does not correctly state the law in many respects. For example, the last sentence, "the inventive concept must be disclosed somewhere in the specification and be rooted in the language of the claims" is in direct conflict with this Court's summary judgment order, D.I. 408 at 21, n.1, where the Court noted that "it is not necessary for the specification to 'expressly list all the reasons why [the] claimed structure is unconventional,' as long as 'what makes the claims inventive is recited by the claims'" (quoting *Cellspin*, 927 F.3d at 1317).

Prolitec's Position: This language is an accurate statement of the law and is consistent with the Court's summary judgement order. *See supra*; D.I. 408 at 21, n.1.

6.  **Damages.**[78]

      If you find that an asserted patent claim is infringed and not invalid, ScentAir is entitled to money damages in the amount of at least a reasonable royalty to compensate ScentAir for that infringement. If you find that each of the asserted claims are not infringed or is invalid, then ScentAir is not entitled to damages, and you need not address damages in your deliberation. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, or which should prevail on any issue.

      [ScentAir: The][79] [Prolitec: Any] damages you award must be adequate to compensate ScentAir for Prolitec's infringement prior to trial. An award of money damages is not meant to punish an infringer. Your damages award, if you reach this issue, should put ScentAir in approximately the same financial position it would have been in had the parties reached an agreement for Prolitec to license the patent before the alleged infringement began.

      ScentAir has the burden to establish the amount of money damages to which it is entitled by a preponderance of the evidence. In other words, you should award only those damages that ScentAir establishes it is more likely than not to have suffered. While ScentAir is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

---

[78]  *Prolitec* Jury Instructions at 20 (instruction 4).

[79]  ScentAir's Position: If the jury reaches damages, they must award damages (35 U.S.C. § 284). Prolitec's framing of the question as "any," however, suggests the jury can reach the damages question but not award any.

Prolitec's Position: This language is pulled straight from the *Prolitec* Jury Instructions. *Prolitec* Jury Instructions at 20 (instruction 4).

### 6.1. Apportionment.[80]

The amount you find as damages must be based on the value attributable to the patented features, as distinct from other, unpatented [Prolitec: or non-infringing][81] features of the accused product, or other factors such as marketing or advertising, the parties' size, or market position. In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the [ScentAir: patented technology][82] [Prolitec: infringing features of the product, and no more]. [Prolitec: The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment. When the accused infringing product has both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.][83]

---

[80]  2024 AIPLA Model Patent Jury Instructions at 10.2.5.4.

[81]  ScentAir's Position: This additional language proposed by Prolitec is not in the model used here, AIPLA Model Jury Instruction 10.2.5.4, and is also confusing in that the jury should not be reaching a damages question on a claim where there is non-infringement.

Prolitec's Position: This language is pulled straight from the *Prolitec* Jury Instructions, which involved a detailed discussion regarding how to address apportionment.

[82]  ScentAir's Position: ScentAir's language comes from AIPLA Model Jury Instruction 10.2.5.4 and is an accurate statement of the law: damages are awarded based on the value of the patented technology. Prolitec's language is not entirely correct because it limits value to individual features of the infringing system, whereas a patent's value can cover those individual features and their use together or collective benefits to the entire system, which is what the language "patented technology" is meant to encompass.

Prolitec's Position: This language is pulled straight from the *Prolitec* Jury Instructions, which involved a detailed discussion regarding how to address apportionment.

[83]  ScentAir's Position: This additional language from Prolitec is not in the Model Instruction and is repetitive of what comes immediately before it.

Prolitec's Position: This language is pulled straight from the *Prolitec* Jury Instructions, which involved a detailed discussion regarding how to address apportionment.

Both the royalty base and the royalty rate must be closely tied to the patented invention. It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

### 6.2. Reasonable Royalty.[84]

For damages, ScentAir is seeking what is referred to as a reasonable royalty. A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is defined as the amount of money ScentAir and Prolitec would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. That amount is considered to be an appropriate way to determine the value of the patented invention.

It does not matter if there were no actual negotiations for permission to use the claimed invention. The question you must ask is, if there had been such a negotiation, what amount of money would the parties have agreed to as the price for giving Prolitec permission to use the claimed invention.

In considering the likely outcome of such a negotiation, you should focus on what the expectations of ScentAir and Prolitec would have been had they entered into an agreement before the infringement began, and had they acted reasonably in their negotiations. In answering that question, you must assume that both parties believed the patent was valid and infringed and that both parties would have been willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty can be calculated in several different ways, but in this case, ScentAir seeks a "running royalty" for Prolitec's infringement up to the date of this trial. A running royalty is based on the revenue from or the volume of sales of licensed products. A running royalty can be

---

[84] *Prolitec* Jury Instructions at 22-23 (instruction 4.2).

calculated, for example, by multiplying a royalty base by a royalty rate, or by multiplying the number of infringing products or product units sold by a royalty amount per unit.[85]

---

[85] *See* FCBA Model Instruction 5.7.

### 6.3. Factors for Determining a Reasonable Royalty.[86]

Damages are not to be based on a hindsight evaluation of what happened, but on what ScentAir and Prolitec would have agreed to at the time of the hypothetical negotiation in November 2020. Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before that date. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation.

In determining the amount of a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the factors you may consider in making your determination are:

(1)   The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the system may be sold.

(2)   The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(3)   The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business.

(4)   The effect of selling the patented system in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

(5)   The duration of the patent and the term of the license.

---

[86] *Prolitec* Jury Instructions at 24 (instruction 4.3); AIPLA Model Jury Instruction 10.2.5.7; FCBA Model Instruction 5.8; *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

(6)    The established profitability of the system made under the patent; its commercial success; and its current popularity.

(7)    The utility and advantages of the patented system over the old modes or devices, if any, that had been used for working out similar results.

(8)    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

(9)    The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

(10)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

(11)    The opinion testimony of qualified experts.

(12)    The amount that a licensor (such as the patent holder) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patent holder who was willing to grant a license.

(13)    Any other economic factor that a normally prudent businessperson would, under similar circumstances, take into consideration in negotiating the hypothetical license.

No one factor is dispositive, and you can and should consider all the evidence that has been presented to you in this case that would have increased or decreased the royalty Prolitec would have been willing to pay, and ScentAir would have been willing to accept, acting as normally prudent businesspeople.

**7. Jury Deliberations.**

**7.1. Election of a Foreperson.[87]**

The first thing you should do when you retire to the jury room is select a foreperson. They will be responsible for communicating with the court as needed.

---

[87] *Ingenico* Jury Instructions at 26 (instruction 5.1).

### 7.2. Verdict – Unanimous – Duty to Deliberate.[88]

You should then begin your deliberations. Your verdict on each issue must be unanimous. There will be a verdict form in the jury room waiting for you when you retire for your deliberations. You will note that the verdict form has a series of questions to be answered during the course of your deliberations. The questions on the form correspond to the jury instructions that I have just given you. When you reach a unanimous verdict as to each question on the verdict form, the foreperson is to fill in the answers on the verdict form, and then sign and date the verdict form.

Please make sure to read the questions carefully, and note that some of the questions may not require answers, depending on how you answer other questions.

Do not reveal your answers to any of the questions to anyone outside of the jury until you finish your deliberations and return to the courtroom to deliver your verdict. If there is a divided vote on any of the issues at some point during your deliberations, you should not reveal how the vote is divided on any issue, even to me. It frequently happens that there is disagreement among jurors when they begin deliberating. But part of your responsibility as jurors is to continue to deliberate in order to attempt to reach a unanimous verdict on each of the questions you are being asked to answer. In the course of respectful discussion among the jurors, it almost always happens that the jurors can reach a unanimous verdict, even if they are divided at the outset.

When you return to the courtroom to announce your verdict, please bring the completed verdict form with you. You will give the completed and signed verdict form to the court security officer, who will give it to me. I will then examine the verdict form to be sure everything is filled out that needs to be filled out, and I will read the verdict aloud.

---

[88] *Ingenico* Jury Instructions at 27–28 (instruction 5.2).

At that point, I may do what is called "polling the jury," which means asking each of you if the verdict I just read is your verdict. That is not because there is a problem or because I am skeptical of what you have reported. It is just a standard procedure to ensure that each juror agrees to the verdict. I will then ask you to return to the jury room where you can gather your things. I will then come to the jury room to thank you for your service and to discharge you.

**7.3. Outside Communication.**[89]

During your deliberations you must not communicate with or obtain any information relating to this case from any source other than your fellow jurors. This means that you may not consult any outside sources, such as the Internet, during your deliberations. Of course, you can have contact with the court security officer or other court staff as necessary to deal with any needs you may have, but you should not discuss the case itself with anyone outside the jury.

---

[89] *Ingenico* Jury Instructions at 29 (instruction 5.3).

### 7.4. Jury's Responsibility.[90]

I expect that when you get to the jury room to begin your deliberations, you may feel a little overwhelmed. That is not uncommon. This has been a complicated case, and there will be a lot of evidence and argument to think about. But I think you will be pleasantly surprised that as you start working methodically through the case, things will begin to seem more manageable.

I hope and expect that you will listen to one another's views respectfully, even if initially you disagree on some issues. Discussing the issues from different perspectives can often help in formulating your own ideas about how particular issues should be decided.

---

[90] *Ingenico* Jury Instructions at 29 (instruction 5.3).

### 7.5. Communications Between Court and Jury During Deliberations.[91]

If you wish to see any of the exhibits, you are free to see them. All you need to do is have your foreperson sign a note asking for the exhibit and provide that note to the court security officer who is taking care of you during your deliberations. You can ask to see all the exhibits or you can just ask for some of them, if you like. Just let us know what you want, and we will get those exhibits for you.

If you have a question or otherwise want to communicate with me at any time, please follow the same procedure by providing a written message or question to the court security officer, who will then bring it to me. You probably will not get a reply right away, as I will usually need to summon all the lawyers and get their input before I can respond to the question. That just means I usually cannot get back to you right away, but we will do our best to get you an answer to your question as soon as we can.

If you do have a question that is hanging you up, you are entitled to ask. I have to tell you, however, that once the case is submitted to you, as it will be in a moment, we will not be able to take any additional evidence, and I may just have to tell you to rely on your collective recollection of what the evidence was and tell you that you have to decide the case based on the evidence you have heard. I think you will find in most instances, if you put your heads together, you will recall the evidence that you need to get over the problem. That's one of the reasons there are eight of you. Eight memories are better than one.

Finally, and most importantly, trust your common sense throughout. One of the strongest traditions of our justice system is the confidence we place in the sound common sense of an

---

[91] *Ingenico* Jury Instructions at 31 (instruction 5.5).

American jury. The parties in this case have confidence in you. And so do I. You may now retire for your deliberations.

[The lawyers will now present their closing arguments to you. ScentAir will go first; then Prolitec will present argument to you; and ScentAir will then return briefly for the last word. After that I will have a few final words for you, and you will then be allowed to begin your deliberations.][92]

---

[92] *Prolitec* Jury Instructions at 24.

## APPENDIX

## CLAIMS AT ISSUE[93]

**U.S. Patent No. 10,838,388 ("the '388 patent"), asserted claims 1 to 20.**

Claim 1 reads as follows:

    **1.** A computer-implemented method for delivering scents, comprising:

        establishing a communication network including a central controller and one or more networked scent delivery devices, wherein the central controller is configured to control an operation of each of the one or more networked scent delivery devices, wherein controlling the operation is based on one or more master schedules, and wherein the central controller stores an in table in which verification information relating to each networked scent delivery device is stored and an out table in which instructions for each networked scent delivery device are stored;

        generating command data that is configured to control the operation of a networked scent delivery device of the one or more networked scent delivery devices, wherein the command data is generated based on the instructions stored in the out table of the central controller;

        transmitting the command data to the networked scent delivery device using the communication network;

        receiving a signal from the networked scent delivery device using the communication network, wherein the signal includes status data representing a status of the networked scent delivery device; and

        storing the status associated with the networked scent delivery device in the in table of the central controller, wherein the status stored in the in table of the central controller identifies a functionality of the networked scent delivery device, thereby providing a real-time status update for each networked scent delivery device.

Claim 2 reads as follows:

    **2.** The computer-implemented method for delivering scents, as recited in claim **1**, wherein the status data corresponding to the networked scent delivery device indicates an operation status of the networked scent delivery device.

Claim 3 reads as follows:

    **3.** The computer-implemented method for delivering scents, as recited in claim **2**, wherein the operation status indicates whether or not the networked scent delivery device is operating to deliver the scent.

---

[93] *See Ingenico* Jury Instructions at 32–37 (Claims at Issue).

Claim 4 reads as follows:

> **4.** The computer-implemented method for delivering scents, as recited in claim **2**, wherein the operation status indicates whether the networked scent delivery device is currently connected to the communication network.

Claim 5 reads as follows:

> **5.** The computer-implemented method for delivering scents, as recited in claim **1**, wherein, when the command data is received at the networked scent delivery device over the communication network, the networked scent delivery device is controlled in accordance with the command data.

Claim 6 reads as follows:

> **6.** The computer-implemented method for delivering scents, as recited in claim **5**, wherein controlling the networked scent delivery device includes activating the networked scent delivery device to deliver a scent in accordance with the command data.

Claim 7 reads as follows:

> **7.** The computer-implemented method for delivering scents, as recited in claim **5**, wherein controlling the networked scent delivery device includes deactivating the networked scent delivery device, such that delivery of a scent is deactivated in accordance with the command data.

Claim 8 reads as follows:

> **8.** A system for delivering scents, comprising:
> one or more data processors; and
> a non-transitory computer-readable storage medium containing instructions which, when executed on the one or more data processors, cause the one or more data processors to perform operations including:
>> establishing a communication network including a central controller and one or more networked scent delivery devices, wherein the central controller is configured to control an operation of each of the one or more networked scent delivery devices, wherein controlling the operation is based on one or more master schedules, and wherein the central controller stores an in table in which verification information relating to each networked scent delivery device is stored and an out table in which instructions for each networked scent delivery device are stored;
>> generating command data that is configured to control the operation of a networked scent delivery device of the one or more networked scent delivery devices, wherein the command data is generated based on the instructions stored in the out table of the central controller;

transmitting the command data to the networked scent delivery device using the communication network;

receiving a signal from the networked scent delivery device using the communication network, wherein the signal includes status data representing a status of the networked scent delivery device; and

storing the status associated with the networked scent delivery device in the in table of the central controller, wherein the status stored in the in table of the central controller identifies a functionality of the networked scent delivery device, thereby providing a real-time status update for each networked scent delivery device.

Claim 9 reads as follows:

**9.** The system for delivering scents, as recited in claim **8**, wherein the status data corresponding to the networked scent delivery device indicates an operation status of the networked scent delivery device.

Claim 10 reads as follows:

**10.** The system for delivering scents, as recited in claim **9**, wherein the operation status indicates whether or not the networked scent delivery device is operating to deliver the scent.

Claim 11 reads as follows:

**11.** The system for delivering scents, as recited in claim **9**, wherein the operation status indicates whether the networked scent delivery device is currently connected to the communication network.

Claim 12 reads as follows:

**12.** The system for delivering scents, as recited in claim **8**, wherein, when the command data is received at the networked scent delivery device over the communication network, the networked scent delivery device is controlled in accordance with the command data.

Claim 13 reads as follows:

**13.** The system for delivering scents, as recited in claim **12**, wherein controlling the networked scent delivery device includes activating the networked scent delivery device to deliver a scent in accordance with the command data.

Claim 14 reads as follows:

**14.** The system for delivering scents, as recited in claim **12**, wherein controlling the networked scent delivery device includes deactivating the networked scent

delivery device, such that delivery of a scent is deactivated in accordance with the command data.

Claim 15 reads as follows:

> **15.** A computer-program product tangibly embodied in a non-transitory machine-readable storage medium, including instructions configured to cause a data processing apparatus to perform operations including:
>
> establishing a communication network including a central controller and one or more networked scent delivery devices, wherein the central controller is configured to control an operation of each of the one or more networked scent delivery devices, wherein controlling the operation is based on one or more master schedules, and wherein the central controller stores an in table in which verification information relating to each networked scent delivery device is stored and an out table in which instructions for each networked scent delivery device are stored;
>
> generating command data that is configured to control the operation of a networked scent delivery device of the one or more networked scent delivery devices, wherein the command data is generated based on the instructions stored in the out table of the central controller;
>
> transmitting the command data to the networked scent delivery device using the communication network;
>
> receiving a signal from the networked scent delivery device using the communication network, wherein the signal includes status data representing a status of the networked scent delivery device; and
>
> storing the status associated with the networked scent delivery device in the in table of the central controller, wherein the status stored in the in table of the central controller identifies a functionality of the networked scent delivery device, thereby providing a real-time status update for each networked scent delivery device.

Claim 16 reads as follows:

> **16.** The computer-program product, as recited in claim **15**, wherein the status data corresponding to the networked scent delivery device indicates an operation status of the networked scent delivery device.

Claim 17 reads as follows:

> **17.** The computer-program product, as recited in claim **16**, wherein the operation status indicates whether or not the networked scent delivery device is operating to deliver the scent.

Claim 18 reads as follows:

> **18.** The computer-program product, as recited in claim **16**, wherein the operation status indicates whether the networked scent delivery device is currently connected to the communication network.

Claim 19 reads as follows:

      **19.**  The computer-program product, as recited in claim **15**, wherein, when the command data is received at the networked scent delivery device over the communication network, the networked scent delivery device is controlled in accordance with the command data.

Claim 20 reads as follows:

      **20.**  The computer-program product, as recited in claim **19**, wherein controlling the networked scent delivery device includes activating the networked scent delivery device to deliver a scent in accordance with the command data.

## GLOSSARY OF PATENT-RELATED TERMS[94]

Some of the terms in this glossary are defined in more detail in the legal instructions you are given.

**Abstract**: A brief summary of the technical disclosure in a patent to enable the U.S. Patent and Trademark Office and the public to determine quickly the nature and gist of the technical disclosure in the patent.

**Amendment**: A patent applicant's change to one or more claims or to the specification either in response to an office action taken by a Patent Examiner or independently by the patent applicant during the patent application examination process.

**Claim**: Each claim of a patent is a concise, formal definition of an invention and appears at the end of the specification in a separately numbered paragraph. In concept, a patent claim marks the boundaries of the patent in the same way that a legal description in a deed specifies the boundaries of land, i.e., similar to a landowner who can prevent others from trespassing on the bounded property, the inventor can prevent others from using what is claimed. Claims may be independent or dependent. An independent claim stands alone. A dependent claim does not stand alone and refers to one or more other claims. A dependent claim incorporates whatever the other referenced claim or claims say.

**Drawings**: The drawings are visual representations of the claimed invention contained in a patent application and issued patent, and usually include several figures illustrating various aspects of the claimed invention.

**Elements**: The required parts of a patent claim, sometimes referred to as "limitations" or "requirements." A system infringes a patent if it contains each and every element of a patent claim.

**Embodiment**: A system that contains the claimed invention.

**Examination**: Procedure before the U.S. Patent and Trademark Office whereby a Patent Examiner reviews the filed patent application to determine if the claimed invention is patentable.

**Filing Date**: Date that a patent application, with all the required sections, has been submitted to the U.S. Patent and Trademark Office.

**Infringement**: Violation of a patent occurring when someone makes, uses, or sells a patented invention, without permission of the patent holder, within the United States during the term of the patent.

**License**: Permission to make, use, or sell a patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other compensation.

**Limitation**: A required part of an invention set forth in a patent claim. A limitation is a requirement of the invention. The word "limitation" is often used interchangeably with the words

---

[94] *Ingenico* Jury Instructions at 38–40 (Glossary of Patent-Related Terms).

"requirement" or "element." The phrase "claim limitation" is often used interchangeably with the phrase "claim element."

**Non-Obviousness**: One of the requirements for securing a patent. To be valid, the subject matter of the invention must not have been obvious to a person of ordinary skill in the art at the time of the earlier of the filing date of the patent application or the date of invention.

**Office Action**: A written communication from the Patent Examiner to the patent applicant in the course of the application examination process.

**Patent**: A patent is an exclusive right granted by the U.S. Patent and Trademark Office to an inventor to prevent others from making, using, or selling an invention for a term of 20 years from the date the patent application was filed. The patent has three parts, which are drawings, a specification, and claims. The patent is granted after examination by the U.S. Patent and Trademark Office of a patent application filed by the inventor which has these parts, and this examination is called the prosecution history.

**Patent Application**: The initial papers filed in the U.S. Patent and Trademark Office by an applicant. These typically include a specification, drawings and the oath (Declaration) of applicant.

**Patent Examiners**: Persons employed by the Patent Office having expertise in various technical areas who review (examine) patent applications to determine whether the claims of a patent application are patentable and the disclosure adequately describes the Invention.

**United States Patent and Trademark Office (USPTO, or PTO, or Patent Office)**: An administrative branch of the U.S. Department of Commerce that is charged with overseeing and implementing the federal laws of patents and trademarks. It is responsible for examining all patent applications and issuing all patents in the United States.

**Prior Art**: Previously known subject matter in the field of a claimed invention for which a patent is being sought. It includes issued patents, publications, and knowledge deemed to be publicly available, such as trade skills, trade practices, and the like.

**Prosecution History**: The prosecution history is the complete written record of the proceedings in the PTO from the initial application to the issued patent. The prosecution history includes the office actions taken by the PTO and the amendments to the patent application filed by the applicant during the examination process.

**Reference (Prior Art Reference)**: Any item of prior art (publication or patent) used to determine patentability.

**Requirement**: A required part or step of an invention set forth in a patent claim. The word "requirement" is often used interchangeably with the word "limitation" or "element."

**Royalty**: A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention.

**Specification**: The specification is a required part of a patent application and an issued patent. It includes a written description of the invention and the process of making and using it, together with the claims of the patent.

**Written Description**: That part of the specification that comes before the claims and describes the invention and the process of making and using it.